**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re SALOMON SMITH BARNEY MUTUAL FUND FEES LITIGATION | : : : : : : : : | Civil Action No. 04-CV-4055 (NRB) |

Civil Action No. 04-CV-4055 (NRB)

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT

JURY TRIAL DEMANDED

Lead Plaintiff R.W. Grand Lodge of F. & A. Masons of Pennsylvania ("Masons"),

individually and on behalf of all others (collectively, the "Class"), that purchased or held one or

more shares or other ownership units of proprietary mutual funds organized and offered by

Salomon Smith Barney, Inc. ("SSB") n/k/a Citigroup Global Markets, Inc., and its affiliates,

from March 22, 1999 to March 22, 2004 (the "Class Period"), alleges the following upon

information and belief, except as to those allegations concerning the named Plaintiffs (as defined

below), which are alleged based upon personal knowledge. Plaintiffs' information and belief are

based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys,

which included: (a) a review and analysis of Defendants' (including mutual funds offered by

Defendants) filings with the United States Securities and Exchange Commission (the "SEC") and

other regulatory filings; (b) review and analysis of press releases, public statements, advisories,

news articles and other publications disseminated by or concerning the Proprietary Funds or the

other defendants; (c) review of documents relating to recent inquiries and regulatory actions

against certain mutual funds by the National Association of Securities Dealers (the "NASD") and

the SEC; and (d) interviews with former employees of SSB and its affiliates who have

knowledge of the conduct complained of herein

Plaintiffs believe that further substantial evidence exists to support the allegations in this Consolidated Class Action Complaint that will become available after a reasonable opportunity for discovery. Most of the specific facts supporting the allegations herein are known only to Defendants or are exclusively within their custody or control

## NATURE OF THE ACTION

1       This is a federal securities class action arising out of an unlawful and deceitful scheme and course of conduct engaged in by SSB and a number of its affiliates, subsidiaries and parent companies, including Smith Barney Fund Management LLC, Salomon Brothers Asset Management Inc. (the "Fund Advisers"), the proprietary mutual funds they manage (the "Proprietary Funds"),[1] and the directors, trustees, and registrants of the Proprietary Funds. SSB and the other defendants engaged in a scheme to use SSB's brokerage arm and its investment clients to line the coffers of SSB through a number of illegal and improper activities, to the detriment of those SSB clients, the Plaintiffs herein   SSB's scheme had three primary components.

2.      The first part of the scheme involved SSB's use of its nationwide network of affiliated broker-dealers to steer Plaintiffs to invest billions of dollars of their hard-earned savings in Proprietary Funds that were managed and administered by officers and employees of SSB, as well as in a select number of other mutual funds with which SSB had undisclosed kick-back arrangements (the "Strategic Partners").

3       SSB steered clients into its own proprietary mutual funds by offering abnormal, undisclosed incentives to its brokers to sell its Proprietary Funds. Plaintiffs set forth in detail below SSB's and its affiliates' improper and undisclosed payments to brokers and financial

---

[1] The Proprietary Funds are listed in Exhibit A hereto.

advisors to induce them to recommend and sell the Proprietary Funds, instead of better performing mutual funds that were more suitable for Plaintiffs' expressed investment needs and objectives.   By offering incentive programs and higher commissions known as "selling concessions" to the SSB-affiliated brokers and financial advisors, SSB and its affiliates artificially increased the sale of shares of the Proprietary Funds.  None of the incentives and/or pressure to sell such Proprietary Funds was ever disclosed to the brokerage clients and, in fact, many brokers would fail to propose anything but SSB's Proprietary Funds to clients, despite their poor performance when compared to the performance of other funds.

4.     SSB and its affiliates had a huge financial incentive to embark on this fraud because the lucrative fees they reaped for managing and advising the Proprietary Funds were calculated as a percentage of assets under management by the funds   As the amount of investors and the size of their collective investments in the Proprietary Funds grew, so did the amount of fees SSB and its affiliates extracted from the funds to line their pockets

5     In addition to pushing its own Proprietary Funds, SSB had an undisclosed arrangement with other mutual fund companies (as well as certain of the Proprietary Funds) that was referred to as the "Strategic Partners Program."   Through this program, SSB received improper and undisclosed payments from participating mutual funds, and in exchange, SSB and its affiliated brokers agreed to and did steer Plaintiffs to invest in the funds of SSB's Strategic Partners   The Strategic Partners paid SSB's affiliated broker-dealers $1 million or more in fees to be "warehoused" at the brokerage houses, and also required the Strategic Partners to make directed brokerage payments, which were lucrative commissions from trades in the mutual funds' investment portfolios that were improperly allotted to brokers as rewards for steering clients to certain pre-determined funds

6      Not only did SSB provide visibility only to Proprietary or Strategic Partners' funds, but their technology was specifically programmed to steer Plaintiffs into these funds SSB's computer system was promoted as being able to conduct in-depth analysis (investment risk, analysis of money manager, historical performance, etc.) so as to provide investment products tailored to each client's investment objectives. However, SSB's sophisticated computer system was yet another mechanism to support its improper schemes. In actuality, SSB's internal computer systems were programmed to consistently suggest SSB's Proprietary Funds, or the funds of its Strategic Partners, rather than the funds best suited to meet investors' objectives

7.      SSB and its affiliates failed to disclose these material conflicts of interest and created undisclosed pecuniary and other incentives (such as higher commissions for its affiliated brokers) to direct unsuspecting Plaintiffs to purchase pre-selected mutual funds with whom SSB had struck secret deals.

8      The second part of the Defendants' scheme involved extracting the maximum fees from the investors who had been improperly steered by SSB into its Proprietary Funds. During the Class Period, Defendants engaged in a number of improper and undisclosed activities in order to extract the maximum possible fees from the Plaintiffs herein  These fees amounted to hundreds of millions of dollars and were improperly used to fund various kickbacks to SSB and its affiliates  Defendants misrepresented the true purpose behind the fees and commissions and the purported value and benefits Plaintiffs were to derive from these fees and commissions.

9.      Defendants extracted excess fees in several ways.  Defendants failed to inform Plaintiffs of "breakpoints," *i e*, levels of investment at which the fees being charged declined in percentage terms.  They also manipulated clients' investments by dividing the investment between multiple purchases and/or multiple funds to fall just below the "breakpoints" and thus

deny Plaintiffs the advantage of lower percentage fees. Defendants also improperly directed Plaintiffs to purchase Class "B" shares in Proprietary Funds, when, given the size of the investment, purchase of Class "A" shares would have been far more economically advantageous [2] Defendants also imposed annual payments, known as "12b-1 trails," to pay for distribution costs, including payments to broker-dealers.   These 12b-1 fees were set at abnormally high levels in order to pay for the unjustified and undisclosed payments to SSB brokers to cause them to push SSB's Proprietary Funds to the exclusion of other products. Finally, while SSB is permitted to charge commissions for transactions at levels above what might be obtained from other sources, so long as the client was obtaining a "benefit" from the additional payment (these excess commissions are known as "soft dollars"), Defendants charged Plaintiffs commissions above the going rate that provided no benefit whatsoever to Plaintiffs On the contrary, the only use of the soft dollars was to provide undisclosed incentives to brokers to channel Plaintiffs into the Proprietary Funds.

10.    The third undisclosed part of the fraudulent scheme involved SSB's use of the Proprietary Funds to support its investment banking clients.  SSB and the other defendants caused the Funds to purchase shares in certain of SSB's investment banking clients.  This caused the Funds to invest in under-performing or non-performing assets to the detriment of Plaintiffs and the benefit of SSB

11.    The materials provided by SSB through its brokerage arm to clients and the Prospectuses, Statements of Additional Information ("SAIs"), Semi-Annual Reports and Annual Reports for the Proprietary Funds failed to disclose any of this improper conduct to Plaintiffs

---

[2] Class A shares generally have an up-front fee, but lower continuing fees, while Class B shares have no up-front fee, but higher continuing payments based upon the amount invested  In general, at investments above $50,000, Class B shares impose much higher fees upon the investor

By concealing their improper conduct, undisclosed concessions, secret revenue-sharing and Strategic Partners agreements and excessive fees and commissions, SSB and its affiliates failed to disclose information that would be significant to any reasonable investor and directly diminished the net return on Plaintiffs' investments in the Proprietary Funds. As a further result of Defendants' fraudulent scheme and material misrepresentations throughout the Class Period, Plaintiffs were denied lucrative investment opportunities and have lost hundreds of millions of dollars

12.    SSB's mutual fund practices were exposed beginning on March 22, 2004, when SSB and its affiliates revised the Proprietary Funds' prospectuses to include language advising investors that previously-undisclosed "revenue sharing" payments that had been made to financial intermediaries "may create an incentive for an intermediary or its employees or associated persons to recommend or sell shares of a fund to you."

