177.    Breakpoints offer customers material relief from high front load fees, channeling a higher percentage of the customer's initial investment to the purchase of fund shares and less into the pockets of the broker. This relief from front load fees increases the initial value of the customer's account, and hence the size of the base from which the customer's investment may grow. While the initial savings from Breakpoints are significant in and of themselves, over time the increased investment gains from the money saved due to Breakpoints are much greater. However, Plaintiffs rarely, if ever, received breakpoint concessions because SSB devised, promulgated and conducted a scheme to cheat and defraud customers of the full benefit of SSB's Breakpoint discounts in order to cull a greater percentage of customers' initial investments in the form of front load fees then would have been realized if the Breakpoint mechanism had been fairly applied.

178.    According to SSB's former Senior VP, breakpoints were just another SSB gimmick used to fleece investors. SSB's former Senior VP reported that SSB brokers were instructed by managers to break up larger orders and talk investors into investing in more than one fund so that they would not receive the benefit of SSB's advertised Breakpoints.

179.    SSB Broker 2 confirmed SSB's former Vice President's statements that SSB management instructed brokers to circumvent Breakpoints. According to SSB Broker 2, the Breakpoint practices policy came down from SSB's West Coast Regional Director, his branch manager, and the sales manager. SSB Broker 3 also stated that he knew of brokers that split orders to avoid Breakpoints.

180.    According to SSB's former Senior VP, the culture of duping investors was so rampant at SSB that if a broker did in fact ignore management instructions to split orders to avoid Breakpoints, SSB's computer systems would default order sizes to one unit below the

amount triggering the Breakpoint discount. Thus, SSB's infrastructure acted as a check against any broker that unwittingly or intentionally sought to give customers the benefit of a program to which they were already entitled

### 2.   Improper "Rollovers" From Plaintiffs' Existing Mutual Funds Into Proprietary Funds To Maximize Fee Income

181.   Defendants also sought to fleece investors who sought to transfer money into SSB from other funds. As explained by SSB's former Senior VP, brokers who transferred client investments from outside funds would liquidate the client's holdings in the outside funds and buy SSB's funds with cash, rather than transferring the investment without liquidating the account as an "in-kind" transfer  By making cash, rather than in-kind, purchases, Plaintiffs were unknowingly forced to pay SSB's customary fees for purchasing shares.  According to SSB's former Senior VP, had the clients made in-kind transfers they would not have been subjected to the fee  However, as was the case with all SSB's programs, the course of conduct promoted by the firm was to advance the firm's best interest and not that of its clients. SSB's former Senior VP also stated that execution slips requesting liquidation of external accounts would indicate that the request was at the client's direction

182.   Internal SSB documentation corroborates SSB's former Senior VP's statements regarding SSB's culture of promoting brokers to encourage their clients to liquidate their external accounts rather than making in-kind transfers.  In a document marked "internal use only" dated June 1, 2001, under the heading "What's New for the 2001 Series," SSB states that

> In our continuing efforts to further investment opportunities, while recognizing the competitive forces within our industry, the Structured Portfolios Group, in partnership with Salomon Smith Barney Private Client Group, have evaluated the longstanding sales charge structure of the Uncommon Values unit trusts. As a result of this review, each of the three portfolios listed above will carry 3.50% up-front sales charge for "new money" and 2.50%

> sales charge on exchanges   Financial Consultants will receive
> 3.00% on "new money" and 2.20% on exchanges

Thus, SSB and its brokers benefited by bringing in "new money" rather than "exchanges" or in-kind transfers

### 3.    Improperly Steering Customers Into Class B Fund Shares To Maximize Fee Income

183.    Shares in mutual funds may be purchased through several types of shares that vary depending, not on the assets owned, but on the fee structure attached to the shares   Two common share types sold by the Proprietary Funds are Class A shares and Class B shares.  Class A shares generally have a much higher front-end fee than Class B shares, but have lower fees over time. According to SSB's former Senior VP, SSB employees were trained to steer clients into certain classes of shares that were the most beneficial to SSB.  For example, SSB's former Senior VP explained that, although Class A shares take a larger dollar amount of fees when initially purchased, when the account value is above $50,000, Class A shares generally perform better for clients than Class B shares, which pay brokers a percentage year after year.  Thus, in the long run SSB's former Senior VP explained, investments in Class B shares diminished more because of sales charges and fees than other classes. However, SSB's former Senior VP stated that SSB received more money from the sale of Class B shares and so SSB and its affiliates pressured brokers to sell Class B shares whenever possible.  Moreover, investors were never explained the ramifications of investing in Class A or B shares.

184    SSB's former Senior VP reported that the pressure to sell Class B shares over other types of shares came from many sources including branch managers, sales managers and national training conferences   Further, according to SSB's former Senior VP, the pressure to push Class B shares was constant and negatively enforced by branch managers telling brokers, "if you don't want to make money don't sell Class B shares."

185.    The SEC has condemned the practice of pushing a certain class of shares without fully explaining to investors the benefits of alternative fee structures (from a different class of shares). In its suit against Morgan Stanley for similar, if not the exact same conduct as alleged herein, the Commission fined Morgan Stanley $50 million and stated:

> As to the sale of Morgan Stanley Funds Class B mutual fund shares, at the point of sale, Morgan Stanley DW's FAs recommended Class B shares to customers without adequately disclosing the differences in share classes, including information about commissions and annual expenses and, importantly, that an equal investment in Class A shares at certain dollar levels could yield a higher return

*In the Matter of Morgan Stanley DW Inc*, Securities Act of 1933 Release No. 8339 November 17, 2003, Securities Exchange Act of 1934, Release No. 48789 November 17, 2003, Administrative Proceedings File No. 3-11335. (Emphasis added).

186.    Statements by SSB's former Senior VP regarding SSB's and its affiliates' conduct clearly show that SSB is guilty of the same conduct condemned by the SEC in its case against Morgan Stanley.

187     Moreover, SSB stated in a post-Class Period supplement dated September 28, 2004 that: "If you are choosing between Class A and Class B shares, it will in almost all cases be the more economical choice for you to purchase Class A shares if you plan to purchase shares in an amount of $50,000 or more (whether in a single purchase or through aggregation of eligible holdings) This is because of the reduced sales charge available on larger investments of Class A shares and the lower ongoing expenses of Class A shares compared to Class B shares   This warning was never provided to investors prior to March 2004, and, in fact, constitutes an acknowledgement that SSB's practice of promoting Class B shares, even to large account holders, is clearly contrary to the interests of those large account holders.

### 4.   **Excessive 12b-1 Trailer Fees**

188.   Rule 12b-1, promulgated by the SEC pursuant to the Investment Company Act,
prohibits mutual funds from directly or indirectly distributing or marketing their own shares
unless certain enumerated conditions set forth in the Rule are met   Rule 12b-1 requires, among
other things, that: (i) payments for marketing must be made pursuant to a written plan
"describing all material aspects of the proposed financing of distribution;" (ii) all agreements
with any person relating to implementation of the plan must be in writing; (iii) the plan and any
related agreements must be approved by a vote of the majority of the board of directors; and (iv)
the board of directors must review, at least quarterly, "a written report of the amounts so
expended and the purposes for which such expenditures were made." *See* 17 C.F.R. § 270 12b-
1.   Additionally, the directors may continue the plan "only if the board of directors who vote to
approve such implementation or continuation conclude, in the exercise of reasonable business
judgment, and in light of their fiduciary duties under state law and section 36(a) and (b) [15
U.S.C. 80a-35(a) and (b)] of the Act that **there is a reasonable likelihood that the plan will
benefit the company and its shareholders**." (Emphasis added.)

189.   The exceptions to the Section 12b prohibition on mutual fund marketing were
enacted in 1980 under the theory that the marketing of mutual funds, all things being equal,
should be encouraged because increased investment in mutual funds would presumably result in
economies of scale, the benefits of which would be shifted from fund managers to investors

190    In theory, as a particular fund's total assets grow, the expenses borne by that fund
would be spread out and shared amongst fund investors, so that each investor's *pro rata* share of
the fund's expenses is correspondingly diminished   However, because of the systematic
overcharging of fees and expenses by defendants and the siphoning of money out of the

Proprietary Funds, whatever economies of scale that might have been achieved by the increase in overall fund assets were *not* passed on to investors. To the contrary, as the Proprietary Funds' assets increased, so too did the fees and expenses borne by investors.

191.    The failure of the Proprietary Funds to pass on the savings created by the growth of the fund's assets is shown in each of the fund's annual and semi-annual reports issued during the Class Period, which provided data -- from year to year and from fund to fund -- regarding the total net assets of the fund and the ratio of expenses to net assets of the fund. Despite the increase in assets across the Proprietary Funds, the economies of scale created did not result in a corresponding decrease in the expense ratios of the funds.

192.    For example, between 2001 and 2003, according to its public filings, the Salomon Brothers Capital Fund's total net assets increased from $655,567,829 to $1,354,925,618. Despite this increase, the expense ratios for Class A shares of the Capital Fund actually *went up* year to year, as follows:

| Ratios to Average Net Assets: | 2003 | 2002 | 2001 |
|---|---|---|---|
| Expenses | 1.13% | 1.12% | 1.07% |

193.    Similarly, the total net assets of the Salomon Brothers Large Cap Growth Fund increased from 2000 to 2003 from $2,318,000 to $7,235,257. Over this same period of time, and despite the fact that the fund's assets increased by over 300%, the savings on expenses and fees were not passed onto investors, and the expense ratios for Class A investors remained identical from year to year, as follows:

| Ratios to Average Net Assets: | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|
| Expenses | 1.45% | 1.45% | 1.45% | 1.45% |

194    By looking at the expense ratio data of the Proprietary Funds, from fund to fund and from year to year, the scheme of the Defendants is further exposed. The distribution of a

fund's shares and the increase in overall assets of a fund were supposed to be good for investors, and the 12b-1 plans were supposed to exist in order to promote this salutary goal. However, the systematic overcharging of fees and expenses by the Defendants throughout the class period eliminated any benefits of distribution for investors. In this case, the distribution plan and other undisclosed incentives existed only to enrich the Defendants.

195. As a result of these practices, the mutual fund industry was enormously profitable for SSB. In this regard, a *Forbes* article, published on September 15, 2003, stated as follows:

> The average net profit margin at publicly held mutual fund firms was 18.8% last year, blowing away the 14.9% margin for the financial industry overall.

(Emphasis added.)

196. Plaintiffs and other members of the Class did not enjoy the benefits of the economies of scale created by having larger funds. Once the Proprietary Funds reached a certain critical mass, the directors knew that there was no discernible benefit from having the fund become bigger by drawing in more investors; in fact, they know the opposite to be true - once a fund becomes too large it loses the ability to trade in and out of positions without hurting its investors.

