for the Proprietary Funds on which Hutchinson served as a Board member or Trustee.

(8) Defendant Roett served on the Boards for at least thirty-two Proprietary Funds during the Class Period, including Salomon Brothers Emerging Markets Debt Fund Inc., Salomon Brothers High Yield Bond Fund, Salomon Brothers International Equity Fund, Salomon Brothers Large Cap Growth Fund, Salomon Brothers Short/Intermediate US Government Fund and Salomon Brothers Small Cap Growth Fund, and received compensation of approximately $93,400 and $163,300, respectively, in 2002 and 2003. Defendant Roett signed the materially false and misleading Prospectuses filed with the SEC in at least 2003 for the Proprietary Funds on which Roett served as a Board member or Trustee.

(9) Defendant Salacuse served on the Boards for at least thirty-two Proprietary Funds during the Class Period, including Salomon Brothers Emerging Markets Debt Fund Inc., Salomon Brothers High Yield Bond Fund, Salomon Brothers International Equity Fund, Salomon Brothers Large Cap Growth Fund, Salomon Brothers Short/Intermediate US Government Fund and Salomon Brothers Small Cap Growth Fund, and received compensation of approximately $90,300 and $137,150, respectively, in 2002 and 2003 Defendant Salacuse signed the materially false and misleading Prospectuses filed with the SEC in at least 2003 for the Proprietary Funds on which Salacuse served as a Board member or Trustee.

(10) Defendant Berv served on the Boards for at least thirty-seven Proprietary Funds during the Class Period, including Smith Barney Large Cap Core Fund, and received compensation of approximately $69,500, $68,000, $90,403, $70,000 and $80,300, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Berv signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Berv served as a Board member or Trustee.

(11) Defendant Finn served on the Boards for at least thirty-seven Proprietary Funds during the Class Period, including Smith Barney Large Cap Core Fund, and received compensation of approximately $63,250, $71,000, $84,467, $72,500 and $84,450, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Finn signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Finn served as a Board member or Trustee.

(12) Defendant Gross served on the Boards for at least thirty-two Proprietary Funds during the Class Period, including Smith Barney Large Cap Core Fund, and received compensation of approximately $59,000, $59,000, $72,600, $72,500 and $81,350, respectively, in 1999, 2000, 2001, 2002 and 2003 Defendant Gross signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Gross served as a Board member or Trustee

(13) Defendant Harrington served on the Boards for at least thirty-seven Proprietary Funds during the Class Period, including Smith Barney Large Cap Core Fund, and received compensation of $71,250, $67,500, $90,400, $72,500 and $80,200, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Harrington signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Harrington served as a Board member or Trustee.

(14) Defendant Kerley served on the Boards for at least thirty-seven Proprietary Funds during the Class Period, including Smith Barney Large Cap Core Fund, and received compensation of approximately $69,750, $66,000, $90,400, $72,500 and $80,300, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Kerley signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Kerley served as a Board member or Trustee

(15) Defendant Breech served on the Boards for at least four Proprietary Funds during the Class Period, including Salomon Brothers Capital Fund and Salomon Brothers Investors Value Fund, and received compensation of approximately $26,875, $32,625, $15,250, $35,500 and $29,500, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Breech signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Breech served as a Board member or Trustee

(16) Defendant Dill served on the Boards for at least four Proprietary Funds during the Class Period, including Salomon Brothers Capital Fund and Salomon Brothers Investors Value Fund, and received compensation of approximately $26,875, $30,375, $13,875, $35,500 and $28,250, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Dill signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Dill served as a Board member or Trustee.

(17) Defendant Kirtland served on the Boards for at least four Proprietary Funds during the Class Period, including Salomon Brothers Capital Fund and Salomon Brothers Investors Value Fund, and received compensation of approximately $28,250, $28,375, $15,375, $35,500 and $28,250, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Kirtland signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Kirtland served as a Board member or Trustee.

(18) Defendant Mattis served on the Boards for at least three Proprietary Funds during the Class Period, including Salomon Brothers Capital Fund and Salomon Brothers Investors Value Fund, and received compensation of approximately $26,000, $27,500, $11,000, $25,250 and $25,250, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Mattis signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Mattis served as a Board member or Trustee

(19) Defendant Schlafly served on the Boards for at least three Proprietary Funds during the Class Period, including Salomon Brothers Capital Fund and Salomon Brothers Investors Value Fund, and received compensation of approximately $28,250, $29,750, $14,000, $32,750 and $28,250, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Schlafly signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Schlafly served as a Board member or Trustee.

(20) Defendant Abraham served on the Boards for at least twenty-eight Proprietary Funds during the Class Period, including Smith Barney Large Cap Value Fund, Smith Barney Diversified Strategic Income Fund and Smith Barney High Income Fund, and received compensation of approximately $71,133, $72,800, $73,500, $75,000 and $76,300, respectively, in 1999, 2000, 2001, 2002 and 2003 Defendant Abraham signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Abraham served as a Board member or Trustee.

(21) Defendant Bloostein served on the Boards for at least thirty-five Proprietary Funds during the Class Period, including Smith Barney Large Cap Value Fund, Smith Barney Diversified Strategic Income Fund and Smith Barney High Income Fund, and received compensation of approximately $112,483, $109,950, $117,100, $122,250 and $126,600, respectively, in 1999, 2000, 2001, 2002

and 2003. Defendant Bloostein signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Bloostein served as a Board member or Trustee.

(22) Defendant Dasher served on the Boards for at least twenty-eight Proprietary Funds during the Class Period, including Smith Barney Large Cap Value Fund, Smith Barney Diversified Strategic Income Fund and Smith Barney High Income Fund, and received compensation of approximately $65,733, $75,000, $75,000, $76,600 and $80,150, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Dasher signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Dasher served as a Board member or Trustee

(23) Defendant Hardin served on the Boards for at least thirty-five Proprietary Funds during the Class Period, including Smith Barney Large Cap Value Fund, Smith Barney Diversified Strategic Income Fund and Smith Barney High Income Fund, and received compensation of approximately $90,450, $93,150, $110,800, $132,300 and $128,775, respectively, in 1999, 2000, 2001, 2002 and 2003 Defendant Hardin signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Hardin served as a Board member or Trustee

(24) Defendant Rasmussen served on the Boards for at least twenty-eight Proprietary Funds during the Class Period, including Smith Barney Large Cap Value Fund, Smith Barney Diversified Strategic Income Fund and Smith Barney High Income Fund, and received compensation of approximately $71,200, $74,900, $74,900, $75,200 and $76,100, respectively, in 1999, 2000, 2001, 2002 and 2003 Defendant Rasmussen signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Rasmussen served as a Board member or Trustee.

(25) Defendant Toolan served on the Boards for at least twenty-eight Proprietary Funds during the Class Period, including Smith Barney Large Cap Value Fund, Smith Barney Diversified Strategic Income Fund and Smith Barney High Income Fund, and received compensation of approximately $69,100, $74,900, $74,900, $73,400 and $77,050, respectively, in 1999, 2000, 2001, 2002 and 2003 Defendant Toolan signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999

to 2003 for the Proprietary Funds on which Toolan served as a Board member or Trustee.

(26) Defendant Foley served on the Boards for at least twenty-eight Proprietary Funds during the Class Period, including Smith Barney Large Cap Value Fund, Smith Barney Diversified Strategic Income Fund and Smith Barney High Income Fund, and received compensation of approximately $71,300, $74,900, $74,900, $75,000 and $53,700, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Foley signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Foley served as a Board member or Trustee.

(27) Defendant Hanson served on the Boards for at least twenty-eight Proprietary Funds during the Class Period, including Smith Barney Large Cap Value Fund, Smith Barney Diversified Strategic Income Fund and Smith Barney High Income Fund, and received compensation of approximately $68,233, $74,800, $74,800, $73,900 and $76,600, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Hanson signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Hanson served as a Board member or Trustee.

(28) Defendant Carlton served on the Boards for at least thirty-two Proprietary Funds during the Class Period, including Smith Barney Large Cap Core Fund, and received compensation of approximately $56,000, $56,000, $73,600, $70,000 and $82,600, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Carlton signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Carlton served as a Board member or Trustee.

(29) Defendant Cocanougher served on the Boards for at least thirty-two Proprietary Funds during the Class Period, including Smith Barney Large Cap Core Fund, and received compensation of approximately $57,000, $57,000, $74,600, $70,100 and $86,200, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Cocanougher signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Cocanougher served as a Board member or Trustee.

(30) Defendant Merten served on the Boards for at least thirty-two Proprietary Funds during the Class Period, including Smith Barney

Large Cap Core Fund, and received compensation of approximately $56,000, $56,000, $72,600, $70,000 and $77,800, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Merten signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Merten served as a Board member or Trustee.

(31) Defendant Pettit served on the Boards for at least thirty-two Proprietary Funds during the Class Period, including Smith Barney Large Cap Core Fund, and received compensation of approximately $59,000, $59,000, $72,500, $72,500 and $82,700, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Pettit signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Pettit served as a Board member or Trustee

(32) Defendant Ades served on the Boards for at least fifteen Proprietary Funds during the Class Period, including Smith Barney Aggressive Growth Fund and Smith Barney Investment Grade Bond Fund, and received compensation of approximately $56,238, $56,775, $52,500, $56,050 and $60,575, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Ades signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Ades served as a Board member or Trustee.