13.    In recent actions against Morgan Stanley DW, Inc. ("Morgan Stanley") and Massachusetts Financial Services Co., the SEC has condemned similar fraudulent practices by mutual funds, finding that the purposeful omissions of compensation programs and excessive fees and commissions create insurmountable, undisclosed conflicts of interest that violate the federal securities laws. The SEC and the NASD recently censured and fined Morgan Stanley for improperly incentivizing brokers to steer investors into Morgan Stanley proprietary mutual funds. Morgan Stanley agreed to settle actions filed by the SEC and the NASD by paying $50 million in civil penalties and surrendering profits.

14.    The unlawful actions of SSB and its affiliates described herein are substantially similar to those already condemned by the NASD and the SEC. Defendants' own unjust enrichment, scheme and conduct, as described herein, exploited the misplaced trust of Plaintiffs

and violated Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o; Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rules 10b-5 (17 C.F.R. 240.10b-5) and 10b-10 (17 C.F.R. § 240.10b-10) promulgated thereunder; and Sections 34(b), 36(b) and 48(a) of the Investment Company Act of 1940 (the "Investment Company Act"). The trustees and members of boards of directors of the Proprietary Funds also breached their common law fiduciary duties to Plaintiffs.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; Sections 34(b), 36(b) and 48(a) of the Investment Company Act, 15 U.S.C. §§80a-33(b), 80a-35(a) and (b) and 80a-47(a); and 28 U.S.C. §§1331, 1337 and 1367(a).

16. Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act and 28 U.S.C. § 1391 because many of the acts and practices complained of herein, including the preparation and dissemination of materially false and misleading Prospectuses, Annual and Semi-Annual Reports and SAIs for the Proprietary Funds, occurred in substantial part in this District. Defendants Citigroup, Inc., Citigroup Asset Management, SSB, Salomon Brothers Asset Management Inc., and Smith Barney Fund Management LLC are and were at all relevant times headquartered in this District in New York City.

17. In connection with the acts and omissions alleged in this Consolidated Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including without limitation, the mails, interstate telephone communications and the facilities of the national securities markets and exchanges.

- 7 -

## PARTIES

**Plaintiffs**

18      Lead Plaintiff the Masons, part of the oldest and largest fraternity of freemasons in the world, is a large institutional investor with approximately $500 million in assets.  As demonstrated by the certification previously filed with the Court, during the Class Period, the Masons purchased or held shares of the Salomon Brothers International Equity Fund, the Salomon Brothers Large Cap Growth Fund, and the Salomon Brothers Emerging Market Debt Fund, and have been damaged thereby.  By order dated August 12, 2004, this Court appointed the Masons as Lead Plaintiff for the Class

19.     Plaintiff Larry D. Turner ("Turner"), as demonstrated by his certification previously filed with the Court, purchased during the Class Period and continues to hold shares of the Smith Barney Mid Cap Core Fund, Class A and the Smith Barney Fundamental Value Fund, Class A, and has been damaged thereby.

20.     Plaintiff Barbara Kopf ("Kopf"), as demonstrated by her certification previously filed with the Court, purchased and continues to hold shares of the Salomon Brothers Capital Fund, Class C, and has been damaged thereby

21      Plaintiff Lorraine Steele ("Steele"), as demonstrated by her certification previously filed with the Court, purchased and continues to hold shares of the Salomon Brothers High-Yield Bond Fund, Class B, and has been damaged thereby.

22      Plaintiff Linda Rotskoff ("Rotskoff"), individually and on behalf of Jenlibrilo, Inc , as demonstrated by certifications previously filed with the Court, purchased and continues to hold shares of the Salomon Brothers Investors Value Fund, Class O and the Salomon Brothers Small Cap Growth Fund, Class O, and has been damaged thereby.

23    Plaintiff Julie A. May ("May"), as demonstrated by her certification previously filed with the Court, purchased and continues to hold shares of the Smith Barney Aggressive Growth Fund, Class A, and has been damaged thereby

24    Plaintiff Carol Chiumento ("Chiumento"), as demonstrated by her certification previously filed with the Court, purchased and continues to hold shares of the Smith Barney Large Cap Core Fund, and has been damaged thereby.

25.   Plaintiff Ruth Kurby ("Kurby"), as demonstrated by her certification previously filed with the Court, purchased and continues to hold shares of the Salomon Brothers Short/Intermediate U.S. Government Fund, Class B and Salomon Brothers High Yield Bond Fund, Class B, and has been damaged thereby.

26.   Plaintiff Kathleen Fitzgerald ("Fitzgerald"), as demonstrated by her certification previously filed with the Court, purchased and continues to hold shares of the Smith Barney Proprietary Funds, and has been damaged thereby.

27.   Plaintiff LuAnn Beyer ("Beyer"), as demonstrated by her certification previously filed with the Court, purchased and continues to hold shares of the Salomon Brothers Capital Fund, Class C, and has been damaged thereby.

28.   Plaintiff Eric J. Clark ("Clark"), as demonstrated by his certification previously filed with the Court, purchased and continues to hold shares of the Salomon Brothers Capital Fund, Class C, and has been damaged thereby

29.   Plaintiff Vera Gould ("Gould"), as demonstrated by her certification previously filed with the Court, purchased and continues to hold shares of the Salomon Brothers Small Cap Growth Fund, Class A, and has been damaged thereby.

30.    Plaintiff R Alan Maurer ("Maurer"), as demonstrated by his certification previously filed with the Court, purchased and continues to hold shares of the Salomon Brothers Small Cap Growth Fund, Class A, and has been damaged thereby

31.    Plaintiff Nickolas J Borders ("Borders"), as demonstrated by his certification previously filed with the Court, purchased and continues to hold shares of the Salomon Brothers Small Cap Growth Fund, Class C, and has been damaged thereby.

32.    Plaintiff Jerome Caplan ("Caplan"), as demonstrated by his certification previously filed with the Court, purchased and continues to hold shares of the Smith Barney Aggressive Growth Fund, Class A, and has been damaged thereby

33.    Plaintiff Dale E. Warfield ("Warfield"), as demonstrated by his certification previously filed with the Court, purchased and continues to hold shares of the Smith Barney Diversified Strategic Income Fund, and the Smith Barney Income Portfolio Fund, and the Smith Barney Investment Grade Bond Fund, and has been damaged thereby

34     Plaintiff Jerome Frizzle ("Jerome Frizzle"), as demonstrated by his certification previously filed with the Court, purchased and continues to hold shares of the Smith Barney Small Cap Growth Fund, Class A, and has been damaged thereby.

35.    Plaintiff Magnoria R. Frizzle ("Magnoria R Frizzle"), as demonstrated by her certification previously filed with the Court, purchased and continues to hold shares of the Smith Barney Small Cap Growth Fund, Class A, and has been damaged thereby.

36.    Plaintiff Chanda Maxwell ("Chanda Maxwell"), as demonstrated by her certification previously filed with the Court, purchased and continues to hold shares of numerous Smith Barney Funds, and has been damaged thereby.

37. Plaintiff Ryan Maxwell ("Ryan Maxwell"), as demonstrated by his certification previously filed with the Court, purchased and continues to hold shares of numerous Smith Barney Funds, and has been damaged thereby.

38. Plaintiff Claus Naehrig ("Naehrig"), as demonstrated by his certification previously filed with the Court, purchased and continues to hold shares of the Salomon Brothers Capital Fund, Class A, and has been damaged thereby

39 Plaintiff Philip J Rosewarne ("Rosewarne"), as demonstrated by his certification, which is attached hereto as Exhibit "D," purchased shares of Smith Barney Aggressive Growth Fund during the Class Period and has been damaged thereby

40 Plaintiffs Masons, Turner, Kopf, Steele, Rotskoff, May, Chiumento, Kurby, Fitzgerald, Beyer, Clark, Gould, Maurer, Borders, Caplan, Warfield, Jerome Frizzle, Magnoria Frizzle, Chanda Maxwell, Ryan Maxwell, Naehrig and Rosewarne are collectively referred to as "named Plaintiffs "

## DEFENDANTS

### The Parents

41. Defendant Citigroup, Inc. ("Citigroup") is the ultimate parent of all of the corporate defendants named herein. Through its subsidiaries, Citigroup markets, sponsors and provides investment advisory, distribution and administrative services to, among others, the Proprietary Funds Citigroup is incorporated in Delaware and its principal executive offices are located at 399 Park Avenue, New York, New York 10043

42. Defendant Citigroup Global Markets Holdings Inc. ("CGMHI"), f/k/a Salomon Smith Barney Holdings Inc , operating through its subsidiaries, engages in full-service investment banking and securities brokerage business   CGMHI is a subsidiary of Citigroup and the sole parent of SSB. The portion of Citigroup's asset management segment housed within

CGMHI is comprised primarily of two asset management business "platforms": Salomon Brothers Asset Management and Smith Barney Asset Management. These platforms offer a broad range of asset management products and services, including mutual funds. CGMHI is incorporated in New York and has its principal executive offices at 388 Greenwich Street, New York, New York 10013.