### 5. The Improper Use of "Soft Dollars": The Investment Adviser Defendants Charged Their Overhead To Proprietary Fund Investors

197. Investment advisers routinely pay broker commissions on the purchase and sale of fund securities, and such commissions may, under certain circumstances, properly be used to purchase certain other services from brokers as well. Specifically, the Section 28(e) "safe harbor" provision of the Exchange Act carves out an exception to the rule that requires investment management companies to obtain the best possible execution price for their trades. Section 28(e) provides that a fund manager shall not be deemed to have breached his fiduciary

duties "solely by reason of his having caused the account to pay a    . broker .. in excess of the amount of commission another  . . broker    . . would have charged for effecting the transaction, if such person determined **in good faith** that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided " 15 U.S.C. §78bb(e). (Emphasis added ) In other words, mutual funds are allowed to include Soft Dollars in "commissions" for not only purchase and sales execution, but also for specified services, which the SEC has defined to include, "any service that provides lawful and appropriate assistance to the money manager in the performance of his investment decision-making responsibilities "

198    The Investment Adviser Defendants went far beyond what is permitted by the Section 28(e) safe harbor    The Investment Adviser Defendants used Soft Dollars to pay overhead costs, thus charging Proprietary Funds investors for costs not covered by the Section 28(e) safe harbor and that, consistent with the investment advisers' fiduciary duties, should properly have been borne by the Investment Adviser Defendants and Citigroup

199.    All the Proprietary Funds are essentially alter egos of one another. The Proprietary Funds are mainly pools of investor assets that are managed and administered by officers and employees of SSB.    The Proprietary Funds share many common members of their Boards of Directors    Individual Proprietary Funds are totally dominated by SSB and its affiliates and the common body of directors established by SSB.    In substance, the Proprietary Funds function as components of one unitary organization.

200.    All Proprietary Funds share Smith Barney Fund Management and Salomon Brothers Asset Management as their investment advisers and share SSB as their principal underwriter and distributor. Additionally, the Investment Adviser Defendants pool together fees and expenses collected from the Proprietary Funds investors, resulting in the Proprietary Funds

sharing expenses with one another. For instance, the SAI for the Salomon Brothers Series Funds Inc. is identical in substance to the SAIs filed by other Proprietary Funds during the Class Period. The SAI describes in the following terms how costs for research services, alleged herein to be excessive, are commingled and shared by the various Funds:

> Research services furnished to [Smith Barney Fund Management or Salomon Brothers Asset Management] by brokers who effect securities transactions for a Fund may be used by [Smith Barney Fund Management or Salomon Brothers Asset Management] in servicing **other investment companies and accounts** which it manages. Similarly, **research services furnished to [Smith Barney Fund Management or Salomon Brothers Asset Management] by brokers who effect securities transactions for other investment companies and accounts which [Smith Barney Fund Management or Salomon Brothers Asset Management] manages may be used by [Smith Barney Fund Management or Salomon Brothers Asset Management] in servicing a Fund.** Not all of these research services are used by [Smith Barney Fund Management or Salomon Brothers Asset Management]in managing any particular account, including the Funds.

(Emphasis added.)

### C.   Defendants Used The Proprietary Funds To Support SSB's Investment Bankers

201.    SSB's treachery in its mutual fund business was not limited to improperly steering investors and charging excessive fees. As has now been widely reported in the media, SSB analysts such as Jack Grubman were encumbered with severe conflicts of interest. According to SSB's former Senior VP, SSB's mutual funds were no different as they also served the interests of SSB's investment banking business and SSB's analysts, above the interests of investors.

202.    As described by SSB's former Senior VP, SSB's investment banking sector would direct SSB's proprietary mutual funds to invest in companies that the investment banking division served. Thus, SSB earned a fee from handling companies' investment banking needs and also generated a fee from including such companies in its mutual fund portfolios. In the end,

the selection of certain companies for inclusion in SSB's mutual funds depended not on the performance of a company, but on that company's overall relationship with SSB

203    With respect to SSB analysts, SSB's former Senior VP stated that SSB research analysts directly advised Proprietary Fund managers to invest in companies with lucrative SSB investment banking relationships, by saying things along the lines of, "if I am in your shoes I am buying WorldCom," when, in fact, those analysts knew that such advice and investments served only to foster the overall banking relationships of SSB with the subject company, without regard to the soundness of the investment to shareholders. The investment tips given by SSB research analysts to the Proprietary Funds, therefore, were not in the best interest of the funds and the funds did no due diligence to ensure that the research was legitimate.

204    According to SSB's former Senior VP, at times SSB's mutual funds would purchase the stock of companies covered by SSB's analysts, certain of which were underwritten by SSB's investment banking sector. Those purchases were made because of the relationship with the investment-banking clients, despite the unsuitability of their securities for the Funds. In this way, SSB's Senior VP stated that SSB encouraged outside funds to invest in downgraded telecom companies. He stated, "if    [SSB] could negotiate an agreement with an outside fund family that would specifically focus on telecom stock then that would be a way for Jack Grubman and our telecom group to offload increased buying power into Jack's hit list or buy recommended stock, supporting his clients." Additionally, according to SSB Broker 2, many of the funds making road show presentations and offering funds of the month were telecom heavy funds. Thus, in the end, all SSB sectors were working in concert to further the scheme to defraud investors.

205.    The comments by the SSB Vice President and SSB Broker 2 are corroborated by a November 2004 article published in Bloomberg Markets, titled "Bank Funds: Draining Investors" (the "Bloomberg article").

206     The Bloomberg article charges that certain bank mutual funds, including Citigroup/SSB's mutual funds, were providing a built-in demand for certain investment banking customers by purchasing shares of investment banking clients without regard to the interests of the funds' investors

207     One of the most notorious examples of SSB's practice of using its mutual funds to support its investment banking clients involved WorldCom   According to the Bloomberg article, "From 1997 to 2001, Citigroup's Salomon Smith Barney led all bankers by collecting $987 million in fees from telecommunication companies . . ." Of this amount, Citigroup collected $107 million from WorldCom between 1996 and 2002.

208.    However, these impressive fees carried with them an understanding that Citigroup would use its mutual funds to support WorldCom's stock.  As uncovered by the Bloomberg article, "[i]n the months before the July 2002 bankruptcy [of WorldCom], fund managers at Fidelity, the world's largest mutual fund company, sold 76 percent of their WorldCom shares; Vanguard Group Inc., the second largest sold 98 percent [of its stake in WorldCom] . . . In that period, Citigroup's mutual funds and private investor accounts bought 8.8 million additional shares of WorldCom . . " (emphasis added). As WorldCom neared bankruptcy, Citigroup's mutual funds and specially managed accounts collectively held 27 5 million shares of the failing company  The 1999 semi-annual report for SSB's Total Return fund shows that the fund not only held 1 2 million shares of WorldCom (making WorldCom a top ten holding) but that it also held $5 5 million in debt and hundreds of options  The Bloomberg article also uncovered that six

months before WorldCom's bankruptcy, the Smith Barney Appreciation fund held 14 7 million shares of WorldCom, an increase of 9 percent from the end of 2000 and up "more than 20-fold" from the end of 1999. "The bank's WorldCom holdings rose as WorldCom's sales fell and some analysts issued warnings about the accounting tactics and lower sales "

209    SSB's increasing stake in WorldCom near the company's demise was not a matter of happenstance, but the result of undisclosed conflicts that caused SSB's mutual funds to buy shares of WorldCom based on its lucrative relationship with Citigroup's investment banking division. These types of conflicts have recently drawn the attention of certain congressional leaders that question the appropriateness of this type of conflict The Bloomberg article quotes Senator Peter Fitzgerald who states that the practices of mutual funds favoring fee producing clients, "[is] a conflict of interest at least as great as the analysts on Wall Street were shown to have when they were pushing dog stocks that were underwritten by their firms "

210    Patrick Byrne, CEO of Overstock com was quoted in the Bloomberg article as saying, "[i]t's no surprise bank funds buy client shares because underwriters use the funds' buying power to pitch for banking work." Byrne stated that when his company was about to go public he was approached by two of the largest investment banks and was promised support from their fund managers if his company selected the banks to underwrite the offering.

211.    The findings in the Bloomberg article and the statements of SSB Broker 2 show that SSB's practice of selecting investments based on a company's relationship with its underwriting division was yet another means by which SSB increased its profits while leaving investors to foot the bill.

## DEFENDANTS HID THEIR FRAUDULENT PRACTICES FROM INVESTORS

212.    Defendants did not reveal that SSB financial advisors were not acting in the best interests of their clients, but rather acting to increase their compensation and to generate

- 62 -

increased management fees for SSB.  In fact, investors were never informed in SSB's fund documents (i.e., prospectuses, annual reports, etc.) or in information (brochures, website, correspondence, *etc*) provided by SSB's brokerage arm that:  1) brokers were incentivized to steer investors into SSB's Proprietary Funds and the funds of its Strategic Partners, 2) SSB brokers steered investors into classes of shares that were beneficial to SSB and its Strategic Partners rather than its clients, 3) SSB's promotion of funds depended not on a fund's performance, ratings or the needs of clients but rather on whether the fund participated in SSB's "pay to play" program, 4) investors would rarely, if ever, receive breakpoint concessions, or 5) SSB selected companies for inclusion in its mutual funds based on their overall financial relationship with SSB

213.   SSB's fraudulent practices presented clear undisclosed conflicts of interest, pitting the financial interest of the SSB financial advisors and/or the firm against that of its clients Disclosure of these conflicts is clearly material if clients are expected to make informed investment decisions   However, knowing that a recommendation to purchase one of the Proprietary Funds or the Strategic Partners Funds would be given lesser weight if clients knew that SSB financial advisors received special incentives for selling these funds over other funds, SSB was strongly motivated to, and did, conceal the truth during the Class Period.  Defendants failed to disclose the secret incentives on their website, in sales brochures distributed to their clients or in any other form or manner.

214.   SSB's breakpoint schemes and inclusion of companies based on their relationship with SSB likewise presented similar conflicts that hid from investors all material information needed to make a fully informed investment decision

## SSB'S MARKETING MATERIALS MATERIALLY MISREPRESENTED
## THE SERVICES BEING PROVIDED TO INVESTORS

215.   During the Class Period, persons who sought to obtain financial advice and/or assistance in the purchase and sale of mutual funds from SSB brokerage affiliates were provided with a variety of information about the services SSB provides   They were provided with brochures, informational videos, access to the Smith Barney Website, individualized letters and other materials touting the financial expertise of SSB "Financial Consultants" and the willingness of SSB Financial Consultants to work with investors to achieve the investors' financial objectives.