(33) Defendant Barg served on the Boards for at least forty-two Proprietary Funds during the Class Period, including Smith Barney Mid Cap Core Fund, Smith Barney Aggressive Growth Fund, Smith Barney Investment Grade Bond Fund and Smith Barney Appreciation Fund Inc., and received compensation of approximately $114,288, $116,075, $146,000, $119,450 and $127,963, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Barg signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Barg served as a Board member or Trustee.

(34) Defendant Crane served on the Boards for at least forty-nine Proprietary Funds during the Class Period, including Smith Barney Mid Cap Core Fund, Smith Barney Aggressive Growth Fund, Smith Barney Investment Grade Bond Fund and Smith Barney Appreciation Fund Inc, and received compensation of approximately $155,363, $155,375, $143,550, $152,200 and $168,875, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Crane signed the materially false and misleading

Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Crane served as a Board member or Trustee.

(35) Defendant Hubbard served on the Boards for at least fifteen Proprietary Funds during the Class Period, including Smith Barney Aggressive Growth Fund and Smith Barney Investment Grade Bond Fund, and received compensation of approximately $56,138, $56,675, $52,400, $56,050 and $60,675, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Hubbard signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Hubbard served as a Board member or Trustee.

(36) Defendant Jerome H. Miller served on the Boards for at least fifteen Proprietary Funds during the Class Period, including Smith Barney Aggressive Growth Fund and Smith Barney Investment Grade Bond Fund, and received compensation of approximately $51,613, $56,275, $47,675, $56,060 and $60,575, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Jerome H. Miller signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Jerome H. Miller served as a Board member or Trustee.

(37) Defendant Ken Miller served on the Boards for at least fifteen Proprietary Funds during the Class Period, including Smith Barney Aggressive Growth Fund and Smith Barney Investment Grade Bond Fund, and received compensation of approximately $47,188, $56,475, $52,200, $56,050 and $60,575, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Ken Miller signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Ken Miller served as a Board member or Trustee.

(38) Defendant Dorsett served on the Boards for at least twenty-seven Proprietary Funds during the Class Period, including Smith Barney Mid Cap Core Fund and Smith Barney Appreciation Fund Inc., and received compensation of approximately $57,950, $59,500, $61,300, $61,300 and $66,050, respectively, in 1999, 2000, 2001, 2002 and 2003. consider a demand from shareholders of the Proprietary Funds Defendant Dorsett signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Dorsett served as a Board member or Trustee.

(39) Defendant Jaffe served on the Boards for at least twenty-seven Proprietary Funds during the Class Period, including Smith Barney

Mid Cap Core Fund and Smith Barney Appreciation Fund Inc., and received compensation of approximately $45,100, $58,700, $115,000, $60,900 and $58,250, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Jaffe signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Jaffe served as a Board member or Trustee.

(40) Defendant Kaufman served on the Boards for at least fifty-six Proprietary Funds during the Class Period, including Smith Barney Mid Cap Core Fund and Smith Barney Appreciation Fund Inc., and received compensation of approximately $110,650, $114,400, $115,000, $114,700 and $119,350, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Kaufman signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Kaufman served as a Board member or Trustee.

(41) Defendant McCann served on the Boards for at least twenty-seven Proprietary Funds during the Class Period, including Smith Barney Mid Cap Core Fund and Smith Barney Appreciation Fund Inc., and received compensation of approximately $58,050, $59,500, $61,300, $62,400 and $66,050, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant McCann signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which McCann served as a Board member or Trustee.

(42) Defendant Rose served on the Boards for at least twenty-seven Proprietary Funds during the Class Period, including Smith Barney Mid Cap Core Fund and Smith Barney Appreciation Fund Inc., and received compensation of approximately $53,500, $59,500, $61,300, $58,050 and $63,000, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Rose signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Rose served as a Board member or Trustee.

(43) Defendant Ellis served on the Boards for at least thirty-four Proprietary Funds during the Class Period, including Smith Barney Allocation Series Inc., and received compensation of approximately $50,600, $54,900, $52,132, $50,900 and $63,800, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Ellis signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Ellis served as a Board member or Trustee

(44) Defendant Kamesar served on the Boards for at least thirty-four Proprietary Funds during the Class Period, including Smith Barney Allocation Series Inc., and received compensation of approximately $52,600, $55,100, $51,932, $50,000 and $63,900, respectively, in 1999, 2000, 2001, 2002 and 2003 Defendant Kamesar signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Kamesar served as a Board member or Trustee

(45) Defendant Murphy served on the Boards for at least thirty-four Proprietary Funds during the Class Period, including Smith Barney Allocation Series Inc., and received compensation of approximately $39,900 and $64,100, respectively, in 2002 and 2003. Defendant Murphy signed the materially false and misleading Prospectuses filed with the SEC in each year from 2002 to 2003 for the Proprietary Funds on which Murphy served as a Board member or Trustee.

(46) Defendant Frayn served on the Board for at least one Proprietary Fund during the Class Period, including Smith Barney Shearson Fundamental Value Fund, and received compensation of approximately $11,000, $9,300, $10,400, $10,000 and $22,500, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Frayn signed the materially false and misleading Prospectuses filed with the SEC in at least 2000 to 2003 for the Proprietary Funds on which Frayn served as a Board member or Trustee

(47) Defendant Johnson served on the Board for at least one Proprietary Fund during the Class Period, including Smith Barney Shearson Fundamental Value Fund, and received compensation of approximately $7,700, $10,000 and $24,000, respectively, in 2001, 2002 and 2003. Defendant Johnson signed the materially false and misleading Prospectuses filed with the SEC in each year from 2001 to 2004 for the Proprietary Funds on which Johnson served as a Board member or Trustee

(48) Defendant Maryatt served on the Board for at least one Proprietary Fund during the Class Period, including Smith Barney Shearson Fundamental Value Fund, and received compensation of approximately $11,000, $9,400, $10,500, $10,000 and $22,500, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Maryatt signed the materially false and misleading Prospectuses filed with the SEC in at least 2000 to 2004 for the Proprietary Funds on which Maryatt served as a Board member or Trustee.

(49) Defendant Viscione served on the Board for at least one Proprietary Fund during the Class Period, including Smith Barney Shearson Fundamental Value Fund, and received compensation of approximately $11,000, $9,300, $10,400, $10,000 and $22,500, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Viscione signed the materially false and misleading Prospectuses filed with the SEC in at least 2000 to 2004 for the Proprietary Funds on which Viscione served as a Board member or Trustee.

(50) Defendant Cohen served on the Boards for at least seventeen Proprietary Funds during the Class Period, including Travelers Series Fund Inc. formally known as Smith Barney Travelers Series Fund Inc., and received compensation of approximately $27,800, $25,500, $25,600, $25,500 and $25,500, respectively, in 1999, 2000, 2001, 2002 and 2003 Defendant Cohen signed the materially false and misleading Prospectuses filed with the SEC in at least 2000 to 2004 for the Proprietary Funds on which Cohen served as a Board member or Trustee.

(51) Defendant Frankel served on the Boards for at least twenty-four Proprietary Funds during the Class Period, including Smith Barney International All Cap Growth Portfolio, and received compensation of approximately $79,450, $72,850, $77,600, $73,450 and $83,900, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Frankel signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Frankel served as a Board member or Trustee.

(52) Defendant Gellert served on the Boards for at least seventeen Proprietary Funds during the Class Period, including Travelers Series Fund Inc formally known as Smith Barney Travelers Series Fund Inc., and received compensation of approximately $22,700, $28,800, $29,600, $25,500 and $25,400, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Gellert signed the materially false and misleading Prospectuses filed with the SEC in at least 2000 to 2004 for the Proprietary Funds on which Gellert served as a Board member or Trustee.

(53) Defendant Greeven served on the Boards for at least seventeen Proprietary Funds during the Class Period, including Travelers Series Fund Inc. formally known as Smith Barney Travelers Series Fund Inc., and received compensation of approximately $25,800, $27,600, $29,400, $27,100 and $27,100, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Greeven signed the materially false and misleading Prospectuses filed with the SEC in

each year from 1999 to 2004 for the Proprietary Funds on which Greeven served as a Board member or Trustee.

(54) Defendant Heilbron served on the Boards for at least seventeen Proprietary Funds during the Class Period, including Smith Barney International All Cap Growth Portfolio, and received compensation of approximately $29,600, $29,600, $29,500, $27,100 and $27,100, respectively, in 1999, 2000, 2001, 2002 and 2003 Defendant Heilbron signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2004 for the Proprietary Funds on which Heilbron served as a Board member or Trustee.

(55) Defendant Cucchi served on the Boards for at least eight Proprietary Funds during the Class Period, including Smith Barney SB Adjustable Rate Income Fund, and received compensation of approximately $38,300, $30,100, $44,400 and $50,400, respectively, in 2000, 2001, 2002 and 2003 Defendant Cucchi signed the materially false and misleading Prospectuses filed with the SEC in at least 2002 to 2003 for the Proprietary Funds on which Cucchi served as a Board member or Trustee.