**The Investment Advisers**

43     Defendant Citigroup Asset Management ("CAM") is a group of investment adviser affiliates of Citigroup. The investment services of CAM are provided by Salomon Brothers Asset Management Inc., Smith Barney Asset Management, Citibank Global Asset Management (a unit of Citibank, N.A. and Citibank International PLC), Citigroup Asset Management Limited and affiliated advisory entities. CAM is incorporated in Delaware and located at 399 Park Avenue, 7th Floor, New York, New York 10043

44.    Defendant SSB, n/k/a Citigroup Global Markets, Inc., and d/b/a Smith Barney Asset Management, is registered as an investment adviser under the Investment Advisers Act and managed and advised the Proprietary Funds during the Class Period. SSB, together with defendants Smith Barney Fund Management and Salomon Brothers Asset Management, as defined herein, had responsibility for overseeing the day-to-day management of the Proprietary Funds. SSB is located at 399 Park Avenue, New York, New York 10022. SSB is also a registered broker-dealer and employs a nationwide network of brokers and financial advisors that sold the Proprietary Funds to Plaintiffs. The main office of SSB's broker-dealer operations is 388 Greenwich Street, New York, New York 10013. As part of its marketing function, SSB also administered the Proprietary Funds distribution plans and served as a vehicle for financing the Proprietary Funds sales campaigns. SSB, when acting in its capacity as a distributor of the

Proprietary Funds, shall be referred to herein as the "Proprietary Fund Distributor," or the "Distributor."

45. Defendant Salomon Brothers Asset Management, Inc ("Salomon Brothers Asset Management") is registered as an investment adviser under the Investment Advisers Act and managed and advised the Proprietary Funds during the Class Period. Salomon Brothers Asset Management, together with defendants SSB and Smith Barney Fund Management, as defined herein, had responsibility for overseeing the day-to-day management of the Proprietary Funds. Salomon Brothers Asset Management is located at 399 Park Avenue, New York, New York 10022.

46. Defendant Smith Barney Fund Management LLC ("Smith Barney Fund Management") is registered as an investment adviser under the Investment Advisers Act and managed and advised the Proprietary Funds during the Class Period. Smith Barney Fund Management, together with defendants SSB and Salomon Brothers Asset Management, had responsibility for overseeing the day-to-day management of the Proprietary Funds. Smith Barney Fund Management is located at 399 Park Avenue, 4th Floor, New York, New York 10022.

47. Defendants CAM, SSB, Salomon Brothers Asset Management and Smith Barney Fund Management are sometimes referred to collectively herein as the "Investment Adviser Defendants".

**The Proprietary Funds**

48. The Defendant Proprietary Funds, as identified in the list attached hereto as Exhibit "A" are open-ended management companies comprised of the capital invested by mutual fund shareholders, each having a board of Directors or Trustees charged with representing the interests of the shareholders of that fund. The Registration Statements and Prospectuses pursuant

to which Plaintiffs purchased their shares or other ownership units in the Proprietary Funds are referred to collectively herein as the "Prospectuses."

**The Registrants**

49. Each of the Defendant Proprietary Fund Registrants, as identified in the list attached hereto as Exhibit "B" was the registrant and issuer, or a successor in interest to a registrant and issuer of the Proprietary Funds sold to Plaintiffs and other members of the Class

**The Directors and Trustees of the Proprietary Funds**

50. During the Class Period, defendant R Jay Gerken ("Gerken") was a Director or Trustee charged with overseeing 227 or more of the Proprietary Funds During the Class Period, Gerken also served as Managing Director of SSB, President and Chief Executive Officer ("CEO") of certain mutual funds associated with Citigroup, Inc and Chairman, President and CEO of Smith Barney Fund Management, Travelers Investment Advisor, Inc. and Citifund Management, Inc. Defendant Gerken was responsible for and signed SSB's false and misleading SEC filings, including the Proprietary Funds' Prospectuses and Annual and Semi-Annual Reports while President, CEO and a Board member of the Funds during the Class Period.

51. During the Class Period, defendant Heath B. McLendon ("McLendon") was a Director or Trustee charged with overseeing 228 or more of the Proprietary Funds. During the Class Period, McLendon also served as Chairman, President and CEO of SSB Citi Fund Management, LLC and more than fifty investment companies sponsored by Salomon Smith Barney, Chairman or Co-Chairman of the Board for more than seventy investment companies associated with Salomon Smith Barney, Managing Director of Smith Barney, Chairman of Smith Barney Strategy Advisers, Inc. and President of SBMFM   Defendant McLendon was responsible for and signed SSB's false and misleading SEC filings, including the Proprietary

Funds' Prospectuses and Annual and Semi-Annual Reports while President, CEO and a Board member of the Funds during the Class Period.

52.     During the Class Period, defendant Phillip W. Coolidge ("Coolidge") was a Director or Trustee charged with overseeing forty-seven or more of the Proprietary Funds. During the Class Period, Coolidge also served as President and CEO of Signature Financial Group, Inc. and CFBDS, Inc., a distributor of Salomon Brothers funds. Defendant Coolidge was responsible for and signed SSB's false and misleading SEC filings, including the Proprietary Funds' Prospectuses and Annual and Semi-Annual Reports while President, CEO and a Board member of the Funds during the Class Period.

53.     During the Class Period, defendant Carol L. Colman ("Colman") was a Director or Trustee charged with overseeing thirty-five or more of the Proprietary Funds. For each of the Proprietary Funds on which she served as a Board member or Trustee during the Class Period, Defendant Colman signed the materially false and misleading Prospectuses that were filed with the SEC.

54.     During the Class Period, defendant Daniel P. Cronin ("Cronin") was a Director or Trustee charged with overseeing seven or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Cronin signed the materially false and misleading Prospectuses that were filed with the SEC.

55.     During the Class Period, defendant Leslie H. Gelb ("Gelb") was a Director or Trustee charged with overseeing thirty-two or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period,

Defendant Gelb signed the materially false and misleading Prospectuses that were filed with the SEC.

56.     During the Class Period, defendant William R. Hutchinson ("Hutchinson") was a Director or Trustee charged with overseeing forty-two or more of the Proprietary Funds.  For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Hutchinson signed the materially false and misleading Prospectuses that were filed with the SEC

57.     During the Class Period, defendant Dr. Riordan Roett ("Roett") was a Director or Trustee charged with overseeing thirty-two or more of the Proprietary Funds.  For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Roett signed the materially false and misleading Prospectuses that were filed with the SEC.

58.     During the Class Period, defendant Jeswald W. Salacuse ("Salacuse") was a Director or Trustee charged with overseeing thirty-two or more of the Proprietary Funds   For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Salacuse signed the materially false and misleading Prospectuses that were filed with the SEC.

59.     During the Class Period, defendant Elliot J. Berv ("Berv") was a Director or Trustee charged with overseeing thirty-seven or more of the Proprietary Funds.  For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Berv signed the materially false and misleading Prospectuses that were filed with the SEC.

60. During the Class Period, defendant Mark I. Finn ("Finn") was a Director or Trustee charged with overseeing thirty-seven or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Finn signed the materially false and misleading Prospectuses that were filed with the SEC

61. During the Class Period, defendant Stephen Randolph Gross ("Gross") was a Director or Trustee charged with overseeing thirty-two or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Gross signed the materially false and misleading Prospectuses that were filed with the SEC

62. During the Class Period, defendant Diana Harrington ("Harrington") was a Director or Trustee charged with overseeing thirty-seven or more of the Proprietary Funds. For each of the Proprietary Funds on which she served as a Board member or Trustee during the Class Period, Defendant Harrington signed the materially false and misleading Prospectuses that were filed with the SEC.

63 During the Class Period, defendant Susan B. Kerley ("Kerley") was a Director or Trustee charged with overseeing thirty-seven or more of the Proprietary Funds. For each of the Proprietary Funds on which she served as a Board member or Trustee during the Class Period, Defendant Kerley signed the materially false and misleading Prospectuses that were filed with the SEC.

64. During the Class Period, defendant Andrew L. Breech ("Breech") was a Director or Trustee charged with overseeing four or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period,

Defendant Breech signed the materially false and misleading Prospectuses that were filed with the SEC.

65.     During the Class Period, defendant William R. Dill ("Dill") was a Director or Trustee charged with overseeing four or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Dill signed the materially false and misleading Prospectuses that were filed with the SEC.

66.     During the Class Period, defendant Clifford M. Kirtland, Jr. ("Kirtland") was a Director or Trustee charged with overseeing four or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Kirtland signed the materially false and misleading Prospectuses that were filed with the SEC.

67.     During the Class Period, defendant Louis P. Mattis ("Mattis") was a Director or Trustee charged with overseeing three or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Mattis signed the materially false and misleading Prospectuses that were filed with the SEC.

68.     During the Class Period, defendant Thomas F. Schlafly ("Schlafly") was a Director or Trustee charged with overseeing three or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Schlafly signed the materially false and misleading Prospectuses that were filed with the SEC.