216.   For example, the Smith Barney website contained (and contains) statements that SSB Financial Consultants "will work with you to understand your financial goals. Together, you will be able to create a customized investment strategy designed to help you achieve your goals." They further stated that their "mission is to help you build a secure financial future" and that toward that end they sell "thousand[s]" of mutual funds and that they will help you select the funds to meet your investment goals.

217   Similar statements were made in a wide variety of brochures, letters, videotapes and on the SSB website throughout the Class Period

218   The statements were all false and misleading, as were all of Defendants' communications with Class members during the Class Period, because they failed to inform investors that Defendants were directing Class members into the Proprietary Funds, as well as Funds offered by the Strategic Partners. As set forth above at paras. 132-213, Defendants wholly failed to inform investors of the unfair and improper actions undertaken by Defendants to direct Class members' purchases of mutual funds into the Proprietary Funds and the funds offered by

the Strategic Partners, regardless of whether such funds were in the Class members' best interests.

## THE PROSPECTUSES, SAIs, AND ANNUAL AND SEMI-ANNUAL REPORTS ISSUED BY THE PROPRIETARY FUNDS OMITTED AND/OR MISSTATED MATERIAL FACTS REGARDING FEES CHARGED TO CLASS MEMBERS

219.    During the Class Period, Plaintiffs received numerous Prospectuses, as well as the SAIs included therein, and Annual and Semi-Annual Reports that were filed with the SEC by the Proprietary Funds or "registrants" in which Plaintiffs invested.  Defendants used a series of combined Prospectuses in which several funds were covered by one Prospectus during the Class Period to purportedly make required disclosures.  Prospectuses are required to disclose all material facts necessary to provide investors with information that will assist them in making informed investment decisions when choosing a mutual fund.  The laws and regulations governing mutual funds require that all disclosures be straightforward and easy to understand by average investors

220.    The Investment Adviser Defendants intentionally or recklessly misrepresented the true nature and purpose of the fees and commissions that were being siphoned from the Proprietary Funds to finance Defendant's fraudulent scheme and practices  Prior to selling the shares or interests in the Proprietary Funds, Defendants were required to provide to investors one or more of the Prospectuses pursuant to which shares of the Proprietary Funds were offered. According to the SSB former Senior VP, SSB's brokers, at the direction of SSB management, were encouraged not to provide the legally-required Prospectuses to investors prior to selling shares of the Proprietary Funds to conceal poor performance, material risks and other adverse information from the investors.

221    Moreover, the Prospectuses, SAIs and Annual and Semi-Annual Reports for the Proprietary Funds that were filed with the SEC and were provided to Plaintiffs and other investors during the Class Period failed to provide the required straightforward disclosures of all material facts necessary to provide Plaintiffs with information to assist them in making informed decisions about investing in the Proprietary Funds

222    In each year from March 1999 through March 2004, Defendants issued a series of combined Prospectuses, SAIs, and Annual and Semi-Annual Reports for 36 different groups of Proprietary Funds (the funds are grouped under various Propriety Fund Registrants) that are listed in Exhibit B  The Prospectuses, SAIs, and Annual and Semi-Annual Reports issued for each of the Proprietary Funds during the Class Period are incorporated herein by reference.  By corralling certain Proprietary Funds together in a series of combined Prospectuses, SSB, the Investment Adviser Defendants and the Proprietary Funds' Boards of Directors and Trustees, provided only general information about fees and expenses extracted from the funds under the guise of approved plans and procedures  The Prospectuses, SAIs and Annual and Semi-Annual Reports issued for the Proprietary Funds in each year during the Class Period, were false and misleading and omitted material information that was necessary to fully understand the true nature of deceptive and improper practices that SSB, and the fund advisers and managers employed for their own financial benefit

223    Each of the Proprietary Funds' Prospectuses, SAIs and Annual and Semi-Annual Reports issued during the Class Period for the Proprietary Funds failed to adequately disclose to investors material information regarding the excessive and undisclosed fees and costs associated with the mutual funds.  As seen below, each of these disclosure documents issued for the Proprietary Funds during the Class Period contained substantially the same false and misleading

- 66 -

statements and omissions regarding revenue sharing agreements, 12b-1 fees, Soft Dollars and Breakpoints.

**A.    False and Misleading Statements and Material
        Omissions Regarding Revenue Sharing**

224.    Each of the Proprietary Funds' Prospectuses, SAIs, Annual and Semi-Annual Reports issued during the Class Period failed to properly disclose to Plaintiffs and other investors material information regarding the Strategic Partners Program and revenue-sharing agreements and the fees and costs associated with them.

225.    Defendants intentionally or recklessly omitted material information in the Prospectuses, SAIs, Annual and Semi-Annual Reports for the Proprietary Funds regarding the revenue-sharing payments that the Funds paid to SSB and the conflicts of interest that such kickbacks created.

226.    In all Prospectuses, SAIs, Annual and Semi-Annual Reports issued during the Class Period for each of the Proprietary Funds, nothing was disclosed about revenue-sharing, Strategic Partners, shelf-spacing, or any additional payments being made by the Proprietary Funds to SSB to steer clients to invest in the Proprietary Funds. Most importantly, the disabling conflict of interest that the revenue-sharing payments and Strategic Partners program created by pitting the financial interests of broker/dealers against the interests of their investor clients was ignored and never disclosed.

227    The December 3, 2003 Prospectus for the Salomon Brothers Emerging Markets Debt Fund, Inc.,[6] is typical. This prospectus is similar, in relevant part, to all Prospectuses issued

---

[6]    The same Prospectus also covers the Salomon Brothers Series Funds, which includes the Salomon Brothers All Cap Value Fund, Salomon Brothers Balanced Fund, Salomon Brothers High Yield Bond Fund, Salomon Brothers International Equity Fund, Salomon Brothers Large Cap Growth Fund, Salomon Brothers Short/Intermediate US Government Fund, Salomon Brothers Small Cap Growth Fund, Salomon Brothers Strategic Bond Fund, Salomon Brothers California Tax Free Bond Fund, Salomon Brothers New York Tax Free Bond Fund,

for the Proprietary Funds during the Class Period.  It provided specific information regarding the

fees and costs incurred by fund holders as follows:

> The Fund's management fees and other expenses, including expenses incurred in
> Borrowings and/or the issuance of the Fund Preferred Shares, are borne by the
> Common Shareholders.
>
> *   *   *
>
> In addition to the fee paid to the Investment Manager, the Fund pays all other
> costs and expenses of its operations, including, but not limited to, compensation
> of its Directors (other than those affiliated with the Investment Manager),
> custodian, transfer agency and dividend disbursing expenses, rating agency fees,
> legal fees, expenses of independent auditors, expenses of registering and
> qualifying shares for sale, expenses of repurchasing shares, expenses in
> connection with any Borrowings, expenses of issuing any Fund Preferred Shares,
> expenses of being listed on a stock exchange, expenses of preparing, printing and
> distributing shareholder reports, notices, proxy statements and reports to
> governmental agencies, amendments to the Fund's registration statement,
> membership in investment company organizations and taxes, if any.

Despite this extensive laundry list of fees and expenses paid by the Fund, it was materially false

and misleading because, as SSB now admits, this fee table and all others like it, failed to include

revenue-sharing amounts incurred and expended pursuant to the secret revenue sharing

agreements.  In similar fashion, all of the Proprietary Funds throughout the Class Period failed to

disclose these fees and expenses in each and every Prospectus they filed.

228.   Each of the Proprietary Funds, from year to year and from fund to fund

throughout the Class Period, also made substantially similar disclosures in Annual and Semi-

Annual Reports regarding the fees and expenses incurred by the Proprietary Funds.  For

example, the Semi-Annual Report dated March 31, 2001 (filed June 8, 2001) set forth the fees

and expenses of the Smith Barney Shearson Fundamental Value Fund, Inc., as follows:

---

Salomon Brothers Mid Cap Fund, Salomon Brothers Investors Value Fund, Salomon Brothers Cash Management
Fund, Salomon Brothers Capital Fund.

**Statement of Assets and Liabilities (unaudited)**
**March 31, 2001**

\*        \*        \*

LIABILITIES:

| | |
|---|---|
| Payable for securities purchased | 6,643,310 |
| Investment advisory fee payable | 1,319,814 |
| Distribution fee payable | 945,090 |
| Written options, at value (Premiums received -- $10,816,370) (Note 5) | 865,528 |
| Administration fee payable | 397,994 |
| Payable for Fund shares purchased | 147,198 |
| Accrued expenses | 564,523 |
| Total Liabilities | 10,883,457 |

**Statement of Operations (unaudited)**
**For the Six Months Ended March 31, 2001**

\*        \*        \*

EXPENSES:

| | |
|---|---|
| Distribution fee (Note 3) | 10,144,864 |
| Investment advisory fee (Note 3) | 7,802,647 |
| Administration fee (Note 3) | 2,764,951 |
| Shareholder and system servicing fees | 846,072 |
| Audit and legal | 69,921 |
| Custody | 49,589 |
| Registration fees | 49,589 |
| Shareholder communications | 42,933 |
| Directors' fees | 39,672 |
| Other | 16,861 |
| Total Expenses | 21,827,099 |

229.   This financial statement, and all of the other Annual and Semi-Annual Reports issued by each of the Proprietary Funds throughout the Class Period, all of which were substantially similar in the type of information provided to the report set forth above, failed to disclose payments made by the Proprietary Funds pursuant to revenue-sharing agreements with SSB.   These disclosures were materially false and misleading because the Proprietary Funds were secretly paying millions of dollars to SSB for the shelf-spacing of the Proprietary Funds and the distribution of those funds to the exclusion of other suitable funds

230.   The Proprietary Funds' revenue-sharing payments were material to the Class members' investment decisions and should have been disclosed to the public by SSB, the Investment Adviser Defendants and the Director Defendants as part of the funds' fee disclosures The Proprietary Funds intentionally or recklessly failed to disclose this secret incentive program in any of their public filings.   The financial disclosures for all of the Proprietary Funds failed to disclose the fees paid pursuant to the revenue-sharing agreements with SSB in each and every Prospectus, SAI, and Annual and Semi-Annual Report they filed during the Class Period