(56) Defendant Pavia served on the Boards for at least nine Proprietary Funds during the Class Period, including Smith Barney SB Adjustable Rate Income Fund, and received compensation of approximately $18,350, $40,600, $57,800 and $51,625, respectively, in 2000, 2001, 2002 and 2003. Defendant Pavia signed the materially false and misleading Prospectuses filed with the SEC in at least 2002 to 2003 for the Proprietary Funds on which Pavia served as a Board member or Trustee.

(57) Defendant Barber served on the Boards for at least sixteen Proprietary Funds during the Class Period, including Salomon Brothers High Yield Bond Fund, Salomon Brothers International Equity Fund, Salomon Brothers Large Cap Growth Fund, Salomon Brothers Short/Intermediate US Government Fund, Salomon Brothers Small Cap Growth Fund, Salomon Brothers Capital Fund and Salomon Brothers Investors Value Fund, and received compensation of approximately $135,100, $136,359 and $111,350, respectively, in 1999, 2000 and 2001. Defendant Barber signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2001 for the Proprietary Funds on which Barber served as a Board member or Trustee

(58) Defendant Morong served on the Boards for at least thirty-seven Proprietary Funds during the Class Period, including Smith Barney Large Cap Core Fund, and received compensation of

approximately $92,000, $93,500, $117,900, $90,500 and $80,300, respectively, in 1999, 2000, 2001, 2002 and 2003 Defendant Morong signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Morong served as a Board member or Trustee.

(59) Defendant Robb served on the Boards for at least thirty-eight Proprietary Funds during the Class Period, including Smith Barney Large Cap Core Fund, and received compensation of approximately $67,500, $63,000, $90,300, $72,500 and $80,600, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Robb signed the materially false and misleading Prospectuses filed with the SEC in at least 2000 to 2003 for the Proprietary Funds on which Robb served as a Board member or Trustee.

(60) Defendant Gilley served on the Boards for at least thirty-five Proprietary Funds during the Class Period, including Smith Barney Large Cap Core Fund, and received compensation of approximately $65,250, $70,500, $76,867 and $47,500, respectively, in 1999, 2000, 2001 and 2002. Defendant Gilley signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2002 for the Proprietary Funds on which Gilley served as a Board member or Trustee

(61) Defendant Lawless served on the Boards for at least four Proprietary Funds during the Class Period, including Salomon Brothers Capital Fund and Salomon Brothers Investors Value Fund, and received compensation of approximately $29,000, $31,375 and $15,250, respectively, in 1999, 2000 and 2001. Defendant Lawless signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2001 for the Proprietary Funds on which Lawless served as a Board member or Trustee.

(62) Defendant Woods served on the Boards for at least thirty-eight Proprietary Funds during the Class Period, including Salomon Funds Trust, and received compensation of approximately $66,000 and $44,250, respectively, in 1999 and 2000. Defendant Woods signed the materially false and misleading Prospectuses filed with the SEC in at least 1999 for the Proprietary Funds on which woods served as a Board member or Trustee.

(63) Defendant Brody served on the Boards for at least twenty Proprietary Funds during the Class Period, including Smith Barney Mid Cap Core Fund and Smith Barney Appreciation Fund Inc., and received compensation of approximately $138,600, $138,600 and

$141,650, respectively, in 1999, 2000 and 2001. Defendant Brody signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2002 for the Proprietary Funds on which Brody served as a Board member or Trustee

(64) Defendant Auch served on the Boards for at least two Proprietary Funds during the Class Period, including Smith Barney Allocation Series Inc , and received compensation of approximately $50,600, $52,800 and $52,000, respectively, in 1999, 2000 and 2001 Defendant Auch signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2001 for the Proprietary Funds on which Auch served as a Board member or Trustee.

(65) Defendant Paulsell served on the Board for at least one Proprietary Fund during the Class Period, including Smith Barney Shearson Fundamental Value Fund, and received compensation of approximately $9,000, $9,200, $10,400, $10,000 and $63,627, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Paulsell signed the materially false and misleading Prospectuses filed with the SEC in at least 2000 to 2002 for the Proprietary Funds on which Paulsell served as a Board member or Trustee.

(66) Defendant Weston served on the Board for at least one Proprietary Fund during the Class Period, including Smith Barney Shearson Fundamental Value Fund, and received compensation of approximately $10,000, $9,200, $10,300 and $10,000, respectively, in 1999, 2000, 2001 and 2002. Defendant Weston signed the materially false and misleading Prospectuses filed with the SEC in at least 2000 to 2002 for the Proprietary Funds on which Weston served as a Board member or Trustee.

(67) Defendant Andrews served on the Board for at least one Proprietary Fund during the Class Period, including Smith Barney Shearson Fundamental Value Fund, and received compensation of approximately $11,000, $9,200 and $10,250, respectively, in 1999, 2000 and 2001. Defendant Andrews signed the materially false and misleading Prospectuses filed with the SEC in at least 2000 for the Proprietary Funds on which Andrews served as a Board member or Trustee

(68) Defendant Atkins served on the Boards for at least two Proprietary Funds during the Class Period, including Travelers Series Fund Inc. formally known as Smith Barney Travelers Series Fund Inc., and received compensation of approximately $27,600, $25,300 and $29,200, respectively, in 1999, 2000 and 2001. Defendant Atkins signed the materially false and misleading Prospectuses filed with

the SEC in each year from 1999 to 2002 for the Proprietary Funds on which Atkins served as a Board member or Trustee.

(69) Defendant Gaguine served on the Board for at least one Proprietary Fund during the Class Period, including Salomon Brothers Opportunity Funds, and received compensation of approximately $2,000, $1,500, $2,000, $1,500 and $3,500, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Gaguine signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Gaguine served as a Board member or Trustee

(70) Defendant Kochman served on the Board for at least one Proprietary Fund during the Class Period, including Salomon Brothers Opportunity Fund Inc , and received compensation of approximately $2,000, $1,500, $2,500, $1,500 and $4,500, respectively, in 1999, 2000, 2001, 2002 and 2003 Defendant Kochman signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Kochman served as a Board member or Trustee

(71) Defendant Sonnenschein served on the Board for at least one Proprietary Fund during the Class Period, including Salomon Brothers Opportunity Funds, and received compensation of approximately $2,000, $1,500, $2,500, $1,500 and $3,500, respectively, in 1999, 2000, 2001, 2002 and 2003. Defendant Sonnenschein signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2003 for the Proprietary Funds on which Sonnenschein served as a Board member or Trustee.

(72) Defendant Warren served on the Boards for at least thirty-five Proprietary Funds during the Class Period, including Smith Barney Large Cap Core Fund, and received compensation of approximately $62,750, $68,250, $90,400 and $55,000, respectively, in 1999, 2000, 2001 and 2002. Defendant Warren signed the materially false and misleading Prospectuses filed with the SEC in each year from 1999 to 2002 for the Proprietary Funds on which Warren served as a Board member or Trustee

**FRAUD-ON-THE MARKET ALLEGATIONS**

303. At all relevant times, the market for the Proprietary Funds was efficient for, *inter alia*, the following reasons:

a) The Proprietary Funds met the requirements for listing, and were listed and actively traded through a highly efficient and automated market;

b) As regulated entitles, periodic public reports concerning the Proprietary Funds were regularly filed with the SEC;

c) Persons associated with the Proprietary Funds regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) The Proprietary Funds were followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

As a result of the foregoing, the market for the Proprietary Funds promptly digested current information regarding the Proprietary Funds from all publicly-available sources and reflected such information in the respective Proprietary Fund's Net Asset Value ("NAV") as well as the market trend and demand for the shares of the Proprietary Funds. Investors who purchased or otherwise acquired shares or interests in the Proprietary Funds relied on the integrity of the market for such securities. Under the circumstances, all purchasers of the Proprietary Funds during the Class Period suffered similar injury through their purchase or acquisition of the Proprietary Funds at prices that did not reflect the risks and costs of the continuing course of conduct alleged herein, and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

304. Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class of all persons or entities that purchased or held one or more shares or other ownership units of proprietary mutual funds organized and offered by SSB and its affiliates between March 22, 1999 and March 22, 2004, inclusive (the "Class Period"), and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

305. The Class is divided into two subclasses—the Purchasers Subclass and the Holders Subclass. The Purchasers Subclass includes all persons or entities that purchased one or more shares or other ownership units of the Proprietary Funds at any time during the Class Period (the "Purchasers Subclass"). The Holders Subclass includes all persons or entities that held one or more shares or other ownership units of the Proprietary Funds at any time during the Class Period (the "Holders Subclass").

306. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of the Class members is currently unknown to Plaintiffs at this time, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Proprietary Funds and other Defendants and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

307. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws and other laws that are complained of herein.

308. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) Whether Defendants' acts and conduct as alleged herein violated the federal securities laws, the Investment Company Act, and state law governing fiduciary duties;

b) Whether Defendants failed to disclose to Plaintiffs during the Class Period material facts about the business, sales practices and sources of compensation of SSB brokers and financial advisors;

c) Whether Defendants failed to disclose to Plaintiffs during the Class Period material facts about the business, operations, kickbacks and revenue-sharing fees and expenses of the Proprietary Funds; and

d) The amount of damages the members of the Class have sustained and the proper measure of such damages.

309. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs alleged herein There will be no difficulty in the management of this action as a class action

310. A class action will redress Defendants' wrongful conduct described herein, including Defendants' constant and improper pressure on brokers to steer Plaintiffs to invest in Proprietary Funds; the Defendants' creation of a Strategic Partners program to favor their Strategic Partners who paid the Defendants undisclosed sums to be favored by the SSB brokers and financial advisors; the improper use of Rule 12b-1 fees, Soft Dollars and excessive commissions to further this scheme; and the Defendants' intentionally concealing their improper conduct from Plaintiffs and the investing public.

**FIRST CLAIM FOR RELIEF**

**ON BEHALF OF THE PURCHASERS SUBCLASS AGAINST THE PROPRIETARY FUNDS REGISTRANTS, THE DIRECTOR DEFENDANTS, AND SSB FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT**

311. Members of the Purchasers Subclass repeat and reallege each and every allegation contained above as if fully set forth herein, except that, for purposes of this claim, members of the Purchasers Subclass expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

312. This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Purchasers Subclass against the Proprietary Funds Registrants, the Director Defendants and SSB, the Proprietary Funds Distributor.

313. Prior to purchasing shares or like interests of one or more of the Proprietary Funds, members of the Purchasers Subclass were provided with one of the materially false and misleading Proprietary Funds Prospectuses. Members of the Purchasers Subclass purchased shares of one or more of the Proprietary Funds traceable to the materially false and misleading Prospectuses and were damaged thereby.

314. As set forth herein, when they became effective, all of the Proprietary Funds' Prospectuses issued during the Class Period were materially false and misleading as they omitted the following material facts:

a) that SSB improperly directed Plaintiffs and other members of the Class to certain Proprietary Funds because the entities operating such funds had made substantial payments to SSB to steer Plaintiffs and other members of the Class to invest in the Proprietary Funds;

b) that to incentivize its affiliated broker-dealers and brokers to recommend the purchase of shares of the Proprietary Funds, SSB and the Proprietary Funds paid undisclosed increased compensation to broker-dealers and brokers on sales of the Proprietary Funds' shares;

c) that by paying brokers to aggressively steer their clients to the Proprietary Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

d) that any economies of scale achieved by marketing of the Proprietary Funds to new investors were not passed on to the Proprietary Funds investors; on the contrary, as the Proprietary Funds grew, fees charged to the Proprietary Funds also increased, and shareholders' investments were divided to avoid promised breakpoint reductions in sales charges;

e) that the Proprietary Funds were advised to and did improperly invest Plaintiffs' and other members of the Class's funds into the securities of certain of SSB's investment-banking clients to foster SSB's investment banking business, without regard to Fund's investment objectives, the Fund's stated investment-selection process, or the soundness of the investment;

f) that the Proprietary Funds and the Investment Adviser Defendants systematically overcharged fees and expenses to Plaintiffs and other members of the Class and improperly siphoned money out of the funds;

g) that the Director Defendants failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Proprietary Funds;

h) that the Investment Adviser Defendants authorized the payment from plaintiffs and other members of the Class of excessive commissions to broker-dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor";

i) that the Investment Adviser Defendants directed brokerage payments to SSB-affiliated broker-dealers that pushed clients to invest in the Proprietary Funds, which was a form of marketing that was not disclosed in or authorized by the Funds Rule 12b-1 plans;

j) that the Proprietary Funds' Rule 12b-1 plans failed to comply with Rule 12b-1, and such plans were not properly evaluated by the Proprietary Funds' Directors and Trustees and there was not a reasonable likelihood that the plans would benefit the Proprietary Funds and their shareholders;

k) that Defendants improperly used Soft Dollars and excessive commissions, paid from the Proprietary Funds assets, to pay for overhead expenses, the cost of which should have been borne by SSB or Citigroup and the Investment Adviser Defendants and not the Proprietary Funds' investors

l) That SSB's employees and affiliates steered clients into certain classes of shares of the Proprietary Funds that were the most beneficial to SSB, and that SSB received more money from the sale of Class B shares

315. Each of the Director Defendants either personally or through an attorney-in-fact, signed the Prospectuses for one or more of the Proprietary Funds or was a director or person performing similar functions for the Proprietary Funds Registrants during the Class Period.

316. The Proprietary Funds Distributor acted as an underwriter for each of the Proprietary Funds within the meaning of the Securities Act and is therefore liable under the Securities Act.

317. Each of the Proprietary Funds Registrants issued, caused to be issued and participated in the issuance of its respective misleading Proprietary Fund Prospectus that omitted material facts and is statutorily liable under Section 11.

318. At the time they purchased the Proprietary Funds shares traceable to the defective Prospectuses, members of the Purchasers Subclass were without knowledge of the facts concerning the material omissions alleged herein and could not reasonably have possessed such knowledge. This claim was brought within the applicable statute of limitations.

**SECOND CLAIM FOR RELIEF**

**ON BEHALF OF THE PURCHASERS SUBCLASS AGAINST THE PROPRIETARY FUNDS FOR VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT**

319. Members of the Proprietary Funds Purchasers Subclass repeat and reallege each and every allegation contained above as if fully set forth herein, except that, for purposes of this claim, members of the Purchasers Subclass expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

320. This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C § 77l(a)(2), on behalf of the Purchasers Subclass against the Proprietary Funds

321. Each of the Proprietary Funds was the seller, or the successor-in-interest to the seller, within the meaning of the Securities Act, for one or more of the respective fund shares sold to members of the Purchasers Subclass because it either: (a) transferred title to members of the Proprietary Funds Purchasers Subclass of the Proprietary Funds; (b) transferred title to shares of the Proprietary Funds to the Proprietary Funds Distributor that in turn sold shares of the Proprietary Funds as an agent for the Proprietary Funds; and/or (c) solicited the purchase of shares of the Proprietary Funds by members of the Purchasers Subclass.

322. Each of the Proprietary Funds issued, caused to be issued and/or participated in the issuance of its respective misleading Prospectus that omitted materials facts and is statutorily liable under Section 12

323. Prior to purchasing shares of the Proprietary Funds, members of the Purchasers Subclass were provided with a Proprietary Fund Prospectus Members of the Purchasers Subclass purchased shares of the Proprietary Funds traceable to a misleading Prospectus and were damaged thereby

324 As set forth herein, when they became effective, the Prospectuses were materially false and misleading as they omitted the following material facts:

a) that SSB improperly directed Plaintiffs and other members of the Class to certain Proprietary Funds because the entities operating such funds had made substantial payments to SSB to steer Plaintiffs and other members of the Class to invest in the Proprietary Funds;

b) that to incentivize its affiliated broker-dealers and brokers to recommend the purchase of shares of the Proprietary Funds, SSB and the Proprietary Funds paid undisclosed increased compensation to broker-dealers and brokers on sales of the Proprietary Funds' shares;

c) that by paying brokers to aggressively steer their clients to the Proprietary Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

d) that any economies of scale achieved by marketing of the Proprietary Funds to new investors were not passed on to the Proprietary Funds investors; on the contrary, as the Proprietary Funds grew, fees charged to the Proprietary Funds also increased, and shareholders' investments were divided to avoid promised breakpoint reductions in sales charges;

e) that the Proprietary Funds were advised to and did improperly invest Plaintiffs' and other members of the Class's funds into the securities of certain of SSB's investment-banking clients to foster SSB's investment banking business, without regard to Fund's investment objectives, the Fund's stated investment-selection process, or the soundness of the investment;

f) that the Proprietary Funds and the Investment Adviser Defendants systematically overcharged fees and expenses to Plaintiffs and other members of the Class and improperly siphoned money out of the funds;

g) that the Director Defendants failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Proprietary Funds;

h) that the Investment Adviser Defendants authorized the payment from plaintiffs and other members of the Class of excessive commissions to broker-dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor";

i) that the Investment Adviser Defendants directed brokerage payments to SSB-affiliated broker-dealers that pushed clients to invest in the Proprietary Funds, which was a form of marketing that was not disclosed in or authorized by the Funds Rule 12b-1 plans;

j) that the Proprietary Funds' Rule 12b-1 plans failed to comply with Rule 12b-1, and such plans were not properly evaluated by the Proprietary Funds' Directors and Trustees and there was not a reasonable likelihood that the plans would benefit the Proprietary Funds and their shareholders;

k) that Defendants improperly used Soft Dollars and excessive commissions, paid from the Proprietary Funds assets, to pay for overhead expenses, the cost of which should have been borne by SSB or Citigroup and the Investment Adviser Defendants and not the Proprietary Funds' investors.

l) That SSB's employees and affiliates steered clients into certain classes of shares of the Proprietary Funds that were the most beneficial to SSB, and that SSB received more money from the sale of Class B shares.

325. Members of the Purchasers Subclass have sustained damages due to the Proprietary Funds' violations.

326. At the time they purchased the Proprietary Funds shares traceable to the defective Prospectuses, members of the Purchasers Subclass were without knowledge of the facts concerning the material omissions alleged herein and could not reasonably have possessed such knowledge. This claim was brought within the applicable statute of limitations.