69.     During the Class Period, defendant Lee Abraham ("Abraham") was a Director or Trustee charged with overseeing twenty-eight or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Abraham signed the materially false and misleading Prospectuses that were filed with the SEC

70.     During the Class Period, defendant Allan J. Bloostein ("Bloostein") was a Director or Trustee charged with overseeing thirty-five or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Bloostein signed the materially false and misleading Prospectuses that were filed with the SEC

71.     During the Class Period, defendant Jane F. Dasher ("Dasher") was a Director or Trustee charged with overseeing twenty-eight or more of the Proprietary Funds. For each of the Proprietary Funds on which she served as a Board member or Trustee during the Class Period, Defendant Dasher signed the materially false and misleading Prospectuses that were filed with the SEC.

72.     During the Class Period, defendant Paul Hardin ("Hardin") was a Director or Trustee charged with overseeing thirty-five or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Hardin signed the materially false and misleading Prospectuses that were filed with the SEC.

73.     During the Class Period, defendant Roderick Rasmussen ("Rasmussen") was a Director or Trustee charged with overseeing twenty-eight or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class

Period, Defendant Rasmussen signed the materially false and misleading Prospectuses that were filed with the SEC

74.    During the Class Period, defendant John P. Toolan ("Toolan") was a Director or Trustee charged with overseeing twenty-eight or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Toolan signed the materially false and misleading Prospectuses that were filed with the SEC

75.    During the Class Period, defendant Donald R. Foley ("Foley") was a Director or Trustee charged with overseeing twenty-eight or more of the Proprietary Funds  For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Foley signed the materially false and misleading Prospectuses that were filed with the SEC.

76     During the Class Period, defendant Richard E. Hanson, Jr ("Hanson") was a Director or Trustee charged with overseeing twenty-eight or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Hanson signed the materially false and misleading Prospectuses that were filed with the SEC.

77     During the Class Period, defendant Donald M. Carlton ("Carlton") was a Director or Trustee charged with overseeing thirty-two or more of the Proprietary Funds  For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Carlton signed the materially false and misleading Prospectuses that were filed with the SEC

78.    During the Class Period, defendant A. Benton Cocanougher ("Cocanougher") was a Director or Trustee charged with overseeing thirty-two or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Cocanougher signed the materially false and misleading Prospectuses that were filed with the SEC.

79.    During the Class Period, defendant Alan G. Merten ("Merten") was a Director or Trustee charged with overseeing thirty-two or more of the Proprietary Funds  For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Merten signed the materially false and misleading Prospectuses that were filed with the SEC.

80.    During the Class Period, defendant R  Richardson Pettit ("Pettit") was a Director or Trustee charged with overseeing thirty-two or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Pettit signed the materially false and misleading Prospectuses that were filed with the SEC

81    During the Class Period, defendant Paul Ades ("Ades") was a Director or Trustee charged with overseeing fifteen or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Ades signed the materially false and misleading Prospectuses that were filed with the SEC.

82.    During the Class Period, defendant Herbert Barg ("Barg") was a Director or Trustee charged with overseeing forty-two or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period,

Defendant Barg signed the materially false and misleading Prospectuses that were filed with the SEC.

83.     During the Class Period, defendant Dwight B. Crane ("Crane") was a Director or Trustee charged with overseeing forty-nine or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Crane signed the materially false and misleading Prospectuses that were filed with the SEC

84.     During the Class Period, defendant Frank G. Hubbard ("Hubbard") was a Director or Trustee charged with overseeing fifteen or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Hubbard signed the materially false and misleading Prospectuses that were filed with the SEC.

85     During the Class Period, defendant Jerome H. Miller ("Jerome H. Miller") was a Director or Trustee charged with overseeing fifteen or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Jerome H. Miller signed the materially false and misleading Prospectuses that were filed with the SEC.

86.     During the Class Period, defendant Ken Miller ("Ken Miller") was a Director or Trustee charged with overseeing fifteen or more of the Proprietary Funds  For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Ken Miller signed the materially false and misleading Prospectuses that were filed with the SEC.

87.    During the Class Period, defendant Burt N. Dorsett ("Dorsett") was a Director or Trustee charged with overseeing twenty-seven or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Dorsett signed the materially false and misleading Prospectuses that were filed with the SEC.

88.    During the Class Period, defendant Elliot S. Jaffe ("Jaffe") was a Director or Trustee charged with overseeing twenty-seven or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Jaffe signed the materially false and misleading Prospectuses that were filed with the SEC.

89.    During the Class Period, defendant Stephen E. Kaufman ("Kaufman") was a Director or Trustee charged with overseeing fifty-six or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Kaufman signed the materially false and misleading Prospectuses that were filed with the SEC.

90.    During the Class Period, defendant Joseph J. McCann ("McCann") was a Director or Trustee charged with overseeing twenty-seven or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant McCann signed the materially false and misleading Prospectuses that were filed with the SEC.

91.    During the Class Period, defendant Cornelius C. Rose, Jr. ("Rose") was a Director or Trustee charged with overseeing twenty-seven or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period,

Defendant Rose signed the materially false and misleading Prospectuses that were filed with the SEC.

92.     During the Class Period, defendant H. John Ellis ("Ellis") was a Director or Trustee charged with overseeing thirty-four or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Ellis signed the materially false and misleading Prospectuses that were filed with the SEC.

93.     During the Class Period, defendant Armon R. Kamesar ("Kamesar") was a Director or Trustee charged with overseeing thirty-four or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Kamesar signed the materially false and misleading Prospectuses that were filed with the SEC.

94.     During the Class Period, defendant John J. Murphy ("Murphy") was a Director or Trustee charged with overseeing thirty-four or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Murphy signed the materially false and misleading Prospectuses that were filed with the SEC.

95      During the Class Period, defendant Robert M. Frayn, Jr. ("Frayn") was a Director or Trustee charged with overseeing one or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Frayn signed the materially false and misleading Prospectuses that were filed with the SEC.

- 24 -

96.     During the Class Period, defendant Leon P. Gardner ("Gardner") was a Director or Trustee charged with overseeing one or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Gardner signed the materially false and misleading Prospectuses that were filed with the SEC.

97.     During the Class Period, defendant Howard J Johnson ("Johnson") was a Director or Trustee charged with overseeing one or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Johnson signed the materially false and misleading Prospectuses that were filed with the SEC

98.     During the Class Period, defendant David E. Maryatt ("Maryatt") was a Director or Trustee charged with overseeing one or more of the Proprietary Funds For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Maryatt signed the materially false and misleading Prospectuses that were filed with the SEC.

99.     During the Class Period, defendant Jerry A. Viscione ("Viscione") was a Director or Trustee charged with overseeing one or more of the Proprietary Funds For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Viscione signed the materially false and misleading Prospectuses that were filed with the SEC.

100.    During the Class Period, defendant Abraham E. Cohen ("Cohen") was a Director or Trustee charged with overseeing seventeen or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period,

Defendant Cohen signed the materially false and misleading Prospectuses that were filed with the SEC

101. During the Class Period, defendant Robert A. Frankel ("Frankel") was a Director or Trustee charged with overseeing twenty-four or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Frankel signed the materially false and misleading Prospectuses that were filed with the SEC

102. During the Class Period, defendant Michael E. Gellert ("Gellert") was a Director or Trustee charged with overseeing seventeen or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Gellert signed the materially false and misleading Prospectuses that were filed with the SEC

103. During the Class Period, defendant Rainer Greeven ("Greeven") was a Director or Trustee charged with overseeing seventeen or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Greeven signed the materially false and misleading Prospectuses that were filed with the SEC

104. During the Class Period, defendant Susan M. Heilbron ("Heilbron") was a Director or Trustee charged with overseeing seventeen or more of the Proprietary Funds. For each of the Proprietary Funds on which she served as a Board member or Trustee during the Class Period, Defendant Heilbron signed the materially false and misleading Prospectuses that were filed with the SEC.

105. During the Class Period, defendant Paolo Cucchi ("Cucchi") was a Director or Trustee charged with overseeing eight or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Cucchi signed the materially false and misleading Prospectuses that were filed with the SEC

106. During the Class Period, defendant George M. Pavia ("Pavia") was a Director or Trustee charged with overseeing nine or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Pavia signed the materially false and misleading Prospectuses that were filed with the SEC.

107. During the Class Period, defendant Charles F. Barber ("Barber") was a Director or Trustee charged with overseeing sixteen or more of the Proprietary Funds For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Barber signed the materially false and misleading Prospectuses that were filed with the SEC

108. During the Class Period, defendant C. Oscar Morong, Jr. ("Morong") was a Director or Trustee charged with overseeing thirty-seven or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Morong signed the materially false and misleading Prospectuses that were filed with the SEC.

109. During the Class Period, defendant Walter E. Robb, III ("Robb") was a Director or Trustee charged with overseeing thirty-eight or more of the Proprietary Funds For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period,

Defendant Robb signed the materially false and misleading Prospectuses that were filed with the SEC.

110.   During the Class Period, defendant Riley C. Gilley ("Gilley") was a Director or Trustee charged with overseeing thirty-five or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Gilley signed the materially false and misleading Prospectuses that were filed with the SEC.

111    During the Class Period, defendant Robert Lawless ("Lawless") was a Director or Trustee charged with overseeing four or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Lawless signed the materially false and misleading Prospectuses that were filed with the SEC

112    During the Class Period, defendant William Woods, Jr ("Woods") was a Director or Trustee charged with overseeing thirty-eight or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Woods signed the materially false and misleading Prospectuses that were filed with the SEC.