231.   In sum, the Prospectuses, SAIs, Annual and Semi-Annual Reports issued for all of the Proprietary Funds during the Class Period were materially false and misleading because, among other things, they failed to disclose material and adverse facts which misled and damaged Plaintiffs, including:

      a) that the Investment Adviser Defendants and SSB used investor assets to satisfy bilateral arrangements with brokerage firms known as Strategic Partners Programs whereby the broker improperly steered unsuspecting clients into Proprietary Funds in exchange for personal financial gain;

      b) that the Investment Adviser Defendants used brokerage commissions over and above those allowed by Rule 12b-1, and over and above those permitted under the shareholder approved Distribution Plans to pay for the "shelf-space" in the Strategic Partners Programs;

- 70 -

c) that the Investment Adviser Defendants directed brokerage payments to brokerage firms that favored the Proprietary Funds to satisfy bilateral arrangements with SSB and its affiliated brokerage firms pursuant to Strategic Partners Programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Proprietary Funds Rule 12b-1 Plans;

d) that SSB was compensated out of investor assets for payments made pursuant to revenue-sharing agreements;

e) that such revenue-sharing payments created undisclosed conflicts of interest;

f) that any economies of scale achieved by increased marketing, promotion and sale of Proprietary Fund shares were not passed on to Proprietary Fund investors; but rather, as the Proprietary Funds' assets grew, the fees charged to Proprietary Fund investors continued to increase; and,

g) that the Director Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, failed to monitor and supervise the Investment Adviser Defendants and, as a consequence, the Investment Adviser Defendants were able to systematically skim millions of dollars from the Proprietary Funds

**B.    False and Misleading Statements and Material**
**Omissions Regarding 12b-1 Fees**

232.    Each of the Proprietary Funds' Prospectuses, SAIs, Annual Reports and Semi-Annual Reports issued during the Class Period failed to properly disclose to Plaintiffs material information about the purported Rule 12b-1 fees associated with the funds. The 12b-1 fees paid to SSB and its affiliates from the Proprietary Funds collectively during the Class Period totaled approximately **$1.49 billion**.

233.    During the Class Period, the Prospectuses for the Proprietary Funds made material false and misleading statements and material omissions regarding service and distribution fees paid by each of the Proprietary Funds pursuant to a 12b-1 plan that was approved by each of the Proprietary Fund's Board of Directors or Trustees.

234.    During the Class Period, the Prospectuses provided minimal disclosure regarding Rule 12b-1 service and distribution fees. Because Defendants undertook to disclose the amount

- 71 -

of fees paid pursuant to Rule 12b-1 and the purported use of such fees, they had a duty to fully disclose the nature and true purpose of the fees. For the years 1999 through 2003, the Prospectuses contained the following information in exact or substantially similar form:

> The fund has adopted a Rule 12b-1 distribution plan for its Class A, B and C shares. Under the plan, the fund pays distribution and/or service fees These fees are an ongoing expense and, over time, may cost you more than other types of sales charges

235   Beginning in 2001, the Smith Barney Small Cap Core Fund Inc , as well as a number of other funds, included the following additional statement in the Prospectuses:

> In addition, the distributor may make payments for distribution and/or shareholder servicing activities out of its past profits and other available sources. The distributor may also make payments for marketing, promotional or related expenses to dealers. The amount of these payments is determined by the distributor and may be substantial. The manager or an affiliate may make similar payments under similar arrangements.

236.   The Prospectuses falsely represented that the distribution fees were paid for legitimate marketing and other services, which purportedly benefited shareholders   The disclosures falsely stated that the distribution fees were used to cover certain expenses, when in fact these distribution fees were being used for overhead, directed brokerage commissions to supplement the kickbacks paid to SSB brokers for steering Plaintiffs to invest in the Proprietary Funds

237.   During the Class Period, the Prospectuses for the Smith Barney Income Funds provided minimal disclosure regarding Rule 12b-1 service and distribution fees. For the years 1999 and 2000, the Prospectuses contained the following information:

> The fund has adopted a Rule 12b-1 distribution plan for its Smith Barney Class A, B, C and O shares. Under the plan, the fund pays distribution and/or service fees. These fees are an ongoing expense and, over time, they increase the cost of your investment and may cost you more than other types of sales charges.

238.   However, in 2001, the Smith Barney Income Funds began providing additional statements in the Prospectuses:

> In addition, the distributor may make payments for distribution and/or shareholder servicing activities out of their past profits and other available sources. The distributors may also make payments for marketing, promotional or related expenses to dealers. The amount of these payments is determined by the distributors and may be substantial. The manager or an affiliate may make similar payments under similar arrangements.

239.   The Prospectuses and SAIs for all of the Proprietary Funds that were filed during the Class Period contained substantially similar materially false and misleading disclosures as those set forth above at paras. 234-38.

240.   All of the Prospectuses for all of the Proprietary Funds, throughout the Class Period, were false and misleading because they omitted the true nature and purpose of the distribution fees which purportedly benefited shareholders.

241.   Defendants failed to disclose in the Proprietary Funds' Prospectuses, *inter alia*, the following material and damaging adverse facts which damaged Plaintiffs and other members of the Class:

   a)   that the Investment Adviser Defendants authorized excessive commission payments from fund assets to broker dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor";

   b)   that the Investment Adviser Defendants directed brokerage payments to firms that favored the Proprietary Funds, which was a form of marketing that was not disclosed in or authorized by the Funds Rule 12b-1 plans;

   c)   that the Proprietary Funds Rule 12b-1 plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plans were in violation of Section 12 of the Investment Company Act because, among other reasons, the plans were not properly evaluated by the Proprietary Funds Directors and Trustees and there was not a reasonable likelihood that the plans would benefit the company and its shareholders;

d)      that by paying brokers to aggressively steer their clients to the Proprietary Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

e)      that any economies of scale achieved by marketing of the Proprietary Funds to new investors were not passed on to the Proprietary Funds investors;

f)      that the Director Defendants failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Proprietary Funds

242      During the Class Period, the Prospectuses, including the SAIs, for the Proprietary Funds made material false and misleading statements and material omissions regarding service and distribution fees paid by each of the Proprietary Funds pursuant to a 12b-1 plan that was approved by each of the Proprietary Fund's Board of Directors or Trustees.

243.      The Smith Barney Small Cap Core Fund Inc.'s Prospectus and SAI, filed in 1999, included the following statement:

> To compensate Salomon Smith Barney for the service it provides and for the expense it bears under the Distribution Agreement, the fund has adopted a services and distribution plan (the "Plan") pursuant to Rule 12b-1 under the 1940 Act Under the Plan, the fund pays Salomon Smith Barney a service fee, accrued daily and paid monthly, calculated at the annual rate of 0.25% of the value of the fund's average daily net assets attributable to the Class A, Class B and Class L shares In addition, the fund pays Salomon Smith Barney a distribution fee with respect to Class B and Class L shares calculated at the annual rate of 0.75% of the value of the fund's average daily net assets attributable those shares primarily intended to compensate Salomon Smith Barney for its initial expense of paying Financial Consultants a commission upon sales of those shares. Class B shares that automatically convert to Class A shares eight years after the date of original purchase will no longer be subject to a distribution fee.
>
> For the year ended December 31, 1998, the fees which have been accrued and/or paid to Salomon Smith Barney pursuant to Rule 12b-1 for the fund were $107,818 for Class A shares, $193,723 for Class B shares and $47,398 for Class L shares. The distribution expenses for 1998 included compensation of financial consultants and printing costs of prospectuses and marketing materials.

*      *      *      *

- 74 -

CFBDS will pay for the printing, at printer's overrun cost, of prospectuses and periodic reports after they have been prepared, set in type and mailed to shareholders, and will also pay the cost of distributing such copies used in connection with the offering to prospective investors and will also pay for supplementary sales literature and other promotional costs. Such expenses incurred by CFBDS are distribution expenses within the meaning of the Plans and may be paid from amounts received by CFBDS from the Company under the Plans.

244.   The Smith Barney Income Fund's SAI, filed in 1999, included the following

statement:

Under its terms, the [12b-1] Plan continues from year to year, provided such continuance is approved annually by vote of the Board of Trustees, including a majority of the Independent Trustees who have no direct or indirect financial interest in the operation of the Plan. The Plan may not be amended to increase the amount to be spent for the services provided by the Distributor without shareholder approval, and all amendments of the Plan must be approved by the Trustees in the manner described above. The Plan may be terminated with respect to a Class at any time, without penalty, by vote of a majority of the Independent Trustees or, with respect to the fund, by vote of a majority of the outstanding voting securities of the Class (as defined in the 1940 Act). Pursuant to the Plan, the Distributor will provide the Board of Trustees with periodic reports of amounts expended under the Plan and the purpose for which such expenditures were made.

245   The Smith Barney Income Fund's SAI filed with the SEC in 2003 made the

following additional obtuse disclosures with respect to Rule 12b-1 fees:

For the fiscal year ended December 31, 2002, CGM and PFS incurred distribution expenses for the following: advertising, printing and mailing prospectuses, support services and overhead expenses to CGM Financial Consultants and accruals for interest on the excess of CGM expenses incurred in the distribution of the fund's shares over the sum of the distribution fees and deferred sales charges received by CGM . .

246   The SAIs for the Smith Barney Shearson Aggressive Growth Fund Inc that were

filed in 2000 and 2001, like most of the other SAIs and Prospectuses filed with the SEC for the

Proprietary Funds during the Class Period, provide extensive disclosures regarding payments

under the Rule 12b-1 Plan, without providing any information about the abuses of the 12b-1

Plans and impact on Plaintiffs and the other Class Members' investments, falsely stated that

- 75 -

distributions under the plan primarily benefited shareholders and had no impact on the net amount invested as follows:

> To compensate each of Salomon Smith Barney and PFSI for the service it provides and for the expense it bears, the fund has adopted a services and distribution plan (the "Plan") pursuant to Rule 12b 1 under the 1940 Act. . . . The service fee is primarily used to pay Salomon Smith Barney Financial Consultants (and PFSI Registered Representatives) for servicing shareholder accounts.

*   *   *

> From time to time, PFSI or its affiliates may also pay for certain non-cash sales incentives provided to PFSI Investments Representatives. Such incentives do not have any effect on the net amount invested. . . . (emphasis added)

247    The Prospectuses, including the SAIs, for all of the Proprietary Funds that were filed during the Class Period contained substantially similar materially false and misleading disclosures as those set forth above at paras. 243-46.

248    All of the Prospectuses and SAIs for all of the Proprietary Funds, throughout the Class Period, were false and misleading because they omitted the true nature and purposes of the distribution fees which purportedly benefited shareholders

249.    The Annual and Semi-Annual Reports for the Funds listed above simply provided a blanket statement explaining that each Fund pays a service and/or distribution fee pursuant to a Rule 12b-1 Distribution Plan, the annual rate of the fee, and the manner in which the fee is calculated.