## THIRD CLAIM FOR RELIEF

## ON BEHALF OF THE PURCHASERS SUBCLASS AGAINST SSB FOR VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT

327. Members of the Purchasers Subclass repeat and reallege each and every allegation contained above as if fully set forth herein, except that, for purposes of this claim, members of the Purchasers Subclass expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

328. This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Purchasers Subclass against SSB for SSB's failure to disclose sales practices that created an insurmountable conflict-of-interest.

329. SSB was the seller, or the successor in interest to the seller, within the meaning of the Securities Act, for one or more of the respective fund shares sold to members of the Purchasers Subclass because it either: (a) transferred title to shares of the Proprietary Funds to members of the Purchasers Subclass; (b) transferred title to shares of the Proprietary Funds to the Proprietary Funds Distributor that in turn sold shares of the Proprietary Funds as an agent for the Proprietary Funds; and/or (c) solicited the purchase of shares of the Proprietary Funds by members of the Purchasers Subclass.

330 During its sale of Proprietary Funds to members of the Purchasers Subclass, SSB failed to disclose the inducements alleged herein that its financial advisors received and created an insurmountable conflict-of-interest. SSB also caused to be issued to members of the Purchasers Subclass the Prospectuses that failed to disclose that fees and commissions from the Proprietary Funds would be used to pay brokers for directing investors into the Proprietary Funds.

331. As set forth herein, when they became effective, all Proprietary Funds Prospectuses were misleading as they omitted the following material facts:

a) that SSB improperly directed Plaintiffs and other members of the Class to certain Proprietary Funds because the entities operating such funds had made substantial payments to SSB to steer Plaintiffs and other members of the Class to invest in the Proprietary Funds;

b) that to incentivize its affiliated broker-dealers and brokers to recommend the purchase of shares of the Proprietary Funds, SSB and the Proprietary Funds paid undisclosed increased compensation to broker-dealers and brokers on sales of the Proprietary Funds' shares;

c) that by paying brokers to aggressively steer their clients to the Proprietary Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

d) that any economies of scale achieved by marketing of the Proprietary Funds to new investors were not passed on to the Proprietary Funds investors; on the contrary, as the Proprietary Funds grew, fees charged to the Proprietary Funds also increased, and shareholders' investments were divided to avoid promised breakpoint reductions in sales charges.

e) that the Proprietary Funds were advised to and did improperly invest Plaintiffs' and other members of the Class's funds into the securities of certain of SSB's investment-banking clients to foster SSB's investment banking business, without regard to Fund's investment objectives, the Fund's stated investment-selection process, or the soundness of the investment;

f) that the Proprietary Funds and the Investment Adviser Defendants systematically overcharged fees and expenses to Plaintiffs and other members of the Class and improperly siphoned money out of the funds;

g) that the Director Defendants failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Proprietary Funds;

h) that the Investment Adviser Defendants authorized the payment from plaintiffs and other members of the Class of excessive commissions to broker-dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor";

i) that the Investment Adviser Defendants directed brokerage payments to SSB-affiliated broker-dealers that pushed clients to invest in the Proprietary Funds, which was a form of marketing that was not disclosed in or authorized by the Funds Rule 12b-1 plans;

j) that the Proprietary Funds' Rule 12b-1 plans failed to comply with Rule 12b-1, and such plans were not properly evaluated by the Proprietary Funds' Directors and Trustees and there was not a reasonable likelihood that the plans would benefit the Proprietary Funds and their shareholders;

k) that Defendants improperly used Soft Dollars and excessive commissions, paid from the Proprietary Funds assets, to pay for overhead expenses, the cost of which should have been borne by SSB or Citigroup and the Investment Adviser Defendants and not the Proprietary Funds' investors.

l) That SSB's employees and affiliates steered clients into certain classes of shares of the Proprietary Funds that were the most beneficial to SSB, and that SSB received more money from the sale of Class B shares than other classes of shares.

Plaintiff and the other members of the Purchasers Subclass have sustained damages due to SSB's violations

332 At the time they purchased the Proprietary Funds shares traceable to the defective Prospectuses, members of the Purchasers Subclass were without knowledge of the facts concerning the material omissions alleged herein and could not reasonably have possessed such knowledge This claim was brought within the applicable statute of limitations.

**FOURTH CLAIM FOR RELIEF**

**ON BEHALF OF THE PURCHASERS SUBCLASS AGAINST CITIGROUP, CGMHI, THE INVESTMENT ADVISER DEFENDANTS AND THE DIRECTOR DEFENDANTS FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT**

333. Members of the Purchasers Subclass repeat and reallege each and every allegation contained above, except that for purposes of this claim, members of the Purchasers Subclass expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

334. This claim is brought pursuant to Section 15 of the Securities Act against Citigroup, CGMHI, the Investment Adviser Defendants and the Director Defendants as control persons of the Proprietary Funds, the Proprietary Funds Registrants, the Director Defendants (with the exception that the Director Defendants are not alleged to be "control persons" of themselves) and the Proprietary Funds Distributor (with the exception that SSB is not alleged to be a "control person" of itself). It is appropriate to treat these Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Prospectuses, public filings, press releases and other publications are the collective actions of Citigroup, CGMHI, the Investment Adviser Defendants, the Director Defendants, the Proprietary Funds Distributor, the Proprietary Funds and the Proprietary Funds Registrants

335. The Proprietary Funds Registrants, the Director Defendants and the Proprietary Funds Distributor are liable under Section 11 and/or Section 12 of the Securities Act as set forth herein

336 Each of Citigroup, CGMHI, the Investment Adviser Defendants and the Director Defendants was a "control person" of the Proprietary Funds Registrants, the Proprietary Funds, the Directors Defendants and/or the Proprietary Funds Distributor within the meaning of Section

15 of the Securities Act, by virtue of its position of operational control and/or ownership. At the time that members of the Purchasers Subclass purchased shares of one or more of the Proprietary Funds—by virtue of their positions of control and authority over the Proprietary Funds Registrants, the Proprietary Funds, the Director Defendants and the Proprietary Funds Distributor—Citigroup, CGMHI, the Investment Adviser Defendants and the Director Defendants, directly and indirectly, had the power and authority, and exercised the same, to cause the Proprietary Funds Registrants, the Proprietary Funds, the Director Defendants and the Proprietary Funds Distributor to engage in the conduct complained of herein Citigroup, CGMHI, the Investment Adviser Defendants and the Director Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements in the Prospectuses.

337. Pursuant to Section 15 of the Securities Act, by reason of the foregoing, Citigroup, CGMHI, the Investment Adviser Defendants and the Director Defendants are liable to members of the Purchasers Subclass to the same extent as are the Proprietary Funds, the Proprietary Funds Registrants, the Director Defendants and the Proprietary Funds Distributor for their primary violations of Section 11 of the Securities Act and for the Proprietary Funds and SSB for their primary violation of Section 12(a)(2) of the Securities Act.

338. By virtue of the foregoing, members of the Purchasers Subclass are entitled to damages against Citigroup, CGMHI, the Investment Adviser Defendants and the Director Defendants

## FIFTH CLAIM FOR RELIEF

## ON BEHALF OF THE PURCHASERS SUBCLASS AGAINST SSB AND THE PROPRIETARY FUNDS FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULES 10b-5(b) AND 10b-10 PROMULGATED THEREUNDER

339. Members of the Purchasers Subclass repeat and reallege each and every allegation contained above as if fully set forth herein except for claims brought pursuant to the Securities Act.

340. This claim is asserted by the Purchasers Subclass against SSB and the Proprietary Funds and is based on Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 and 10b-10, 17 C.F.R. § 240.10b-5, -10, promulgated thereunder.

341. During the Class Period, SSB and the Proprietary Funds employed manipulative and deceptive devices and contrivances in that they omitted to state material facts, i.e., disclose the improper incentives and compensation offered and provided to SSB broker-dealers, brokers and financial advisors in connection with their sales of the Proprietary Funds that created an insurmountable conflict of interest (which Plaintiffs and other members of the Class were not informed of or otherwise aware of) and that such incentives were intended to and did deceive the Purchasers Subclass, and caused members of the Purchasers Subclass to purchase Proprietary Funds and consequently suffer damages.

342. SSB and the Proprietary Funds, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information about the improper inducements alleged herein.

343. SSB and the Proprietary Funds employed manipulative and deceptive devices as alleged herein to unlawfully manipulate and profit from excess fees and commissions paid to it as a result of its undisclosed incentives to peddle the Proprietary Funds as well as benefit from

the improper inducements offered through the sales campaigns alleged above which operated as a fraud and deceit upon members of the Purchasers Subclass.