113.   During the Class Period, defendant Martin Brody ("Brody") was a Director or Trustee charged with overseeing twenty or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Brody signed the materially false and misleading Prospectuses that were filed with the SEC.

114.   During the Class Period, defendant Walter E. Auch ("Auch") was a Director or Trustee charged with overseeing two or more of the Proprietary Funds.  For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Auch signed the materially false and misleading Prospectuses that were filed with the SEC.

115    During the Class Period, defendant Frederick O. Paulsell ("Paulsell") was a Director or Trustee charged with overseeing one or more of the Proprietary Funds.  For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Paulsell signed the materially false and misleading Prospectuses that were filed with the SEC.

116    During the Class Period, defendant Julie W. Weston ("Weston") was a Director or Trustee charged with overseeing one or more of the Proprietary Funds.  For each of the Proprietary Funds on which she served as a Board member or Trustee during the Class Period, Defendant Weston signed the materially false and misleading Prospectuses that were filed with the SEC.

117.   During the Class Period, defendant Lloyd J. Andrews ("Andrews") was a Director or Trustee charged with overseeing one or more of the Proprietary Funds.  For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Andrews signed the materially false and misleading Prospectuses that were filed with the SEC.

118    During the Class Period, defendant Victor Atkins ("Atkins") was a Director or Trustee charged with overseeing two or more of the Proprietary Funds.  For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period,

Defendant Atkins signed the materially false and misleading Prospectuses that were filed with the SEC

119. During the Class Period, defendant B Alexander Gaguine ("Gaguine") was a Director or Trustee charged with overseeing one or more of the Proprietary Funds  For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Gaguine signed the materially false and misleading Prospectuses that were filed with the SEC.

120. During the Class Period, defendant Rosalind A. Kochman ("Kochman") was a Director or Trustee charged with overseeing one or more of the Proprietary Funds. For each of the Proprietary Funds on which she served as a Board member or Trustee during the Class Period, Defendant Kochman signed the materially false and misleading Prospectuses that were filed with the SEC.

121. During the Class Period, defendant Irving Sonnenschein ("Sonnenschein") was a Director or Trustee charged with overseeing one or more of the Proprietary Funds  For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Sonnenschein signed the materially false and misleading Prospectuses that were filed with the SEC

122. During the Class Period, defendant E Kirby Warren ("Warren") was a Director or Trustee charged with overseeing thirty-five or more of the Proprietary Funds. For each of the Proprietary Funds on which he served as a Board member or Trustee during the Class Period, Defendant Warren signed the materially false and misleading Prospectuses that were filed with the SEC.

123.   All of the Director Defendants violated their fiduciary duties to the Proprietary Funds and Plaintiffs by knowingly or recklessly allowing the conduct complained of herein.

124   Defendants Cocanougher, Cohen, Merten, Bloostein, Breech, Kamesar, Gaguine, Dorsett, Morong, Colman, Barber, Kirtland, Rose, Cronin, Maryatt, Harrington , Carlton, Foley, Crane, Warren, Berv, Jaffe, Paulsell, Hubbard, Pavia, Ellis, McLendon, Barg, Johnson, Sonnenschein, Dasher, Jerome H. Miller, Viscione, Salacuse, Murphy, Toolan, McCann, Weston, Ken Miller, Abraham, Gardner, Gelb, Andrews, Mattis, Finn, Brody, Gellert, Cucchi, Ades, Hardin, Coolidge, Gerken, Pettit, Greeven, Hanson, Gilley, Roett, Frankel, Lawless, Frayn, Rasmussen, Kochman, Kaufman, Gross, Kerley, Heilbron, Schlafly, Atkins, Auch, Robb, Dill, Hutchinson, Woods and any additional Directors and Trustees of the Proprietary Funds whom Plaintiffs will identify after a reasonable opportunity for discovery, are referred to collectively herein as the "Director Defendants "

125.   Collectively, all defendants named above shall sometimes be referred to herein as "Defendants "

### THE STRUCTURE AND OPERATION OF SSB AND ITS MUTUAL FUNDS

126.   SSB is a diversified financial services firm that offers investment banking, investment analysis, and brokerage services, among other things, and also has a family of mutual funds – the Proprietary Funds – for which it solicits business through its affiliate brokers and provides advisory services through its advisory subsidiaries.

127.   Each Proprietary Fund Registrant is its own trust or corporation   Each of the Proprietary Funds also is a business trust (or a series of a trust) or corporation that is owned by the shareholders of the fund   At all times during the Class Period, it was the legal responsibility of the Director Defendants to exercise control and supervision over the business affairs of the

Proprietary Funds so as to protect the best interests of fund shareholders. The prospectus for the

Salomon Brothers Capital Fund and the Salomon Brothers Small Cap Growth Fund, which is

typical of the representations made in all other Prospectuses, states:

> The business and affairs of each Fund are managed under the
> direction of the Board of Directors. The Board of Directors
> approves all significant agreements between the Funds and the
> persons or companies that furnish services to the Fund, including
> agreements with its distributor, investment manager, administrator,
> custodian and transfer agent. The Funds' day-to-day operations are
> delegated to the investment manager and administrator.

128.    Similarly, with respect to the duties of the Directors and Trustees vis-à-vis the

funds' investment advisers, the SAIs typically stated:

> [Smith Barney Fund Management] **serves as investment manager
> to the fund pursuant to an investment management agreement
> (the "Management Agreement") with the trust, which was
> approved by the board of trustees, including a majority of the
> independent trustees on July 17, 2002** . . .   Subject to the
> supervision and direction of the trust's board of trustees, the
> manager manages the fund's portfolio in accordance with the
> fund's stated investment objective and policies, makes investment
> decisions for the fund, places orders to purchase and sell securities,
> and employs professional portfolio managers and securities
> analysts who provide research services to the fund.

(Emphasis added).    The Directors or Trustees of each fund thus admit responsibility for

reviewing and approving the advisory and fee agreements between the Advisers and the

Proprietary Funds.

129.    The Investment Company Institute ("ICI"), of which CAM is a member, recently

described the duties of mutual fund boards as follows:[3]

---

[3] The ICI describes itself as the national association of the U.S. investment company industry. Founded in 1940, its
membership includes approximately 8,601 mutual funds, 604 closed-end funds, 110 exchange-traded funds, and six
sponsors of unit investment trusts. Its mutual fund members have 86.6 million individual shareholders and manage
approximately $7.2 trillion in investor assets. The quotation above is excerpted from a paper entitled *Understanding
the Role of Mutual Fund Directors*, available on the ICI's website at
http://www.ici.org/funds/dir/bro_mf_directors.pdf

Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the funds' investors. The unique "watchdog" role, which does not exist in any other type of company in America, provides investors with the confidence of knowing the directors oversee the advisers who manage and service their investments.

In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company.

130.   SEC Chairman William H. Donaldson further articulated the duties of mutual

fund directors in a January 7, 2004 speech given at the Mutual Fund Directors Forum, wherein

he stated:

The board of directors of a mutual fund has significant responsibility to protect investors. By law, directors generally are responsible for the oversight of all of the operations of a mutual fund. In addition, under the Investment Company Act, directors are assigned key responsibilities, such as **negotiating and evaluating the reasonableness of advisory and other fees**, selecting the fund's independent accountants, valuing certain securities held by the fund, and **managing certain operational conflicts**

The role of fund directors is particularly critical in the mutual fund context because almost all funds are organized and operated by external money-management firms, thereby creating inherent conflicts of interest and potential for abuse. Money-management firms operating mutual funds want to maximize their profits through fees provided by the funds, but the fees, of course, paid to these firms, reduce the returns to fund investors

Independent directors, in particular, should serve as "independent watchdogs" guarding investors' interests — and helping to protect fund assets from uses that will be of primary benefit to management companies. These interests must be paramount, for **it is the investors who own the funds and for whose sole benefit they must be operated.**

The recent revelations about mutual funds have led to greater focus and scrutiny of the role played by independent fund directors. Some have questioned whether mutual fund directors are too passive, are captives of fund management companies, sit on too

many boards, lack the knowledge to keep apprised of a fund's activities, and are paid too much for any value they bring in protecting fund investors. . .

[Mutual fund directors are] . . . investors' first line of defense in ensuring that their interests are being served, that conflicts of interest are appropriately managed and disclosed, and that investors' money is being managed responsibly. While the SEC shares this mission to protect investors, we cannot be in the boardroom when investors' interests may be compromised. Investors are depending on [Mutual fund directors] to stand up for them.

http://www.sec.gov/news/speech/spch010704whd.htm

131.    Rather than fulfill the critical role described by Chairman Donaldson, in truth and in fact, as described below, the Proprietary Funds Boards of Directors and Trustees, *i.e.* the Director Defendants, were captive to the Investment Adviser Defendants, who induced the Director Defendants to breach their statutory and fiduciary duties to manage and supervise the Proprietary Funds, approve all significant agreements and otherwise take reasonable steps to prevent the Advisers from skimming Proprietary Fund assets.