250.    The Annual and Semi-Annual Reports for the Smith Barney Trust II included the following disclosures regarding 12b-1 fees in substantially similar terms:

> The Fund maintains separate Service Plans for Class A and Class B shares, which have been adopted in accordance with Rule 12b-1 under the 1940 Act Under the Class A Service Plan, the Fund may pay monthly fees at an annual rate not to exceed 0.25% of the average daily net assets represented by Class A shares of the Fund The Service fees for Class A shares amounted to $1,210,672 for the year ended October 31, 2000. Under the Class B and Class L Service Plan, the Fund may pay a combined monthly distribution and service fee at an annual rate not to

- 76 -

exceed 1 00% of the average daily net assets represented by Class B shares and Class L shares of the Fund The Distribution fees for Class B and Class L shares amounted to $277,371 and $29, respectively, for the year ended October 31, 2000. These fees may be used to make payments to the Distributor for distribution services and to others as compensation for the sale of shares of the applicable class of the Fund, for advertising, marketing or other promotional activity, and for preparation, printing and distribution of prospectuses, statements of additional information and reports for recipients other than regulators and existing shareholders. The Fund may also make payments to the Distributor and others for providing personal service or the maintenance of shareholder accounts.

251    The Annual and Semi-Annual Reports for all of the Proprietary Funds provide substantially similar false and misleading disclosures regarding 12b-1 fees.

252    Defendants failed to disclose in the Proprietary Funds' Prospectuses, SAIs, Annual Reports, or Semi-Annual Reports, *inter alia*, the following material and damaging adverse facts which damaged Plaintiffs and other members of the Class:

a)    that the Investment Adviser Defendants authorized excessive commission payments from fund assets to broker dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor";

b)    that the Investment Adviser Defendants directed brokerage payments to firms that favored the Proprietary Funds, which was a form of marketing that was not disclosed in or authorized by the Funds Rule 12b-1 plans;

c)    that the Proprietary Funds Rule 12b-1 plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plans were in violation of Section 12 of the Investment Company Act because, among other reasons, the plans were not properly evaluated by the Proprietary Funds Directors and Trustees and there was not a reasonable likelihood that the plans would benefit the company and its shareholders;

d)    that by paying brokers to aggressively steer their clients to the Proprietary Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

e)    that any economies of scale achieved by marketing of the Proprietary Funds to new investors were not passed on to the Proprietary Funds investors;

- 77 -

f)     that the Director Defendants failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Proprietary Funds

## C.    Material Omissions Regarding Soft Dollars
and Directed Brokerage Business

253    All of Prospectuses and SAIs issued for the Proprietary Funds during the Class Period are materially false and misleading because they all fail to disclose that the Investment Adviser Defendants improperly directed brokerage commissions to SSB's affiliated brokers and other broker-dealers to satisfy secret *quid-pro-quo* agreements to pay excessive commissions and directed brokerage business to brokers and broker-dealers that steered their clients into pre-determined Proprietary Funds    These Prospectuses and SAIs provide materially misleading information under the heading "Portfolio Transactions " or "Portfolio Transactions and Brokerage." For example, the December 3, 2003 prospectus and SAI for the Salomon Bros Emerging Markets Debt Fund Inc. states:

> The general policy of the Fund in selecting brokers and dealers is to obtain the best results taking into account factors such as the general execution and operational facilities of the broker or dealer, the type and size of the transaction involved, the creditworthiness of the broker or dealer, the stability of the broker or dealer, execution and settlement capabilities of the broker or dealer, time required to negotiate and execute the trade, research services and the Investment Manager's arrangements related thereto (as described below), overall performance, the dealer's risk in positioning the securities involved, and the broker's commissions and dealer's spread or mark-up. While the Investment Manager generally seeks the best price in placing its orders, the Fund may not necessarily be paying the lowest price available.

> Notwithstanding the above, in compliance with Section 28(e) of the Securities Exchange Act of 1934, as amended, the Investment Manager may select brokers who charge a commission in excess of that charged by other brokers if <u>the Investment Manager determines **in good faith** that the commission to be charged is reasonable in relation to the brokerage and research services provided to the Investment Manager by such brokers.</u> (emphasis added).

- 78 -

254.    The Prospectus SAI for the Smith Barney Mid Cap Core Fund (filed with the SEC

on March 28, 2003) stated as follows with respect to Soft Dollars and directed brokerage:

> In executing portfolio transactions and selecting brokers or dealers, it is the fund's
> policy to seek the best overall terms available.  The manager, in seeking the most
> favorable price and execution, considers all factors it deems relevant, including,
> for example, the price, the size of the transaction, the reputation, experience and
> financial stability of the broker-dealer involved and the quality of service
> rendered by the broker-dealer in other transactions.  The manager receives
> research, statistical and quotation services from several broker-dealers with which
> it places the fund's portfolio transactions.  It is possible that certain of the services
> received primarily will benefit one or more other accounts for which the manager
> exercises investment discretion.  For the fiscal year ended November 30, 2002,
> the fund directed brokerage transactions totaling $1,451,183,194 to brokers
> because of research services provided.  The amount of brokerage commissions
> paid on such transactions totaled $62,155,568.  (Emphasis added.)

255.    The Prospectuses and SAIs for all of the Proprietary Funds provide substantially

similar false and misleading disclosures regarding Soft Dollars and directed brokerage fees and

commissions.

256.    The Prospectuses, SAIs and Annual and Semi-Annual Reports failed to disclose

the following material, adverse facts which were necessary to fully inform Plaintiffs of the nature

of the fees, commissions and expenses paid to SSB and the Investor Adviser Defendants and

their affiliates from Plaintiffs' investments:

   a) that the Investment Adviser Defendants authorized the payment of
      excessive commissions from the Proprietary Funds' assets to broker
      dealers in exchange for preferential marketing services and that such
      payments were in breach of their fiduciary duties, in violation of Section
      12(b) of the Investment Company Act and unprotected by any "safe
      harbor";

   b) that the Investment Adviser Defendants directed brokerage payments to
      firms that aggressively steered clients to invest in the Proprietary Funds,
      which was a form of marketing that was not disclosed in or authorized by
      the Proprietary Funds' purported Rule 12b-1 plans;

   c) that by paying brokers to aggressively steer their clients to the Proprietary
      Funds, the Investment Adviser Defendants were knowingly aiding and

- 79 -

abetting a breach of fiduciary duties and profiting from the brokers' improper conduct; and

d) that Defendants improperly used Soft Dollars and excessive commissions, paid from the Proprietary Funds assets, to pay for overhead expenses, the cost of which should have been borne by the Company and the Investment Adviser Defendants and not the Proprietary Funds investors.

## D.   **Material Omissions Regarding Breakpoints**

257.   The Smith Barney Shearson Aggressive Growth Fund Prospectus dated December 29, 2003, ("2003 Aggressive Growth Prospectus"), which is substantially similar in substance to all Prospectuses issued for the Proprietary Funds that charged a front-load sales fee during the Class Period, promised volume discounts at various investment levels as follows:

> You buy Class A shares at the offering price, which is the net asset value plus a sales charge. You pay a lower sales charge as the size of your investment increases to certain levels called breakpoints. You do not pay a sales charge on the fund's distributions or dividends you reinvest in additional Class A shares.

> The table below shows the rate of sales charge you pay, depending on the amount you purchase. The table below also shows the amount of broker/dealer compensation that is paid out of the sales charge. This compensation includes commissions received by Service Agents that sell shares of the fund. The distributors keep up to approximately 10% of the sales charge imposed on Class A shares. Service Agents also will receive the service fee payable on Class A shares at an annual rate equal to 0.25% of the average daily net assets represented by the Class A shares serviced by them.

| Amount of purchase | Sales Charge as a % of Offering price (%) | Broker/Dealer Net amount invested(%) | Commission as % of offering price |
|---|---|---|---|
| Less than $25,000 | 5.00 | 5.26 | 4.50 |
| $25,000 but less than $50,000 | 4.25 | 4.44 | 3.83 |
| $50,000 but less than $100,000 | 3.75 | 3.90 | 3.38 |
| $100,000 but less than $250,000 | 3.25 | 3.36 | 2.93 |
| $250,000 but less than $500,000 | 2.75 | 2.83 | 2.48 |
| $500,000 but less than $1,000,000 | 2.00 | 2.04 | 1.80 |
| $1,000,000 or more | 0.00 | 0.00 | up to 1.00* |

258.   The Prospectuses issued for the Proprietary Funds during the Class Period are materially false and misleading because they omitted material information that should have informed Plaintiffs and other Class members that SSB and its affiliated brokers were engaged in a deceptive practice to divide shareholders' investments into separate funds to avoid offering investors the promised Breakpoint reductions in up-front sales charges.

### THE PROPRIETARY FUNDS MISREPRESENTED THEIR INVESTMENT STRATEGY BECAUSE THEY FAILED TO INFORM INVESTORS THAT INVESTMENTS WERE BEING MADE TO SUPPORT SSB'S INVESTMENT BANKING BUSINESS

259.   The Defendants misled customers regarding the methods by which the Proprietary Funds selected securities for investment by describing in their prospectuses sophisticated research and decisional processes that were incomplete, false and misleading.

260.   The following incomplete, false and misleading statements are made in the Smith Barney Appreciation Fund, Inc. prospectus dated April 30, 2003:

Selection process

- 81 -

The manager's investment strategy consists of individual company selection and management of cash reserves. The manager looks for investments among a strong core of growth stocks, consisting primarily of blue chip companies dominant in their industries. The fund may also invest in companies with prospects for sustained earnings growth and/or a cyclical earnings record.

In selecting individual companies for the fund's portfolio, the manager looks for the following:

- Strong or rapidly improving balance sheets
- Recognized industry leadership
- Effective management teams that exhibit a desire to earn consistent returns for shareholders

In addition, the manager considers the following characteristics:

- Past growth records
- Future earnings prospects
- Technological innovation
- General market and economic factors
- Current yield or potential for dividend growth

Generally, companies in the fund's portfolio fall into one of the following categories:

- Undervalued companies: companies with assets or earning power that are either unrecognized or undervalued. The manager generally looks for a catalyst that will unlock these values. The manager also looks for companies that are expected to have unusual earnings growth or whose stocks appear likely to go up in value because of marked changes in the way they do business (for example, a corporate restructuring).

- Growth at a reasonable price: companies with superior demonstrated and expected growth characteristics whose stocks are available at a reasonable price. Typically, there is strong recurring demand for these companies' products.