344. SSB and the Proprietary Funds had actual knowledge of the omissions of material facts set forth herein, or acted with reckless disregard for the truth in that it failed to ascertain and to disclose such facts, even though such facts were available to it SSB's material omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth. As set forth herein, all Proprietary Funds Prospectuses, Annual Reports, Semi-Annual Reports and SAIs filed with the SEC during the Class Period were misleading as they omitted the following material facts:

a) that SSB improperly directed Plaintiffs and other members of the Class to certain Proprietary Funds because the entities operating such funds had made substantial payments to SSB to steer Plaintiffs and other members of the Class to invest in the Proprietary Funds;

b) that to incentivize its affiliated broker-dealers and brokers to recommend the purchase of shares of the Proprietary Funds, SSB and the Proprietary Funds paid undisclosed increased compensation to broker-dealers and brokers on sales of the Proprietary Funds' shares;

c) that by paying brokers to aggressively steer their clients to the Proprietary Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

d) that any economies of scale achieved by marketing of the Proprietary Funds to new investors were not passed on to the Proprietary Funds investors; on the contrary, as the Proprietary Funds grew, fees charged to the Proprietary Funds also increased, and shareholders' investments were divided to avoid promised breakpoint reductions in sales charges;

e) that the Proprietary Funds were advised to and did improperly invest Plaintiffs' and other members of the Class's funds into the securities of certain of SSB's investment-banking clients to foster SSB's investment banking business, without regard to Fund's investment objectives, the Fund's stated investment-selection process, or the soundness of the investment;

f) that the Proprietary Funds and the Investment Adviser Defendants systematically overcharged fees and expenses to Plaintiffs and other members of the Class and improperly siphoned money out of the funds;

g) that the Director Defendants failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Proprietary Funds;

h) that the Investment Adviser Defendants authorized the payment from plaintiffs and other members of the Class of excessive commissions to broker-dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor";

i) that the Investment Adviser Defendants directed brokerage payments to SSB-affiliated broker-dealers that pushed clients to invest in the Proprietary Funds, which was a form of marketing that was not disclosed in or authorized by the Funds Rule 12b-1 plans;

j) that the Proprietary Funds' Rule 12b-1 plans failed to comply with Rule 12b-1, and such plans were not properly evaluated by the Proprietary Funds' Directors and Trustees and there was not a reasonable likelihood that the plans would benefit the Proprietary Funds and their shareholders;

k) that Defendants improperly used Soft Dollars and excessive commissions, paid from the Proprietary Funds assets, to pay for overhead expenses, the cost of which should have been borne by SSB or Citigroup and the Investment Adviser Defendants and not the Proprietary Funds' investors.

l) That SSB's employees and affiliates steered clients into certain classes of shares of the Proprietary Funds that were the most beneficial to SSB, and that SSB received more money from the sale of Class B shares than other classes of shares

345. As a result of the failure to disclose material facts, as set forth above, the market prices and market trends of the Proprietary Funds were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein In ignorance of the fact that market prices and market trends for the shares were distorted, and relying directly or indirectly on the false and misleading statements made by SSB and the Proprietary Funds, or upon the integrity of the market in which the securities trade, and/or on the

absence of material adverse information that was known to or recklessly disregarded by SSB but not disclosed in public statements by SSB and the Proprietary Funds during the Class Period, members of the Purchasers Subclass bought shares of mutual funds they would not have otherwise purchased; purchased Proprietary Funds instead of better-performing comparable funds with a higher rate of return; and paid excessive fees and commissions for mutual funds they would not have otherwise purchased and were damaged thereby.

346. At the time of said omissions, members of the Purchasers Subclass were unaware of the truth. Had members of the Purchasers Subclass known the truth concerning SSB's operations, which were not disclosed by SSB or the Proprietary Funds, members of the Purchasers Subclass would not have purchased or otherwise acquired their shares or, if they had acquired such shares during the Class Period, they would not have done so at the prices which they paid.

347 By virtue of the foregoing, SSB and the Proprietary Funds have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) and Rule 10b-10 promulgated thereunder.

348. As a direct and proximate result of SSB's wrongful conduct, members of the Purchasers Subclass suffered damages in connection with their purchases and acquisitions of Proprietary Funds during the Class Period.

## SIXTH CLAIM FOR RELIEF

## ON BEHALF OF THE PURCHASERS SUBCLASS AGAINST THE PROPRIETARY FUNDS REGISTRANTS FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b) PROMULGATED THEREUNDER

349. Members of the Purchasers Subclass repeat and reallege each and every allegation contained above as if fully set forth herein except for claims brought pursuant to the Securities Act.

350 This claim is asserted by the Purchasers Subclass against the Proprietary Funds Registrants and is based on Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 and 17 C.F.R. § 240.10b-5, promulgated thereunder.

351. During the Class Period, the Proprietary Funds Registrants employed manipulative and deceptive devices and contrivances in that they omitted to state material facts in their Prospectuses, i.e., disclose the improper incentives they offered to SSB to direct investors into the Proprietary Funds, which was intended to and, throughout the Class Period, did deceive the Purchasers Subclass, as alleged herein, and caused members of the Purchasers Subclass to purchase Proprietary Funds and suffer damages.

352. The Proprietary Funds Registrants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information about the improper inducements alleged herein.

353 The Proprietary Funds Registrants employed manipulative and deceptive devices as alleged herein as they failed to disclose in their Prospectuses that they paid SSB brokers to peddle the Proprietary Funds which operated as a fraud and deceit upon members of the Purchasers Subclass

354. The Proprietary Funds Registrants had actual knowledge of the omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Proprietary Funds Registrants' material omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth. As set forth herein, all Proprietary Funds

Prospectuses, Annual Reports, Semi-Annual Reports and SAIs filed with the SEC during the Class Period were misleading as they omitted the following material facts:

a) that SSB improperly directed Plaintiffs and other members of the Class to certain Proprietary Funds because the entities operating such funds had made substantial payments to SSB to steer Plaintiffs and other members of the Class to invest in the Proprietary Funds;

b) that to incentivize its affiliated broker-dealers and brokers to recommend the purchase of shares of the Proprietary Funds, SSB and the Proprietary Funds paid undisclosed increased compensation to broker-dealers and brokers on sales of the Proprietary Funds' shares;

c) that by paying brokers to aggressively steer their clients to the Proprietary Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

d) that any economies of scale achieved by marketing of the Proprietary Funds to new investors were not passed on to the Proprietary Funds investors; on the contrary, as the Proprietary Funds grew, fees charged to the Proprietary Funds also increased, and shareholders' investments were divided to avoid promised breakpoint reductions in sales charges;

e) that the Proprietary Funds were advised to and did improperly invest Plaintiffs' and other members of the Class's funds into the securities of certain of SSB's investment-banking clients to foster SSB's investment banking business, without regard to Fund's investment objectives, the Fund's stated investment-selection process, or the soundness of the investment;

f) that the Proprietary Funds and the Investment Adviser Defendants systematically overcharged fees and expenses to Plaintiffs and other members of the Class and improperly siphoned money out of the funds;

g) that the Director Defendants failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Proprietary Funds;

h) that the Investment Adviser Defendants authorized the payment from plaintiffs and other members of the Class of excessive commissions to broker-dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor";

i) that the Investment Adviser Defendants directed brokerage payments to SSB-affiliated broker-dealers that pushed clients to invest in the Proprietary Funds, which was a form of marketing that was not disclosed in or authorized by the Funds Rule 12b-1 plans;

j) that the Proprietary Funds' Rule 12b-1 plans failed to comply with Rule 12b-1, and such plans were not properly evaluated by the Proprietary Funds' Directors and Trustees and there was not a reasonable likelihood that the plans would benefit the Proprietary Funds and their shareholders;

k) that Defendants improperly used Soft Dollars and excessive commissions, paid from the Proprietary Funds assets, to pay for overhead expenses, the cost of which should have been borne by SSB or Citigroup and the Investment Adviser Defendants and not the Proprietary Funds' investors.

l) That SSB's employees and affiliates steered clients into certain classes of shares of the Proprietary Funds that were the most beneficial to SSB, and that SSB received more money from the sale of Class B shares than other classes of shares.

355. As a result of the failure to disclose material facts, as set forth above, the market prices and market trends of the Proprietary Funds were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein. In ignorance of the fact that market prices and market trends for the shares were distorted, and relying directly or indirectly on the false and misleading statements made by the Proprietary Funds Registrants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Proprietary Funds Registrants but not disclosed in public statements by the Proprietary Funds Registrants during the Class Period, members of the Purchasers Subclass acquired the shares or interests in the Proprietary Funds during the Class Period and were damaged thereby

356 At the time of said omissions, members of the Purchasers Subclass were ignorant of the truth. Had members of the Purchasers Subclass known the truth concerning the Proprietary Funds operations, which were not disclosed by the Proprietary Funds Registrants, members of the Purchasers Subclass would not have purchased or otherwise acquired their

shares or, if they had acquired such shares during the Class Period, they would not have done so at the prices which they paid

357. By virtue of the foregoing, the Proprietary Funds Registrants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

358. As a direct and proximate result of the Proprietary Funds Registrants' wrongful conduct, members of the Purchasers Subclass suffered damages in connection with their purchases and acquisitions of Proprietary Funds during the Class Period.

**SEVENTH CLAIM FOR RELIEF**

**ON BEHALF OF THE PURCHASERS SUBCLASS AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(a) AND (c) PROMULGATED THEREUNDER**

359 Members of the Purchasers Subclass repeat and reallege each and every allegation contained above as if fully set forth herein except for claims brought pursuant to the Securities Act.