### THE DEFENDANTS ENGAGED IN AN ILLEGAL AND UNDISCLOSED SCHEME TO MAXIMIZE DEFENDANT SSB'S REVENUES AT THE EXPENSE OF INVESTORS

132.    As explained in more detail below, Defendants used SSB's position as a diversified financial services firm to exploit Plaintiffs in a number of different and undisclosed ways. SSB improperly directed Plaintiffs to mutual funds based upon SSB's desire to earn fees from those customers (the Proprietary Funds) or because the entities operating such funds had made substantial payments to SSB to tout their funds (the Strategic Partners). In addition, Defendants manipulated customers' fund purchases to maximize fees and commissions to SSB and charged exorbitant fees to be used to provide kickbacks to brokers to improperly tout certain funds. Finally, Defendants selected investments for purchase by the mutual funds based not upon the merits of the investment, but on their overall financial relationship with SSB.

- 34 -

A.    **SSB Improperly Directed Plaintiffs To Purchase Shares In Mutual Funds For Improper And Undisclosed Reasons**

1.    **Improperly Directing Purchasers To The Proprietary Funds**

133    Like all mutual fund managers, the Investment Adviser Defendants are paid a percentage of mutual fund assets under management as a management fee. In order to increase their management fees, Defendants directed Class members into the Proprietary Funds.

134.   By steering investors into Proprietary Funds, SSB increased the amount of money under its management, which in turn increased fund management fees and boosted SSB's overall profitability. In support of this tactic, SSB pressured its brokers through undisclosed incentive programs to steer Plaintiffs into SSB's Proprietary Funds. Rather than offer clients funds that best suited their investment objectives, SSB provided brokers, regional managers and branch managers, various cash and non-cash incentives so that these employees would personally benefit by steering investors into SSB's Proprietary Funds, regardless of the clients' best interests. These incentives created undisclosed conflicts of interest for the broker-dealers and brokers in violation of Rule 10b-10, which requires broker-dealers to disclose to investors any remuneration it receives from third parties so that customers are aware of any conflicts of interest that the broker-dealer has.

135.   According to a former SSB Senior VP who was employed by SSB between 1996 and 2000, and who was familiar with SSB's sales and compensation practices ("SSB's former Senior VP"), SSB based employee compensation on a "payout grid." The factors used in the grid's matrix included an employee's production to date and the types of products sold by the employee (proprietary v. non-proprietary products). SSB's former Senior VP reported that SSB paid employees higher commissions on Proprietary Funds than non-Proprietary Funds. According to SSB's former Senior VP, SSB's incentives for pushing Proprietary Funds were

never communicated to clients  Thus, SSB created an undisclosed compensation program that pitted brokers' interests against the interests of the clients.

136.  Additionally, SSB management strongly encouraged brokers to push the Proprietary Funds on investors by offering brokers incentives such as gift certificates, dinners, N.B.A. tickets, vacations or lucrative Initial Public Offering ("IPO") allocations.

137.  According to SSB's former Senior VP, Proprietary Fund representatives customarily visited brokers' offices to pitch newly-issued Proprietary Funds (so-called "road shows")  At these road shows, the representatives continued SSB's steering program by stressing the enhanced payouts brokers received if they sold such funds.  SSB's former Senior VP also reported that, in addition to promoting SSB's Proprietary Funds, the representatives often downplayed the funds' shortcomings

138.  The former Senior VP personally attended road shows where SSB-affiliated wholesalers marketed the Proprietary Funds  According to SSB's former Senior VP, during such road shows, Proprietary Fund coordinators compared the Proprietary Funds' performance to certain external funds' performance and provided brokers with the information necessary to steer clients seeking external funds into the Proprietary Funds  One such tactic was a presentation of skewed performance figures that made it appear as if the Proprietary Funds were performing much better than their actual performance.  In addition to presenting skewed performance figures, SSB's former Senior VP stated that SSB's brokerage support infrastructure was designed to assist brokers in their steering efforts.  Specifically, the mutual fund group at SSB had a support desk that brokers called to determine which Proprietary Fund they could sell to a customer who was requesting a similar non-proprietary fund.

139.    Another former SSB broker who worked for SSB and with SSB's former Senior VP between 1998 and 2001("SSB Broker 2"), reported that investors who sought investment advice from SSB brokers were steered into funds based on the inducements provided to the broker by the particular Proprietary Fund.  SSB Broker 2 was privy to SSB's steering tactics because, on several occasions, he dined with SSB sales managers who told him about the various incentives and benefits available to brokers that sold a certain level of Proprietary Funds. Moreover, SSB Broker 2 confirms that investors seeking non-Proprietary Funds were directed into Proprietary Funds based on "ammunition" provided by SSB managers and fund wholesalers, which consisted of documents and marketing materials that painted an overly-optimistic and misleading picture of the fund's financial highlights, while downplaying the funds' risks and/or poor performance.  SSB Broker 2 stated that he would use these misleading materials with clients and would "always" attempt to convert a customer seeking an external fund into purchasing a Proprietary Fund because of the benefits he would receive from SSB management for doing so.

140.    SSB Broker 2 also stated that he knew of a 75-year-old investor who was steered by an SSB broker into a Proprietary Fund that held high-risk telecom securities.  Subsequent to the investment, the fund declined 20% over a three- to four-month period, and the broker had been discouraged by management from sending the investor the fund's prospectus – so that the investor would and did continue in the erroneous belief that the fund was a safe and suitable investment

141.    Internal SSB documentation confirms that SSB presented skewed data   In the January 5, 2001 issue of *The Financial Consultant*, an internal SSB publication, which is marked "[For] Internal Use Only," in a section titled "Why Keep Up with the Joneses, When you Can

Beat Them," SSB presents brokers with the financial performance of its mutual funds benchmarked against well-known funds as reflected by Lipper rankings.[4]  Not surprisingly, SSB's Proprietary Funds outperformed the other funds listed in Lipper in each category over every time period  However, SSB failed to present brokers with comparisons of the Proprietary Funds' performance to that of funds which performed better than SSB's funds. Over the same period SSB stated that its Mid Cap Core Fund returned 17 3%;[5] however, rather than compare those returns to Meridian Growth (described as a mid-cap growth fund), which returned 30 65%, SSB compared its fund to Lipper's average of Multi-Cap Core Funds, which purportedly returned -3.0%  Thus, rather than "keeping up with the Joneses" SSB was pushing funds that underperformed comparable funds.

142.   SSB's unwavering scheme to sell Proprietary Funds was implemented not only with carrots and constant bombardment with skewed marketing, but also with sticks. According to a former SSB broker that worked in SSB's Billings Montana office between 1997 and 2002 ("SSB Broker 3"), SSB rewarded brokers that sold Proprietary Funds with higher commissions and punished brokers that failed to sell a minimum threshold of funds  SSB Broker 3 stated that brokers had fee-based proprietary business targets to hit  He said that if they did not do proprietary business, there were penalties  SSB Broker 3 also stated that SSB encouraged brokers to sell Proprietary Funds even where the funds were not in the client's best interests

143    SSB Broker 3 reported that there were perks for being a leader in the mutual fund products and that the easiest way to become a leader was to participate in selling the Proprietary Funds  In addition to incentivizing brokers with perks, SSB compounded the push to sell

---

[4]  Lipper is a Reuters company that provides benchmarking information used to evaluate mutual funds managers' performance and portfolio performance.

[5] Percentages based on reported adjusted close

Proprietary Funds by pressuring brokers  Specifically, SSB Broker 3 also stated that there were constant e-mails, manager meetings and wholesaler visits from Proprietary Fund representatives who touted the benefits of selling Proprietary Funds  SSB Broker 3 stated broker participation in wholesaler visits was mandatory when the Proprietary Funds were involved.  SSB Broker 3 reported that SSB managers pushed brokers to be "company guy[s]" and sell Proprietary Funds.

144    Initially, SSB Broker 3 sold Proprietary Funds "just to shut them [the branch mangers] up [and] to get them off his back."  However, after initially succumbing to SSB's demands, SSB Broker 3 made an about face and refused to sell Proprietary Funds to his clients. In retaliation, SSB Broker 3's branch manager heavily criticized him for breaking protocol, not selling the Proprietary Funds, and holding too much client funds in cash, instead of encouraging them to invest in the market, although he said that at the time that the market was crashing.

145.    Moreover, when SSB Broker 3 scaled back selling Proprietary Funds, he stated that his branch manager began to "make things difficult."  Specifically, SSB Broker 3 reported that his branch manager constantly "rode" him for failing to push Proprietary Funds and eventually threatened his U-4 with a manufactured customer complaint  SSB Broker 3 stated that the threatened complaint was "put to bed" after his client discussed the matter with his manager.

### 2.    Improperly Directing Purchasers to Strategic Partners

146    In addition to steering investors into SSB's Proprietary Funds, SSB also steered investors into the funds of certain outside wholesalers that were willing to pay SSB and its employees for access to SSB's clients through a marketing plan referred to within SSB as the "Strategic Partners Program."  Some or all of the Proprietary Funds also made payments to SSB under this program.