The manager adjusts the amount held in cash reserves depending on the manager's outlook for the stock market. The manager will increase the fund's allocation to cash when, in the manager's opinion, market valuation levels become excessive. The manager may sometimes hold a significant portion of the fund's assets in cash while waiting for buying opportunities or to provide a hedge against stock market declines.

261    Similar statements are made in the other Proprietary Funds' Prospectuses issued
to customers during the Class Period   All of the investment strategies disclosed by the
Proprietary Funds are set forth in Exhibit C, which is incorporated herein by reference.

262.    The statements above, as well as the statements regarding the means by which the
Proprietary Funds selected stocks for purchase by the Funds in all of the prospectuses issued by
the Proprietary Funds (see Exhibit C) throughout the Class Period are false and misleading
because, as described at paras. 201-11, *supra*, the Proprietary Funds selected stocks based in part
upon the requirements of SSB's investment banking business.  At no time was there ever any
disclosure to investors that stocks were purchased by the Proprietary Funds to assist SSB's
investment bankers in obtaining and retaining investment banking business.

## THE TRUTH BEGINS TO EMERGE

263.    In a Prospectus Supplement dated March 22, 2004, Defendants revealed, for the
first time, that they had secret revenue-sharing agreements:

> the distributors may make payments for distribution and/or shareholder servicing
> activities out of their past profits and other available sources.  The distributors
> may also make payments for marketing, promotional or related expenses to
> dealers.  The amount of these payments is determined by the distributors and may
> be substantial.  The manager or an affiliate may make similar payments under
> similar arrangements.
>
> The payments described above are often referred to as "revenue sharing
> payments."  The recipients of such payments may include the funds' distributor
> and other affiliates of the manager, broker-dealers, financial institutions and other
> financial intermediaries through which investors may purchase shares of a fund.
> In some circumstances, such payments may create an incentive for an
> intermediary or its employees or associated persons to recommend or sell shares
> of a fund to you.

264.    As the March 22, 2004 prospectus amendment makes clear, the Proprietary Funds
Distributor and the Investment Adviser Defendants made undisclosed, improper "revenue
sharing" payments to SSB and its affiliates, which created conflicts of interest and incentives for

SSB's affiliated brokers to recommend and sell the Proprietary Funds to Plaintiffs and other members of the Class.

265.   A few months later in 2004, Defendants disclosed for the first time on SSB's website (www.smithbarney.com) that:

> For each fund family we offer, we seek to collect a mutual fund support fee, or what has come to be called a revenue-sharing payment. These revenue-sharing payments are in addition to the sales charges, annual service fees (referred to as "12b-1 fees"), applicable redemption fees and deferred sales charges, and other fees and expenses disclosed in a fund's prospectus fee table.
>
> *   *   *
>
> Because Fund Families With Branch Access have access to our branch offices and Financial Consultants, they have enhanced opportunities to promote their funds to our Financial Consultants. **This fact could, in turn, lead our Financial Consultants to focus on those funds when recommending mutual fund investments to our clients instead of on funds from those fund families that do not have access to our branch offices and Financial Consultants. Fund families (With or Without Branch Access) that do not remit revenue-sharing payments typically will not be provided such access and will not participate in or receive other corporate promotional support. In 2003 and prior years, those fund families now classified as Fund Families With Branch Access were categorized as Level I, or Strategic Partners, and Level II fund families. Level I Strategic Partners generally were given greater access to our Financial Consultants than Level II fund families.**

(emphasis added).   The Proprietary Funds are listed among the "Fund Families With Branch Access" on the website.

266.   SSB's 2004 statement that the "revenue-sharing payments are in addition to the sales charges, annual service fees (referred to as '12b-1 fees'), applicable redemption fees and deferred sales charges, and other fees and expenses disclosed in a fund's prospectus fee table" was an admission that all the Prospectus fee tables in 2003 and prior years during the Class Period contained material omissions. In 2004, amidst increasing industry-wide scrutiny over a number of unscrupulous mutual fund practices, SSB and the Proprietary Funds finally came clean and disclosed for the first time material information that shed light on the revenue-sharing

and shelf-spacing schemes that permeated SSB and its affiliates and the Proprietary Funds during the Class Period.

267    SSB's website disclosures further made clear that its revenue sharing payment formula was tied to the amount of shares sold to Plaintiffs and other Class members, as well as the overall size of the Funds' assets:

> For 2003, **we received revenue-sharing payments that were generally based upon a previous revenue-sharing formula that took into account overall fund sales and fund assets held in client accounts during the year**. We expect overall levels of revenue-sharing payments to increase in 2004
>
> Set forth below is a listing of the fund families from which we received revenue-sharing payments in 2003    The listing is divided into Fund families are listed within [two categories: "Fund Families With Branch Access" and "Fund Families Without Branch Access."] based upon the total amount of revenue-sharing payments each fund family made to us for 2003  Mutual funds offered by these two categories of fund families represented approximately 99 2% of **our total mutual fund sales in 2003, with Fund Families With Branch Access representing approximately 96.9% of the total.**  (emphasis added)

268.    The practice of aggressively selling the Proprietary and Strategic Partners Funds to clients, without disclosing defendants' strong financial interest in recommending such funds over other investment choices, coupled with the Proprietary and Strategic Partners Funds' undisclosed practice of paying excessive commissions to SSB for steering investors their way, was a clear violation of defendants' fiduciary obligations of loyalty and care to their clients. Additionally, this type of conduct operated as a fraud and deceit against Plaintiffs and other members of the Class.

269.    SSB's website disclosures in 2004 also revealed for the first time that Class B shares of the Proprietary Funds are subject to higher 12b-1 fees and higher ongoing expenses than other shares that are subject to a front-end sales charge:

- 85 -

### Class B shares

Investments in Class B shares typically are not subject to a front-end sales charge, but purchasers normally are required to pay a contingent deferred sales charge ("CDSC") on shares sold during a specified time period (typically six years). In addition, Class B shares are subject to higher 12b-1 fees, which result in higher ongoing expenses, than Class A shares. For this reason, even though they carry no front-end load, Class B shares are not, and should not be viewed as, "no-load" shares. The CDSC associated with an investment in Class B shares declines over time, and in most funds is eventually avoided entirely following the expiration of a designated holding period. Upon the expiration of that holding period, or shortly thereafter, Class B shares typically "convert" into Class A shares, at which point the investment will begin to be charged the Class A shares' lower 12b-1 fees.

It is important to bear in mind that the CDSCs and higher annual fees (in part attributable to higher 12b-1 fees) charged on Class B shares can cost you more than the Class A front-end sales charges, especially on purchases that are eligible for breakpoint discounts. This can make Class B shares more expensive to you and economically inferior to Class A shares depending upon the fund, the amount invested in the fund, and the holding period. If you are considering investing in Class B shares, you should discuss with your Financial Consultant whether an investment in Class A shares might be preferable for you, considering the availability of breakpoint discounts on the front-end sales charge and the generally lower 12b-1 fees of Class A shares. Some fund companies are brokerage firms (including Smith Barney) limit the amount of Class B shares you can purchase in a fund.

## PLAINTIFF AND OTHER MEMBERS OF THE CLASS HAVE SUFFERED DAMAGES

270.   As a result of Defendants' conduct alleged above, Plaintiffs suffered damages. The damages suffered by the Plaintiffs were a foreseeable consequence of Defendants' material omissions and wrongful conduct. Plaintiffs have suffered at least three different types of damages.

271.   First, they were improperly directed into mutual funds (either Proprietary Funds or Strategic Partners' Funds) that provided Plaintiffs with lower returns then they would have received had the SSB Financial Consultants directed them toward funds that were in their best interests. Plaintiffs would not have purchased the inferior Proprietary and Strategic Partners' Funds had they known of the illegal and improper practices the Defendants used to direct

Plaintiffs into the Proprietary and Strategic Partners' Funds  By investing in Proprietary and Strategic Partners' Funds, Plaintiffs received a return on their investment that was substantially less than the return on investment that they would have received had they invested the same dollars in a comparable fund.

272.   Second, Plaintiffs and members of the Class were forced to pay excessive and improper commissions in connection with their purchases and ownership of shares in the Proprietary Funds through the various mechanisms described *supra* at paras. 173-200. Plaintiffs have been damaged by the amounts of the excessive commissions they paid and the income they could have earned had they not been charged those excessive and improper commissions. Plaintiffs' damages as a result of the commissions they paid for shares of the Proprietary Funds was a foreseeable consequence of Defendants' failure to disclose their steering and compensation practices.

273.   Third, Plaintiffs were damaged because the Proprietary Funds purchased fund assets in contravention of the investment guidelines disclosed in the fund Prospectuses and other Fund documents.   Instead of following the disclosed guidelines, on many occasions, the Proprietary Funds purchased assets to further the goals of SSB's investment banking business. Plaintiffs and members of the Class were damaged by the losses incurred in the Proprietary Funds as a result of the acquisition of assets at the behest of SSB's investment banking business. Plaintiffs' damages as a result of the improper acquisition of assets by the Proprietary Funds was a foreseeable consequence of Defendants' failure to disclose their asset acquisition practices

274   Additionally, the Prospectus for the Smith Barney Appreciation Fund Inc. states that a table describing the Fund's fee structure "sets forth the fees and expenses you will pay if you invest in fund shares " (Emphasis added). The Prospectuses for all of the Proprietary

Funds that were filed during the Class Period contained substantially similar statements. The table includes "Management Fees" and "12b-1 Distribution and Service Fees," which are at the heart of this action. In addition, the Prospectus also states that these fees "are an ongoing expense and, over time, may cost <u>you</u> more than other types of sales charges." (Emphasis added.). Therefore, mutual fund fees paid to investment advisers and their affiliates are <u>paid directly by investors</u>.

### ADDITIONAL SCIENTER ALLEGATIONS

275.   SSB and its affiliates aggressively sold Proprietary Funds to investors during the Class Period without disclosing their strong financial interest in recommending Proprietary Funds over other investment choices.   This practice coupled with the Proprietary Funds' undisclosed practice of paying excessive fees and commissions to SSB and its affiliated brokers and financial advisors for steering the Plaintiff Class to invest in the Proprietary Funds constitutes a knowing violation of federal securities laws. The Investment Adviser Defendants' clear breach of their fiduciary obligations of loyalty and care to investors operated as a fraud and deceit against the Plaintiff Class. Each Defendant is liable for intentionally or recklessly:  (i) failing to disclose material adverse facts while selling shares of the Proprietary Funds, and/or (ii) participating in a scheme to defraud and/or a course of conduct that operated as a fraud or deceit on purchasers of the Proprietary Funds shares during the Class Period. The wrongful conduct alleged above enabled Defendants to profit extensively and surreptitiously at the expense of Plaintiffs.