360 During the Class Period, each of the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including members of the Purchasers Subclass, as alleged herein and caused members of the Purchasers Subclass to purchase shares of the Proprietary Funds and to otherwise suffer damages In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

361. Defendants (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the purchasers of the Proprietary Funds, including members of the Purchasers Subclass, in an effort to enrich themselves through undisclosed manipulative tactics by which they wrongfully distorted the pricing and market trends of the Proprietary Funds in violation of Section 10(b) of

the Exchange Act and Rule 10b-5. All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

362 Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SSB and the Proprietary Funds operations, as specified herein.

363 Defendants employed devices and artifices to defraud and engaged in a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from excessive fees and commissions as a result of the undisclosed sales practices to peddle the Proprietary Funds alleged above and thereby engaged in transactions, practices and a course of conduct which operated as a fraud and deceit upon members of the Purchasers Subclass.

364. The members of the Purchasers Subclass reasonably relied upon the integrity of the market in which the Proprietary Funds traded.

365. Members of the Purchasers Subclass were ignorant of Defendants' fraudulent scheme. Had members of the Purchasers Subclass known of Defendants' unlawful scheme, they would not have purchased or otherwise acquired shares of the Proprietary Funds or if they had, they would not have purchased or otherwise acquired them at the artificially prices they paid for such securities.

366 Members of the Purchasers Subclass were injured because the risks that materialized were risks of which they were unaware as a result of Defendants' scheme to defraud as alleged herein. Absent Defendants' wrongful conduct, members of the Purchasers Subclass would not have been injured.

367. By virtue of the foregoing, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

368. As a direct and proximate result of Defendants' wrongful conduct, members of the Purchasers Subclass suffered damages in connection with their purchases and acquisitions of Proprietary Funds during the Class Period.

**EIGHTH CLAIM FOR RELIEF**

**ON BEHALF OF THE PURCHASERS SUBCLASS AGAINST CITIGROUP, CGMHI, THE INVESTMENT ADVISER DEFENDANTS AND THE DIRECTOR DEFENDANTS FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT**

369. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein except for claims brought pursuant to the Securities Act.

370. This claim is brought pursuant to Section 20(a) of the Exchange Act against: (a) Citigroup and CGMHI as control persons of SSB, and (b) Citigroup, CGMHI, the Investment Adviser Defendants and the Director Defendants as control persons of the Proprietary Funds and the Proprietary Funds Registrants.

371. It is appropriate to treat Defendants Citigroup, CGMHI and SSB as a group for pleading purposes and to presume that the issuance of materially false, misleading, and incomplete information conveyed by Citigroup Global Markets' public filings, including the Prospectuses, was the collective action of Citigroup, CGMHI and SSB.

372. It is appropriate to treat Defendants Citigroup, CGMHI, the Investment Adviser Defendants, the Director Defendants, the Proprietary Funds and the Proprietary Funds Registrants as a group for pleading purposes and to presume that the issuance of materially false, misleading, and incomplete information conveyed in the Proprietary Funds public filings, including the Prospectuses, was the collective action of Citigroup, CGMHI, the Investment

Adviser Defendants, the Director Defendants, the Proprietary Funds and the Proprietary Funds Registrants

373. Each of Citigroup, CGMHI, the Investment Adviser Defendants and the Director Defendants acted as a controlling person of the Proprietary Funds and the Proprietary Funds Registrants within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein By virtue of their operational and management control of the Proprietary Funds and the Proprietary Funds Registrants' respective businesses and systematic involvement in the fraudulent scheme alleged herein, Citigroup, CGMHI, the Investment Adviser Defendants and the Director Defendants each had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of the Proprietary Funds and the Proprietary Funds Registrants, including the content and dissemination of the various statements which Plaintiff contends are false and misleading Citigroup, CGMHI, the Investment Adviser Defendants and the Director Defendants had the ability to prevent the issuance of the statements alleged to be false and misleading or cause such statements to be corrected.

374. In particular, each of Citigroup, CGMHI, the Investment Adviser Defendants and the Director Defendants had direct and supervisory involvement in the operations of the Proprietary Funds and the Proprietary Funds Registrants and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and to have exercised the same.

375. As set forth above, each and all of the Proprietary Funds and Proprietary Funds Registrants violated Section 10(b) and Rule 10b-5(a) and (c) by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Citigroup, CGMHI, the Investment Adviser Defendants and the Director Defendants are liable pursuant to

Section 20(a) of the Exchange Act. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Proprietary Funds securities during the Class Period.

376. Additionally, Citigroup and CGMHI acted as controlling persons of SSB within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein. By virtue of their operational and management control of SSB and its respective businesses and systematic involvement in the fraudulent scheme alleged herein, Citigroup and CGMHI had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of SSB, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Citigroup and CGMHI had the ability to prevent the issuance of the statements alleged to be false and misleading or cause such statements to be corrected.

377. In particular, Citigroup and CGMHI had direct and supervisory involvement in the operations of SSB (a wholly-owned subsidiary) and, therefore, are presumed to have had the power to control or influence the particular transaction giving rise to the securities violations as alleged herein, and to have exercised same

378. As set forth above, SSB violated Section 10(b) and Rule 10b-5(a) and (c) by its acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Citigroup and CGMHI are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with SSB's conduct during the Class Period.

## NINTH CLAIM FOR RELIEF

## ON BEHALF OF THE HOLDERS SUBCLASS AGAINST THE INVESTMENT ADVISER DEFENDANTS FOR VIOLATIONS OF SECTION 34(b) OF THE INVESTMENT COMPANY ACT

379 Members of the Holders Subclass repeat and reallege each and every allegation contained above as if fully set forth herein.

380. This Count is asserted against the Investment Adviser Defendants in their role as investment advisers to the Proprietary Funds

381. The Investment Adviser Defendants made untrue statements of material fact in registration statements and reports filed and disseminated pursuant to the Investment Company Act and omitted to state facts necessary to prevent the statements made therein, in light of the circumstances under which they were made, from being materially false and misleading. The Investment Adviser Defendants failed to disclose the following:

a) that SSB improperly directed Plaintiffs and other members of the Class to certain Proprietary Funds because the entities operating such funds had made substantial payments to SSB to steer Plaintiffs and other members of the Class to invest in the Proprietary Funds;

b) that to incentivize its affiliated broker-dealers and brokers to recommend the purchase of shares of the Proprietary Funds, SSB and the Proprietary Funds paid undisclosed increased compensation to broker-dealers and brokers on sales of the Proprietary Funds' shares;

c) that by paying brokers to aggressively steer their clients to the Proprietary Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

d) that any economies of scale achieved by marketing of the Proprietary Funds to new investors were not passed on to the Proprietary Funds investors; on the contrary, as the Proprietary Funds grew, fees charged to the Proprietary Funds also increased, and shareholders' investments were divided to avoid promised breakpoint reductions in sales charges;

e) that the Proprietary Funds were advised to and did improperly invest Plaintiffs' and other members of the Class's funds into the securities of

certain of SSB's investment-banking clients to foster SSB's investment banking business, without regard to Fund's investment objectives, the Fund's stated investment-selection process, or the soundness of the investment;

f) that the Proprietary Funds and the Investment Adviser Defendants systematically overcharged fees and expenses to Plaintiffs and other members of the Class and improperly siphoned money out of the funds;

g) that the Director Defendants failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Proprietary Funds;

h) that the Investment Adviser Defendants authorized the payment from plaintiffs and other members of the Class of excessive commissions to broker-dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor";

i) that the Investment Adviser Defendants directed brokerage payments to SSB-affiliated broker-dealers that pushed clients to invest in the Proprietary Funds, which was a form of marketing that was not disclosed in or authorized by the Funds Rule 12b-1 plans;

j) that the Proprietary Funds' Rule 12b-1 plans failed to comply with Rule 12b-1, and such plans were not properly evaluated by the Proprietary Funds' Directors and Trustees and there was not a reasonable likelihood that the plans would benefit the Proprietary Funds and their shareholders;

k) that Defendants improperly used Soft Dollars and excessive commissions, paid from the Proprietary Funds assets, to pay for overhead expenses, the cost of which should have been borne by SSB or Citigroup and the Investment Adviser Defendants and not the Proprietary Funds' investors

l) That SSB's employees and affiliates steered clients into certain classes of shares of the Proprietary Funds that were the most beneficial to SSB, and that SSB received more money from the sale of Class B shares than other classes of shares

382. By reason of the conduct described above, the Investment Adviser Defendants violated Section 34(b) of the Investment Company Act

383 As a direct, proximate and foreseeable result of the Investment Adviser Defendants' violation of Section 34(b) of the Investment Company Act, members of the Holders Subclass have incurred damages.

384. Members of the Holders Subclass have been injured by Defendants' violations of Section 34(b) of the Investment Company Act. Such injuries were suffered directly by the shareholders.

385 The Investment Adviser Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal such adverse material information

**TENTH CLAIM FOR RELIEF**

**ON BEHALF OF THE HOLDERS SUBCLASS AGAINST THE INVESTMENT ADVISER DEFENDANTS PURSUANT TO SECTION 36(b) OF THE INVESTMENT COMPANY ACT**

386 Plaintiff repeats and realleges each and every allegation contained above and otherwise incorporates the allegations contained above.