- 39 -

147.   Payments to SSB under the Strategic Partners Program were made in addition to existing payments, such as up front commissions, 12b-1 trailing commissions paid to brokers after the initial sale, shareholder servicing fees, and account maintenance fees   Under the Strategic Partners Program, SSB's Strategic Partners made payments to SSB in exchange for SSB directing its clients into the Strategic Partners' funds   Essentially, the Strategic Partners Program participants were paying for "shelf space" in the mutual funds market run by SSB SSB's Strategic Partners included the following fund families:   AIM, Alliance, Fidelity, Lord Abbett, MFS, Putnam and Van Kampen

148.   In return for their payments, Strategic Partners received a number of marketing benefits.  First, SSB identified program participants on an internal list of Strategic Partners distributed to financial advisors via SSB's intranet.   Second, SSB ensured that program participants had a "higher profile" in SSB's sales system than non-participating funds by, *inter alia*, increasing the visibility of the Strategic Partners Program participants on its financial advisors' workstations.  Additionally, SSB divided the mutual fund families it offers into three tiers.  The Proprietary Funds and those 10 fund families recognized by SSB as Strategic Partners are designated as "Level 1" mutual funds and get the most favored treatment from SSB financial advisors   Other funds were placed into other categories such as Level 2 and Level 3.  These assigned "levels" had little to do with the funds' actual performance, or favorable ratings, and had everything to do with which funds generated extra compensation for SSB

149   In addition to promoting its Proprietary Funds, SSB also promoted the funds of its Strategic Partners   For example, in the February 2, 2001, edition of the Financial Consultant, SSB promoted certain funds of Putnam Investments and one of Putnam's fund managers.

150     SSB was not alone in perpetrating this type of fraud. According to the Wall Street Journal:

> The SEC has been investigating the business arrangements between fund companies and brokerage houses since last spring. [The SEC's investigation] . . has found widespread evidence that brokerage houses steered investors to certain mutual funds because of payments they received from fund companies or their investment advisers as part of sales agreements.
>
>          * * *
>
> The SEC said payments varied between 0.05% and 0.4% of sales and as much as 0.25% of assets that remained invested in the fund. So for every $100,000 in new sales, a broker-dealer would receive between $50 and $400, plus another $250 annually for every $100,000 that remained invested.
>
> "In many cases we're concerned that the disclosure [to shareholders] doesn't adequately reflect the nature of the relationship," said Stephen Cutler, the SEC's Director of Enforcement.

Tom Lauricella and Deborah Solomon, "SEC Readies Cases On Mutual Funds' Deals With Brokers," *The Wall Street Journal*, 2004 WL-WSJ 56917021 (Jan. 14, 2004).

151.    Because of the benefits that would accrue to it, SSB created a compensation structure, undisclosed to Plaintiffs, that rewarded SSB's brokers for pushing its Proprietary/Strategic Partners' funds on investors. For example, actual sales commissions paid to brokers that sold Class B Proprietary Fund shares would typically be 4.5%, compared to 4% for a similar class in a non-proprietary fund. Additionally, actual sales commissions paid to brokers for selling a Proprietary Fund's Class C shares would typically be 2-3%, compared to 1% on other similar non-Proprietary Funds. Finally, actual sales commissions paid to brokers for selling a Proprietary Fund's L shares would typically be 2% compared to 1% on non-proprietary funds. Investors were unaware and brokers were careful not to disclose that this additional

undisclosed sum – beyond the standard up-front commission – was being paid to brokers as an incentive to sell the particular Proprietary/Strategic Partner Fund.

152.   According to a former SSB broker that worked in SSB's Orange County office between 1996 and 2001 ("SSB Broker 5"), Smith Barney constantly promoted contests and prizes for brokers who sold the most Preferred Partner and Smith Barney Funds. Brokers who sold the most shares of Proprietary Funds in each office regularly received these benefits. SSB Broker 5 stated that when a client walked into the Smith Barney offices, brokers would determine the client's needs, such as investment horizon, risk tolerance, etc. However, when selecting a fund, brokers were pressed to pick Smith Barney funds. According to SSB Broker 5, brokers never told clients about Smith Barney's incentives.

153.   Moreover, management treated brokers who sold substantial quantities of Proprietary/Strategic Partner Funds "more fondly." Managers knew which brokers were selling Smith Barney funds because broker sales were plotted on a grid for all to see. Additionally, Smith Barney compensated the managers based on the volume of Smith Barney products sold from their offices.

154.   The type of *quid pro quo* agreements that SSB had with its Strategic Partners has been condemned by the SEC. The SEC's action against Morgan Stanley charged Morgan Stanley with giving its pay-to-play participants similar accommodations as bestowed by SSB upon its Strategic Partners. Specifically, the SEC stated:

> In return for their payments, program participants received a number of marketing benefits. First, Morgan Stanley DW included all Asset Retention Program Participants on its "preferred list," which was a list of fund complexes that FAs should look to first in making recommendations of mutual fund products. Second, it ensured that Asset Retention Program Participants had a "higher profile" in Morgan Stanley DW's sales system than non-participating fund complexes by, among other things, increasing

the visibility of the Asset Retention Program Participants on its FAs' workstations.

*In the Matter of Morgan Stanley DW Inc*, Securities Act of 1933 Release No. 8339 / November 17, 2003, Securities Exchange Act of 1934, Release No. 48789 / November 17, 2003, Administrative Proceedings File No. 3-11335.

155.   In the press release accompanying the SEC's cease and desist order against Morgan Stanley, the Commission further stated:

> Stemming from the SEC's ongoing industry-wide investigation of mutual fund sales practices, this inquiry uncovered two distinct, firm-wide disclosure failures by Morgan Stanley. The first relates to Morgan Stanley's "Partners Program" and its predecessor, in which a select group of mutual fund complexes paid Morgan Stanley substantial fees for preferred marketing of their funds. To incentivize its sales force to recommend the purchase of shares in these "preferred" funds, Morgan Stanley paid increased compensation to individual registered representatives and branch managers on sales of those funds' shares. The fund complexes paid these fees in cash or in the form of portfolio brokerage commissions
>
> *     *     *
>
> The Commission's Order finds that this conduct violated Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934 Section 17(a)(2) prohibits the making of materially misleading statements or omissions in the offer and sale of securities Rule 10b-10 requires broker dealers to disclose the source and amount of any remuneration received from third parties in connection with a securities transaction. **The Order also finds that the conduct violated NASD Rule 2830(k), which prohibits NASD members from favoring the sale of mutual fund shares based on the receipt of brokerage commissions**
>
> Stephen M. Cutler, Director of the Commission's Division of Enforcement, said: "Unbeknownst to Morgan Stanley's customers, Morgan Stanley received monetary incentives -- in the form of "shelf space" payments -- to sell particular mutual funds to its customers. When customers purchase mutual funds, they should understand the nature and extent of any conflicts of interest that may affect the transaction."

http://www.sec.gov/news/press/2003-159.htm (emphasis added)

156. As described herein, Morgan Stanley's deceptive conduct was mimicked by SSB, which never disclosed to customers that it received monetary incentives in the form of shelf space payments to sell particular mutual funds to its customers

157. SSB's illicit conduct has been confirmed by SSB's former Senior VP, who stated that funds that refused to pay SSB's entrance fee were not listed in SSB's systems. Additionally, SSB's former Senior VP reported that one of his former managers admitted to him that no mutual funds were allowed in SSB's door unless they provided monetary benefits. Thus, only funds that increased the size of SSB's coffers were given visibility by SSB. This scheme completely ignored SSB's duty to act in its clients' best interests. Throughout the Class Period, SSB and its employees acted in the interest of only one entity – SSB.

158. As indicated in screen printouts from SSB's systems, which were obtained through Lead Plaintiff's investigation, SSB's Level 1 funds were identified not by a specific fund, but by fund families. For example, the screen printouts state that Level 1 funds include Oppenheimer (a fund family) rather than Oppenheimer Enterprise Fund (a specific fund) According to SSB's former Senior VP the distinction is of vital importance because had SSB recommended funds based on legitimate factors such as its due diligence, specific funds should have been listed, rather than SSB's listing, which included only listings by fund families. Thus, again, the quality of a fund was of no concern to SSB; the sole driver for SSB to recommend a fund was whether that fund participated in SSB's "pay-to-play shelf space program."

159. SSB's and its affiliates' technology was specifically programmed to steer Plaintiffs into these funds. According to SSB's former Senior Vice President and SSB Broker 5, SSB's computer system was promoted as being able to conduct in-depth analysis (investment

risk, analysis of money manager, historical performance, etc.) so as to provide investment products tailored to each client's investment objectives. However, SSB's sophisticated computer system was yet another mechanism to support its improper schemes. In actuality, according to SSB's former Senior Vice President, SSB's internal computer systems were programmed to consistently suggest SSB's Proprietary Funds, or the funds of its Strategic Partners, rather than the funds best suited to meet investors' objectives.