276    As alleged above, the Director Defendants and the Investment Adviser Defendants acted with scienter by knowingly or recklessly disseminating public documents and statements in the name of the Proprietary Funds that they knew or recklessly disregarded were

materially false and misleading because they omitted material facts regarding fees, expenses and conflicts of interest. The Board members of the Proprietary Funds and the Investment Adviser Defendants knew that statements in the Prospectuses, SAIs and Annual and Semi-Annual Reports would be issued to Plaintiffs and other members of the investing public and knowingly or recklessly participated or acquiesced in the issuance and dissemination of materially false and misleading statements and documents.

277. The Board members and the Investment Adviser Defendants at all times throughout the Class Period maintained control over the true, material information that was falsely communicated, or not communicated at all, to investors including all members of the Plaintiff Class. On account of their close association with the Proprietary Funds, the Director Defendants and Investment Adviser Defendants were privy to confidential information concerning the Proprietary Funds, and all of the fees and expenses borne by the Funds. By concealing the fraudulent scheme detailed herein, they knowingly and culpably participated in the fraudulent course of conduct.

278. All Defendants were highly motivated to allow, facilitate, and participate in the fraudulent conduct alleged herein and all Defendants had actual knowledge of such conduct. In exchange for allowing the unlawful practices alleged herein, the Investment Adviser Defendants, *inter alia,* received increased management fees which inured to their benefit and to the benefit of Citigroup and CGMI, as SSB's parent corporations. In addition, SSB, Citigroup and CGMI were highly motivated to engage in the wrongdoing alleged herein because they incurred lower costs selling the Proprietary Funds than funds sold by competitors, thereby increasing SSB's profitability and the profitability of SSB's parents. Furthermore, the Investment Adviser Defendants, Citigroup, and CGMI profited through the receipt of excessive fees, revenue-sharing

payments, bonuses, kickbacks, commissions, and numerous other incentives from the Proprietary Funds and the funds of Strategic Partners.

279.    The financial incentives for SSB, and its affiliate brokers and financial advisors, were massive, and touched upon every level of the organization:   SSB received illegal, undisclosed payments amounting to millions of dollars per year from Strategic Partners for providing branch access and brokers who were instructed and encouraged to push the funds of Strategic Partners on unsuspecting clients; SSB collected excessive fees and directed brokerage commissions from the Proprietary Funds and the funds of Strategic Partners which amounted to hundreds of millions of dollars over the Class Period as a *quid pro quo* for steering investors into the Funds that paid-to-play; individual brokers, financial advisors, branch managers, and regional managers received cash kickbacks, increased salaries and bonuses, dinners, event tickets, vacations, lucrative IPO allocations, and other undisclosed incentives for participating in the scheme to steer investors into the Funds that paid-to-play; the Investment Adviser defendants also received higher, undisclosed sales commissions paid to financial advisors for selling Proprietary Funds over other more suitable investments; and the Investment Adviser Defendants and managers also steered clients into Proprietary and Strategic Partner Funds, and paid incentives to support steering, because upon increasing the size of the Fund the management fee would correspondingly increase since it was most often calculated as a percentage of assets under management.

280    The fact that the Investment Adviser defendants knew about, and participated in, this illegal scheme is perhaps best illustrated by the sales and performance data of the Proprietary Funds themselves.   According to SSB's own sales figures, fund families who paid-to-play represented 96 9% of total mutual fund sales for the organization in 2003   From 2001 to 2003,

however, the Proprietary Funds performed in the bottom 1/3 of 549 mutual funds families in the United States, and are thus listed among the worst performing funds. The Investment Adviser Defendants conduct in steering virtually all of their clients into terrible investments cannot be understood without taking into account the fact that the Investment Adviser Defendants stood to benefit personally and substantially from the scheme.

281.    Indeed, every facet of Investment Adviser Defendants' operations was devised to support this steering program and it was so all encompassing that if anyone did not have actual knowledge of it within the organization, they should have known about it, or were reckless in not knowing.

282.    For example, the set-up of the proprietary computer system,[7] the compensation practices that revolved around the pay-to-play steering program,[8] the training of support personnel at the mutual fund sales desk,[9] the far more simplified process for purchasing Proprietary over non-proprietary Funds,[10] and the internal publication "*The Financial Consultant*"[11] were all means of selling the brokers and financial advisors on the idea that the Proprietary Funds were proper investment vehicles for their clients. In all of these ways, the Investment Adviser Defendants were well-aware of the shelf-spacing program, the pay-to-play practices, and the financial and other incentives offered to them for steering clients into the Proprietary of Strategic Partner Funds

---

[7]   *See supra* ¶¶ 6, 158-60

[8]   *See supra* ¶¶ 136-37, 165-67

[9]   *See supra* ¶¶ 161-63

[10]   *See supra* ¶ 164.

[11]   *See supra* ¶ 141.

283.    The Investment Adviser Defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein, and each Defendant participated in and/or had actual knowledge of the fraudulent conduct. In exchange for allowing and facilitating all of these unlawful practices, SSB received at least hundreds of millions of dollars from the sale of Strategic Partner and Proprietary Funds based upon the improper inducements and incentives received from the these Funds, or the managers or affiliates of these Funds.

284    Moreover, Defendants were highly motivated to conceal from Plaintiffs the receipt of directed brokerage fees, revenue-sharing payments, and other excessive fees from the Funds, along with concealing the inherent, insurmountable conflicts of interest created by these practices, because Defendants knew that if SSB clients were aware that SSB was being paid cash or otherwise compensated to make recommendations to invest in the Strategic Partner or Proprietary Funds, then such recommendations (and their corresponding financial rewards) would be undermined

285.    As alleged above, moreover, Defendants were not only rewarded for steering large numbers of clients into Proprietary or Strategic Partner Funds, but they were also censured for failing to steer clients to these Funds. The Investment Adviser Defendants instilled this steering program into those who were less inclined to participate in the scheme by sending constant email reminders about steering clients into Proprietary Funds, and by holding constant, mandatory meetings with managers and wholesalers to discuss ways in which to sell Proprietary Funds.

286.    Defendants further acted with scienter because they knew, or were reckless in not knowing, that entering into the directed brokerage, revenue-sharing and the other improper pay-

to-play practices that provided incentives to push the Proprietary Funds and funds of Strategic Partners was illegal, created conflicts of interest and violated SEC and NASD Rules.

287    Section 17(a)(2) of the Securities Act prohibits one from obtaining money or property in the offer or sale of any securities "by means of any untrue statement of a material fact . . . necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 15 U S C § 77q(a)(2). Defendants knew or were reckless in not knowing that their failure to disclose the receipt of fees from directed brokerage, from so-called "revenue-sharing" payments made to gain access to branch locations, and from other sources alleged herein violated the disclosure provisions of the securities laws and created inherent, insurmountable conflicts of interest.

288    Defendants are also charged with knowledge of NASD Rule 2830(k), which provides, in relevant part, the following:

> No member shall, directly or indirectly, favor or disfavor the sale or distribution of shares of any particular investment company or group of investment companies on the basis of brokerage commissions received or expected by such member from any source, including such investment company, or any covered account

289    Defendants knew or were reckless in not knowing that their acceptance of directed brokerage commissions from the Strategic Partners Program in return for steering SSB clients into the Proprietary of Strategic Partner Funds violated Rule 2830(k) and they therefore acted with scienter.

290.    All of the Director Defendants failed to monitor and supervise the Investment Adviser Defendants, and intentionally or recklessly turned a blind-eye when the Investment Adviser Defendants systematically siphoned hundreds of millions of dollars from the Proprietary Funds.

291    The Director Defendants, moreover, assumed an obligation to know    In representation upon representation throughout the Class Period, the Director Defendants informed the Fund investors that they supervised, approved, and monitored the business affairs of the Funds   According to the Prospectuses of the Proprietary Funds, the Director Defendants were charged with approving or disapproving all agreements entered by the Fund, including revenue-sharing agreements, participation in any Strategic Partners Program, or any other agreements   For example, as stated in the Prospectus for the Salomon Brothers Small Cap Growth Fund, which is typical of the representations made in other Proprietary Fund Prospectuses:

> The business and affairs of each Fund are managed under the direction of the Board of Directors.  **The Board of Directors approves all significant agreements between the Funds and the persons or companies that furnish services to the Fund, including agreements with its distributor, investment manager, administrator, custodian and transfer agent.** The Funds' day-to-day operations are delegated to the investment manager and administrator

292.   The Director Defendants are also directly responsible for promoting and protecting the interests of shareholders by approving and supervising the 12b-1 Distribution Plan, which was subject to annual or semi-annual review and approval by the Board.  For example, in 1999 through 2002, the Salomon Brothers Series Funds contained the following disclosure, or one similar in substance:

> The Board of Directors of each Fund ... has adopted a services and distribution plan with respect to each class of shares (other than Class O) of each Fund pursuant to the Rule (the 'Plan').  **The Board of Directors of each Fund has determined that there is a reasonable likelihood that the Plan will benefit such Fund and its shareholders.**
>
> **A quarterly report of the amounts expended with respect to each Fund under the applicable Plan, and the purposes for which such expenditures were incurred, is presented to the Board of Directors for its review.** In addition, each Plan provides that it may not be amended with respect to any class of shares of the applicable Fund to increase materially the costs which may be borne for

- 94 -

distribution pursuant to the Plan without the approval of shareholders of that class, and that other material amendments of the Plan must be approved by the Board of Directors, and by the Directors who are neither 'interested persons,' as defined in the 1940 Act, nor have any direct or indirect financial interest in the operation of the Plan or any related agreements, by vote cast in person at a meeting called for the purpose of considering such amendments. Each Plan and any related agreements are subject to annual approval by such vote cast in person at a meeting called for the purpose of voting on the Plan. Each Plan may be terminated with respect to a Fund or any class thereof at any time by vote of a majority of the Directors who are not 'interested persons' and have no direct or indirect financial interest in the operation of the Plan or in any related agreement or by vote of a majority of the shares of a Fund or class, as the case may be.

293. In this case, the Director Defendants ignored or abdicated their fiduciary duties to the Proprietary Funds and shareholders of the Proprietary Funds by either approving undisclosed revenue-sharing and shelf-spacing arrangements, or deliberately or recklessly turning a blind-eye to the existence of such a program regardless of the negative impact such arrangements had on fund shareholders.