387. This Count is brought by the Holders Subclass (as Proprietary Funds securities holders) against the Investment Adviser Defendants for breach of their fiduciary duties as defined by Section 36(b) of the Investment Company Act.

388. The Investment Adviser Defendants had a fiduciary duty to the Class with respect to the receipt of compensation for services and of payments of a material nature made by and to the Investment Adviser Defendants

389. The Investment Adviser Defendants violated Section 36(b) by improperly charging investors in the Proprietary Funds purported Rule 12b-1 marketing fees, and by

drawing on Proprietary Funds assets to make undisclosed payments of Soft Dollars and excessive commissions, as defined herein, in violation of Rule 12b-1

390 By reason of the conduct described above, the Investment Adviser Defendants violated Section 36(b) of the Investment Company Act.

391. As a direct, proximate and foreseeable result of the Investment Adviser Defendants' breach of their fiduciary duty of loyalty in their role as investment advisers to Proprietary Funds investors, the Proprietary Funds and the Class have incurred millions of dollars in damages.

392. Plaintiff, in this count, seeks to recover the Rule 12b-1 fees, Soft Dollars, excessive commissions and the management fees charged the Proprietary Funds and the Holders Subclass by the Investment Adviser Defendants.

**ELEVENTH CLAIM FOR RELIEF**

**ON BEHALF OF THE HOLDERS SUBCLASS AGAINST CITIGROUP, CGMHI AND THE DIRECTOR DEFENDANTS (AS CONTROL PERSONS OF THE INVESTMENT ADVISER DEFENDANTS) FOR VIOLATIONS OF SECTION 48(a) OF THE INVESTMENT COMPANY ACT BY THE CLASS**

393. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

394. This Count is brought by the Holders Subclass pursuant to Section 48(a) of the Investment Company Act against Citigroup, CGMHI and the Director Defendants, as control persons of the Investment Adviser Defendants, who caused the Investment Adviser Defendants, to commit the violations of the Investment Company Act alleged herein. It is appropriate to treat these Defendants as a group for pleading purposes and to presume that the misconduct complained of herein is the collective actions of Citigroup, CGMHI and the Director Defendants and the Investment Adviser Defendants.

395. The Investment Adviser Defendants are liable under Sections 34(b) and 36(b) of the Investment Company Act to the Holders Subclass, i.e., investors in the Proprietary Funds as set forth herein.

396. Citigroup, CGMHI and the Director Defendants were "control persons" of the Investment Adviser Defendants and caused the violations complained of herein. By virtue of their positions of operational control and/or authority over the Investment Adviser Defendants, Citigroup, CGMHI and the Director Defendants directly and indirectly, had the power and authority, and exercised the same, to cause the Investment Adviser Defendants to engage in the wrongful conduct complained of herein.

397. Pursuant to Section 48(a) of the Investment Company Act, by reason of the foregoing, Citigroup, CGMHI and the Director Defendants are liable to members of the Holders Subclass to the same extent as are the Investment Adviser Defendants for their primary violations of Sections 34(b) and 36(b) of the Investment Company Act.

398. By virtue of the foregoing, members of the Holders Subclass and the Proprietary Funds are entitled to damages against Citigroup, CGMHI and the Director Defendants.

**TWELFTH CLAIM FOR RELIEF**

**BREACH OF FIDUCIARY DUTY AGAINST THE INVESTMENT ADVISER DEFENDANTS ON BEHALF OF THE HOLDERS SUBCLASS**

399. Members of the Holders Subclass repeat and reallege each of the preceding allegations as though fully set forth herein.

400. As investment advisers to the Proprietary Funds, the Investment Adviser Defendants were fiduciaries to members of the Holders Subclass and were required to act with the highest obligations of good faith, loyalty, fair dealing, due care and candor.

401. As set forth above, the Investment Adviser Defendants breached their fiduciary duties to members of the Holders Subclass.

402. Members of the Holders Subclass have been injured as a direct, proximate and foreseeable result of such breach on the part of the Investment Adviser Defendants and have suffered substantial damages

403. Because the Investment Adviser Defendants acted with reckless and willful disregard for the rights of members of the Holders Subclass, the Investment Adviser Defendants are liable for punitive damages in an amount to be determined by the jury.

## THIRTEENTH CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY AGAINST THE DIRECTOR DEFENDANTS ON BEHALF OF THE HOLDERS SUBCLASS

404. Plaintiff repeats and realleges each of the preceding allegations as though fully set forth herein.

405. As Proprietary Funds Directors and Trustees, the Director Defendants had a fiduciary duty to the Proprietary Funds and Proprietary Funds investors to supervise and monitor the Investment Adviser Defendants

406. The Director Defendants breached their fiduciary duties by reason of the acts alleged herein, including their knowing or reckless failure to prevent the Investment Adviser Defendants from (1) charging the Proprietary Funds and Proprietary Funds investors improper Rule 12b-1 marketing fees; (2) making improper undisclosed payments of Soft Dollars; (3) making unauthorized use of "directed brokerage" as a marketing tool; and (4) charging the Proprietary Funds for excessive and improper commission payments to brokers and financial advisors.

407. Members of the Holders Subclass have been injured as a direct, proximate and foreseeable result of such breach on the part of the Director Defendants and have suffered substantial damages

408. Because the Director Defendants acted with reckless and willful disregard for the rights of members of the Holders Subclass, the Director Defendants are liable for punitive damages in an amount to be determined by the jury

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment as follows:

A. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B. Awarding rescission and/or rescissionary damages, where appropriate, to Planitiffs and the other members of the Class against all Defendants;

C. Awarding Plaintiffs and other members of the Class rescission of their contracts with the Investment Adviser Defendants, where appropriate, and recovery of all attendant fees that would otherwise apply and recovery of all fees paid to the Investment Adviser Defendants pursuant to such agreements;

D. Enjoining Defendants from engaging in the improper sales practices alleged herein;

E Awarding Plaintiffs and the Class members their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

F. Awarding Plaintiffs an accounting of all fees and commissions paid, received or shared by Defendants that relate in any way to the Proprietary Funds or the Strategic Partners Program; and

G Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

Dated: December 15, 2004

James J Sabella (JS-5434)
Sidney S Liebesman (SL-8444)
GRANT & EISENHOFER P A
445 Park Avenue - Suite 900
New York, New York 10022
Tel: (212) 755-6501
Fax: (212) 755-6503

Jay W Eisenhofer
Geoffrey Jarvis
Lauren E Wagner
Jeff Almeida
Redmond L Clevenger
Naumon A Amjed
GRANT & EISENHOFER P.A.
Chase Manhattan Centre
1201 North Market Street – Suite 2100
Wilmington, Delaware 19801
Tel: (302) 622-7000
Fax: (302) 622-7100

**LEAD COUNSEL FOR PLAINTIFFS**

MILBERG WEISS BERSHAD & SCHULMAN LLP
Jerome M Cargress (JC-2060
Kim E Levy (KL-6996)
Janine L Pollak (JP-0178)
Michael R Reese (MR-3183)
One Pennsylvania Plaza
New York, NY 10119-0165
Tel: (212) 594-5300
Fax: (212) 868-1229

**EXHIBIT "A"**

**EXHIBIT A**
**Proprietary Fund Defendants**

Salomon Brothers All Cap Value Fund
Salomon Brothers Balanced Fund
Salomon Brothers California Tax Free Bond Fund
Salomon Brothers Capital Fund
Salomon Brothers Emerging Markets Debt Fund Inc.
Salomon Brothers High Yield Bond Fund
Salomon Brothers International Equity Fund
Salomon Brothers Investors Value Fund
Salomon Brothers Large Cap Growth Fund
Salomon Brothers Mid Cap Fund
Salomon Brothers National Tax Free Bond Fund
Salomon Brothers New York Tax Free Bond Fond
Salomon Brothers Opportunity Fund Inc
Salomon Brothers SB Capital and Income Fund
Salomon Brothers SB Convertible Fund
Salomon Brothers SB Growth & Income Fund
Salomon Brothers Short/Intermediate US Government Fund
Salomon Brothers Small Cap Growth Fund
Salomon Brothers Strategic Bond Fund
Smith Barney Aggressive Growth Fund
Smith Barney All Cap Growth and Value Fund
Smith Barney Allocation Series, Inc.
Smith Barney Appreciation Fund Inc
Smith Barney Arizona Municipals Funds Inc
Smith Barney Balanced Portfolio
Smith Barney California Municipals Funds Inc
Smith Barney Classic Values Fund
Smith Barney Conservative Portfolio
Smith Barney Diversified Large Cap Growth Fund
Smith Barney Diversified Strategic Income Fund
Smith Barney Dividend and Income Fund
Smith Barney Financial Services Fund
Smith Barney Florida Portfolio
Smith Barney Fundamental Value Fund
Smith Barney Georgia Portfolio
Smith Barney Global All Cap Growth and Value Fund
Smith Barney Global Government Bond Portfolio
Smith Barney Global Portfolio
Smith Barney Government Securities Fund
Smith Barney Group Spectrum Fund
Smith Barney Growth and Income Fund
Smith Barney Growth Portfolio
Smith Barney Hansberger Global Value Fund