160.   SSB's former Senior VP confirmed SSB's system was bogus by conducting his own research on independent search engines such as Morningstar using the exact parameters he entered into SSB's systems. The results were shocking. On average, 9 of 10 funds suggested by SSB's systems were not on Morningstar's list. Moreover, SSB's former Senior VP reported that SSB's Proprietary Funds and Strategic Partners were suggested as investment options irrespective of the type of investment clients sought – the same family of funds was suggested for mid-cap investments, small cap investments, fundamental value investments, etc.

161.   SSB's former Senior VP's Morningstar research was confirmed by another former SSB broker employed in SSB's Boston, Massachusetts office ("SSB Broker 1"). SSB Broker 1 stated that his research on Morningstar also revealed funds that were not found on SSB's computer system. SSB Broker 1 stated that on occasion he would telephone SSB's mutual fund desk to ask why specific funds could not be found on SSB's network to which the desk frequently responded, "the fund is closed."

162.   SSB Broker 1 reported that after being told the fund was closed by SSB he followed up directly with the fund and was often told, "[t]he fund is not closed. We just don't want to pay money to be listed with your firm."

- 45 -

163.   In addition to SSB's computer system, SSB established a helpdesk to assist brokers and financial consultants when advising clients. According to SSB Broker 2, whenever clients asked brokers about non-SSB funds, SSB's helpdesk immediately suggested a similar SSB fund for the client. As part of the ploy to entice clients to buy SSB funds, SSB Broker 2 reported that brokers would sell SSB funds by saying something along the lines of – "normally I would not suggest an SSB fund but this is 99% correlated with the outside fund and we get IPO allocation rights with this fund." However, Plaintiffs were conveniently kept in the dark regarding SSB's conflicts of interests and broker incentives for promoting a particular fund. Also, because of the purported correlation with outside funds, the SSB brokers did little, if any, research on the Proprietary Funds, which further demonstrates that SSB's advisory fees were excessive.

164    SSB brokers who would attempt to purchase a fund from a fund family outside of the Strategic Partner alliance were faced with a time-consuming process requiring paper tickets and approvals rather than simply inputting the client's order directly into the SSB computer system. In this way, SSB brokers were further discouraged from going outside of the "pay-to-play" system.

165.   In addition to giving Strategic Partners enhanced exposure, SSB opened the doors to its brokerage offices to those wholesalers that were willing to pay SSB's one million dollar entrance fee. SSB's former Senior VP explained that wholesalers knew that they could not enter SSB's offices without making payments to SSB employees. SSB's former Senior VP stated that SSB's pay-to-play expectation was prevalent at all levels of the firm – including the highest levels. SSB's expectations were so notorious that wholesalers would take the initiative by

calling SSB's managers and saying – "this is what I can do for you" if you let us into your office to pitch our product.

166    Additionally, according to SSB Broker 5, Smith Barney limited the number of wholesalers that were able to meet with Smith Barney brokers to promote their funds  Broker 5 stated that only approximately twelve wholesalers were permitted to pitch their funds to Smith Barney brokers    Smith Barney's explanation for the reduction in wholesalers was that wholesalers wasted the brokers' time.  However, the wholesalers who offered outside mutual funds – those not offered by Preferred Partners or by Smith Barney – were barred from Smith Barney's offices.  The outside mutual funds, however, often were better performers financially and offered lower risk for Smith Barney's clients.  One particular mutual fund, First Eagle, which SSB Broker 5 recommended to many clients, was barred from Smith Barney's offices. SSB Broker 5 had a contact person who worked at First Eagle who confirmed that Smith Barney blocked this particular fund

167.    SSB Broker 5 indicated his understanding that Smith Barney requires a one million dollar payment from wholesalers who wish to push funds to Smith Barney brokers. SSB's one million  dollar fee was confirmed by SSB Broker 4 and SSB's former Senior VP, who both stated that this was the level of payment SSB required to provide the wholesalers with access to its brokerage offices

168.    SSB's former Senior VP stated that SSB's shelf space program had two components, a macro component and a micro component  As described by SSB's former Senior VP, before a wholesaler was given access to SSB's offices they had to make the one million dollar payment to SSB.  After such payment, outsiders were only permitted to enter SSB's office and peddle their funds if they also made additional payments to branch managers and individual

brokers. In fact, SSB's former Senior VP stated that he knew of a wholesaler who left envelopes of cash in the desks of SSB employees to pay SSB's entry fee.

169    According to SSB's former Senior VP, external wholesalers that participated in SSB's partner program would also give SSB employees lavish vacations under the pretext of training as a means to incentivize SSB's brokers to sell their funds. For instance, SSB's former Senior VP stated that wholesalers who wanted access to SSB employees would pay for 3-4 day "seminars" in exotic locations. However, rather than spend any significant time training SSB employees or educating them on a fund, the entire seminar usually lasted for half an hour leaving SSB employees free to enjoy the rest of the time as they saw fit.

170    In addition to cash payments and lavish vacations, wholesalers also paid for investor conferences held by individual SSB branches. According to SSB's former Senior VP, branch managers welcomed payments by wholesalers because each manager was responsible for his/her own P&L (profit/loss). Thus, if a wholesaler offered to pay for a conference room in exchange for speaking to SSB clients (or having an SSB employee speak on behalf of the wholesaler), the branch manager would accept the offer because under this arrangement wholesalers footed the bill for client conferences rather than the branches; thus making the branches appear more profitable.

171.    SSB Broker 2 also stated that external mutual funds ran a program called the "fund of the month" where SSB brokers were given incentives for pushing that month's selected fund. According to SSB Broker 2, every month there were certain outside funds that received heightened levels of attention at sales meetings. The fund of the month's wholesaler would typically present road shows at SSB's offices to highlight the benefits of investing in the fund. These funds offered 3-4% sales commission concessions over the standard 1-2% sales

commission. While some of the funds of the month permitted investment without a load, the real incentive to push such funds was not driven by what benefited the customers, but how the broker could receive the largest compensation. This is yet another example of SSB putting the interests of its brokers and the firm ahead of its clients

172    SSB's practice of opening its doors to those funds willing to pay its entrance fees produced shocking results. According to a post-Class Period statement on SSB's website, "Fund Families With Branch Access represent[ed] approximately **96.9%** of [SSB's total mutual fund sales for 2003] . . ." *See* http://www.smithbarney.com/products_services/mutual_funds/ investor_information/revenueshare.html (June 2004) (emphasis added). Despite the staggering correlation between a particular fund's access to SSB's offices and the sale of those funds' products, SSB only disclosed the impact of this conduct after the Class Period.

### B.    Defendants' Improper And Undisclosed Schemes To Extract Excessive And Unwarranted Fees And Commissions From Plaintiffs

173    Having improperly directed Plaintiffs into the Proprietary Funds, Defendants then engaged in a number of improper and/or undisclosed schemes to extract the maximum possible fees. Each of the Proprietary Funds charged fees to the fund investors. There were three types of fees charged to mutual fund shareholders that were abused by Defendants. There is a fee known as a front-end load that is collected from the customer at the time of sale of mutual fund shares. This is charged as a percentage of the mutual fund shares purchased. Mutual funds also charge annual fees, known as 12b-1 trails, based on the value of customer assets held with the mutual fund. The 12b-1 payments are made pursuant to each fund's 12b-1 plan, which sets forth the amount of the annual fee mutual funds pay for distribution costs, including payments to broker-dealers. Finally, there are commissions that are charged for the execution of purchases and/or sales. While mutual funds are allowed to include amounts for services other than

- 49 -

execution of purchases and sales in the "commissions" they charge, they may only include such additional charges in the commission for services that provide "lawful and appropriate assistance to the money manager in the performance of his investment decision-making responsibilities." The commission amounts charged by brokerages to investment advisers in excess of the purchase and sale charges are known within the industry as "Soft Dollars."

174. There were five primary "tricks" employed by Defendants to improperly increase the fees, each of which is discussed below.

### 1. Defendants Failed To Disclose "Breakpoints" In The Fee Schedule To Plaintiffs And Manipulated Purchases To Maximize Fees

175. When investors purchase mutual fund shares they are charged an initial sales fee – called a front-end load – calculated as a percentage of the offering price of the shares. For each of its Propriety Funds, SSB charged customers front load fees calculated at a progressively lower percentage of the purchase price of a given customer's initial investment in a fund. The levels of investment at which the percentage charged was reduced are known as "breakpoints." A typical SSB breakpoint plan consists of six or seven investment tiers ranging from under $25,000 to over $1,000,000, and charges front load fees starting at 4.0% to 5.75% at the most modest investment tier to 0% at the high end tier. At each breakpoint, the front load fee materially drops from one-half (0.5) percentage point to as much as two (2) full points from the percentage charged in the immediately lower investment tier.

176. According to SSB's 2002 Prospectus for its Appreciation Fund, which is typical of SSB Proprietary Fund prospectuses throughout the Class Period, when investors purchase a certain class of shares they are entitled to "pay a lower sales charge as the size of    [the] investment increases to certain levels called breakpoints."