294. The Director Defendants were also directly responsible for overseeing portfolio transactions so as to prevent the type of directed brokerage transactions that occurred in this case. The Director Defendants either knew, or recklessly turned a blind-eye to the practice of directed brokerage when it came to SSB. In this regard, the Prospectuses and SAIs of the Proprietary Funds throughout the Class Period would typically provide:

> Subject to policy established by the Board of Directors, the investment manager is primarily responsible for each Fund's portfolio decisions and the placing of the Fund's portfolio transactions
>
>          * * *
>
> Each Fund contemplates that, consistent with the policy of obtaining the best net results, brokerage transactions may be conducted through 'affiliated broker/dealers,' as defined in the 1940 Act. Each Company's Board of Directors has adopted procedures in accordance with Rule 17e-1 promulgated under the 1940 Act to ensure that all brokerage commissions paid to such affiliates are reasonable and fair in the context of the market in which such affiliates operate. Any such compensation will be paid in accordance with applicable SEC regulations.

- 95 -

295.    The pecuniary interests of the interested Directors Defendants are not disclosed in any of SSB's filings with the SEC. The interested directors, however, are directly beholden to SSB and its affiliates for their high-paying positions at SSB and lucrative benefits related to their positions. The interested Director Defendants maintain a business and financial relationship with and are subject to a controlling influence of both SSB and its affiliates.

296.    In addition to the enormous financial rewards reaped by Citigroup on account of the hundreds of millions of dollars of excessive fees being collected by its wholly owned subsidiary, SSB, Citigroup was otherwise well-aware of the scheme, helped to conceive it, and participated in it.

297.    Throughout most of the Class Period, Citigroup and SSB worked as an integrated, albeit conflicted, unit. Research provided by SSB analysts were used to support both the SSB retail sales side of the business and Citigroup's stake in fostering major investment banking relationships. The fees generated from Citigroup's investment banking business were often shared with SSB in the form of a "helper's fee." Likewise, fees generated by SSB were shared with Citigroup to foster their symbiotic relationship. Amidst several high profile government investigations, however, which exposed the serious conflicts of interest existing between Citigroup and SSB, Citigroup paid over $1 billion and agreed to separate its businesses as required by law.

298.    Still, however, Citigroup itself generated fees from SSB's mutual fund business, and knows what fees were generated from SSB's mutual fund business. During the Class Period, for instance, a business unit of Citigroup called Citigroup Asset Management ("CAM") which was involved in certain of the Proprietary Funds as a transfer agent collected over $16 million from a sub-contractor pursuant to an illicit "revenue guarantee agreement," which agreement

caused the Funds to incur excessive, undisclosed fees and expenses. Citigroup therefore did not have its blinders on, rather it too had its hand out and was participating in the scheme to siphon shareholder wealth from the Proprietary Funds.

299.   Other fees were collected directly by Citigroup as well  In a post-Class Period representation contained on SSB's website, for instance, it was disclosed for the first time, as follows:

### Compensation Citigroup Receives from Funds

Citigroup Global Markets Inc. ("CGMI") and other Citigroup affiliates receive from certain funds compensation in the form of commissions and other fees for providing traditional brokerage services, including related research and advisory support, and for purchases and sales of securities for fund portfolios  CGMI and other Citigroup affiliates also receive other compensation from certain funds for financial services performed for the benefit of such funds. We prohibit linking the determination of the amount of such brokerage commissions and service fees charged to a fund to the aggregate values of Smith Barney's overall fund share sales, client holdings of the fund, or to offset the revenue-sharing or expense reimbursement and administrative fees described above. We prohibit the use of brokerage commissions and other compensation to CGMI and Citigroup affiliates to offset the revenue-sharing, expense reimbursement, or administrative fees described above. Moreover, such commissions or other compensation are not paid to or shared with Smith Barney's mutual fund sales business unit.

### The Individual Board Members' Scienter is Demonstrated By
### The Fact That They Are Financially Beholden To SSB

300.   The Proprietary Funds' Boards, i e , the Director Defendants, were captive to and controlled by Citigroup and the Investment Adviser Defendants, who induced the Director Defendants to breach their statutory and fiduciary duties to manage and supervise the Proprietary Funds in the best interest of the Fund and its investors. In many cases, key Proprietary Fund directors and trustees were employees or former employees of Citigroup or the Investment Adviser Defendants who were beholden for their positions, not to the Proprietary Funds investors, but rather to the Investment Adviser Defendants they were supposed to oversee  The

Director Defendants served for indefinite terms at the pleasure of the Investment Adviser Defendants and formed supposedly independent committees, charged with responsibility of overseeing billions of dollars of fund assets (much of which was comprised of Plaintiffs' college and retirement savings)

301.   Moreover, to ensure that the directors were compliant, the Investment Adviser Defendants often recruited key fund directors from the ranks of Citigroup or the Investment Adviser Defendants.   In exchange for creating and managing the Proprietary Funds, the Investment Adviser Defendants charged the Proprietary Funds a variety of fees, each of which was calculated as a percentage of assets under management.   Hence, the more money invested in the funds, the greater the fees ultimately paid to SSB, its affiliates and their corporate parents.

302.   The Board members were willing to approve the improper kickbacks paid to brokers and financial advisors who steered Plaintiffs to invest in the Proprietary Funds, and to charge excessive fees to fund such kickbacks, because each Board member received substantial payments and benefits by virtue of his or her membership on the Proprietary Funds' Boards, as follows:

>    (1)   Defendant Gerken served on the Boards for 227 Proprietary Funds during the Class Period, including Smith Barney Mid Cap Core Fund, Smith Barney Large Cap Value Fund, Smith Barney Shearson Fundamental Value Fund, Smith Barney Diversified Strategic Income Fund, Smith Barney High Income Fund, Smith Barney Large Cap Core Fund, Smith Barney Aggressive Growth Fund, Smith Barney Investment Grade Bond Fund and Smith Barney Appreciation Fund Inc.   In addition, the Proprietary Funds disclose Gerken as an interested director because he served, at all relevant times, as a managing director of defendant SSB and Chairman, President and CEO of defendant Smith Barney Fund Management.   As a Board member, President, and CEO of numerous Proprietary Funds, Defendant Gerken is (and was during the Class Period) responsible for the false and misleading statements and omissions in the Proprietary Funds' Prospectuses

and Annual and Semi-Annual Reports, which Gerken signed each year from 2002 to 2004.

(2)    Defendant McLendon served on the Boards for 228 Proprietary Funds during the Class Period, including Smith Barney Mid Cap Core Fund, Smith Barney Large Cap Value Fund, Smith Barney Shearson Fundamental Value Fund, Salomon Brothers High Yield Bond Fund, Salomon Brothers International Equity Fund, Salomon Brothers Large Cap Growth Fund, Salomon Brothers Short/Intermediate US Government Fund, Salomon Brothers Small Cap Growth Fund, Salomon Brothers Capital Fund, Salomon Brothers Investors Value Fund, Smith Barney Diversified Strategic Income Fund, Smith Barney High Income Fund, Smith Barney Large Cap Core Fund, Smith Barney Aggressive Growth Fund, Smith Barney Investment Grade Bond Fund and Smith Barney Appreciation Fund Inc. In addition, the Proprietary Funds disclose McLendon as an interested director because he served, at all relevant times, as Chairman, President and CEO of SSB Citi Fund Management, LLC. and more than fifty investment companies sponsored by Salomon Smith Barney, Chairman or Co-Chairman of the Board for more than seventy investment companies associated with Salomon Smith Barney, Managing Director of Smith Barney, Chairman of Smith Barney Strategy Advisers, Inc., and President of SBMFM. As a Board member, President, and CEO of numerous Proprietary Funds, Defendant McLendon was responsible for the false and misleading statements and omissions in the Proprietary Funds' Prospectuses and Annual and Semi-Annual Reports, which McLendon signed each year from 1999 to 2002.

(3)    Defendant Coolidge served on the Boards for at least forty-seven Proprietary Funds during the Class Period, including Salomon Funds Trust. In addition, the Proprietary Funds disclose Coolidge as an interested director because he served, at all relevant times, as President and CEO of Signature Financial Group, Inc. and CFBDS, Inc. As a Board member, President, and CEO of numerous Proprietary Funds, Defendant Coolidge was responsible for the false and misleading statements and omissions in the Proprietary Funds' Prospectuses and Annual and Semi-Annual Reports, which Coolidge signed each year from 1999 to 2000.

(4)    Defendant Colman served on the Boards for at least thirty-five Proprietary Funds during the Class Period, including Salomon Brothers Emerging Markets Debt Fund Inc., Salomon Brothers High Yield Bond Fund, Salomon Brothers International Equity Fund, Salomon Brothers Large Cap Growth Fund, Salomon Brothers Short/Intermediate US Government Fund, Salomon

Brothers Small Cap Growth Fund, Salomon Brothers Capital Fund, and Salomon Brothers Investors Value Fund, and received compensation of approximately $54,225, $52,534, $36,875, $90,950 and $197,350, respectively, in 1999, 2000, 2001, 2002 and 2003 totalling $431,934 during the Class Period. Defendant Colman signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Colman served as a Board member or Trustee.

(5)     Defendant Cronin served on the Boards for at least seven Proprietary Funds during the Class Period, including Salomon Brothers Emerging Markets Debt Fund Inc., Salomon Brothers High Yield Bond Fund, Salomon Brothers International Equity Fund, Salomon Brothers Large Cap Growth Fund, Salomon Brothers Short/Intermediate US Government Fund and Salomon Brothers Small Cap Growth Fund, and received compensation of approximately $50,200, $57,109, $52,700, $90,300 and $117,450, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Cronin signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Cronin served as a Board member or Trustee.

(6)     Defendant Gelb served on the Boards for at least thirty-two Proprietary Funds during the Class Period, including Salomon Brothers Emerging Markets Debt Fund Inc., Salomon Brothers High Yield Bond Fund, Salomon Brothers International Equity Fund, Salomon Brothers Large Cap Growth Fund, Salomon Brothers Short/Intermediate US Government Fund and Salomon Brothers Small Cap Growth Fund, and received compensation of approximately $81,700 and $111,150.11, respectively, in 2002 and 2003. Defendant Gelb signed the materially false and misleading Prospectuses filed with the SEC in at least 2003 for the Proprietary Funds on which Gelb served as a Board member or Trustee.

(7)     Defendant Hutchinson served on the Boards for at least forty-two Proprietary Funds during the Class Period, including Salomon Brothers Emerging Markets Debt Fund Inc., Salomon Brothers Capital Fund and Salomon Brothers Investors Value Fund, and received compensation of approximately $49,350, $38,300, $43,900, $46,750 and $114,600, respectively, in 1999, 2000, 2001, 2002 and 2003 totalling at least $192,805 during the Class Period. Defendant Hutchinson signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003