UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                              :

                                                                                    04 Civ. 4055 (PAC)

In re SALOMON SMITH BARNEY MUTUAL    :
FUND FEES LITIGATION                     <u>DECISION AND ORDER</u>

                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HONORABLE PAUL A. CROTTY, United States District Judge:

Inspired by the Securities and Exchange Commission ("SEC"), the National

Association of Securities Dealers ("NASD") and various state attorneys general investigations

into the fee- and revenue-sharing in the mutual fund industry and subsequent settlement of these

investigations,[1] Plaintiffs filed a 148-page Consolidated Amended Class Action Complaint (the

"Complaint"), together with another 37 pages of exhibits, against Salomon Smith Barney

("SSB").  Plaintiffs, who are owners of some, but not all, of the mutual funds organized and

offered by SSB, assert thirteen claims for relief: (1) under the Securities Act of 1933 ("SA" or

"the 1933 Act"), 15 U.S.C. §§ 77-k, 77l(a)(2), and 77o; (ii) under the Securities and Exchange

Act of 1934 ("SEA" or "the Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rules 10b-5,

17 C.F.R. § 240.10b-5, and 10b-10, 17 C.F.R. § 204.10b-10; (iii) under Investment Company Act

of 1940 ("ICA"), 15 U.S.C. §§ 80a-33(b), 80a-35(a), and (b), and 80a-47(a); and (iv) state

common law claims for breach of fiduciary duty.

---

[1] The industry fund practices which were the subject of the investigations and subsequent settlement became public in March, 2004.  A wave of class action litigation immediately washed over the mutual fund industry.

Defendants move to dismiss the complaint pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(6), and 23.1.  For the reasons that follow, Defendants' motion is granted, with a limited leave to replead on one claim.  Further, Plaintiffs have no standing as to funds which they do not own, but Plaintiffs may replead, if they find additional owners of the funds which are not represented by the current claims.

## I.      STANDARD OF REVIEW

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  On a motion to dismiss based on Rule 12(b)(6), "all factual allegations in the complaint must be taken as true and construed favorably to the plaintiff." LaBounty v. Adler, 933 F.2d 121, 123 (2d Cir. 1991) (citations omitted).  "The issue is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.'" Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995) (citations omitted).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the Complaint as exhibits or incorporated in it by reference. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

II.    **FACTS ALLEGED IN THE COMPLAINT**[2]

A.    **The Parties**

Plaintiffs include one institutional investor, the Masons (Compl. ¶ 18), and twenty-two individual investors (id. ¶¶ 19-40), who own shares in twenty of the eighty-eight mutual funds offered by SSB.  Plaintiffs seek class certification "on behalf of a class of all persons or entities that purchased or held one or more shares . . . of proprietary mutual funds organized and offered by SSB and its affiliates between March 22, 1999 and March 22, 2004," – i.e., the "Class Period" (id. ¶ 304).

The Complaint names numerous defendants, including corporate parents, investment advisers, proprietary funds, registrants, and the directors and trustees of the proprietary funds.  Defendant Citigroup, Inc. ("Citigroup) is the corporate parent of all of the corporate defendants named in the Complaint (id. ¶ 41).  Defendant Citigroup Global Markets Holding, Inc. ("CGMHI"), f/k/a Salomon Smith Barney Holdings Inc., is an investment banking and securities brokerage business, a subsidiary of Citigroup, and the sole parent of SSB (id. ¶ 42).  SSB is a diversified financial services firm that offers investment banking, investment analysis, and brokerage services, and also operates a family of mutual funds (i.e., the Proprietary Funds) for which it solicits business through affiliate brokers and provides advisory services through advisory subsidiaries (id. ¶ 126).  Defendant investment advisers include SSB, Citigroup Asset Management ("CAM"),[3] Salomon Brothers Asset Management, Smith Barney Fund

---

[2] The allegations set out in the Complaint are taken as true for the purpose of this motion.

[3] Defendants contend that CAM is not a legal entity that is susceptible to suit (Defs.' Mem. Supp. Mot. Dismiss at 1 n.2).

3

Management (collectively the "Investment Adviser Defendants") (id. ¶¶ 43-47). Plaintiffs also

name as defendants eighty-eight proprietary funds (collectively referred to as "Defendant

Proprietary Funds") (see id. ¶ 48 & Ex. A). Defendant Proprietary Fund Registrants, of which

there are thirty-six, served as the registrant and issuer, or a successor in interest to a registrant

and issuer, of the Proprietary Funds sold to Plaintiffs (id. ¶ 49). Finally, the Complaint also

asserts claims against seventy-three individuals in their capacity as directors and trustees of the

Proprietary Funds (collectively referred to as the "Director Defendants") (id. ¶¶ 50-125).[4]

### B.    The Claimed Wrongdoing

In main part, the Complaint alleges a scheme, with three primary components.

First, SSB uses a nationwide network of broker-dealers to steer Plaintiffs to invest in Proprietary

Funds that SSB employers and officers managed and administered (Compl. ¶¶ 2, 133-145). This

practice involved (among other allegations) undisclosed cash and non-cash incentives (id. ¶¶ 3,

134-36), road shows (id. ¶¶ 3, 137), skewed financial publications and data (id. ¶¶ 3, 141), and

penalties for non-compliant brokers (id. ¶¶ 142-45). Plaintiffs also assert that SSB broker-

dealers also improperly steered them to other mutual funds with which SSB had undisclosed

kickback arrangements (id. ¶¶ 5, 146-72). This program was called the "Strategic Partners

Program" (id. ¶¶ 5, 146) whereby participating companies paid for "shelf space" in SSB's mutual

funds operation (id. ¶¶ 5, 147). Both methods of steering occurred because SSB offered

undisclosed incentives to brokers and financial advisers to sell SSB Proprietary Funds, instead of

better performing mutual funds (id. ¶¶ 3-7, 151 (describing disparate commission rates paid to

brokers based on whether sales occurred with Proprietary Funds or non-Proprietary Funds)).

---

[4] Collectively, all defendants named above shall be referred to as the "Defendants".

Plaintiffs contend that SSB and its affiliates engaged in these practices because they reaped lucrative fees for managing and advising the Proprietary Funds, which were calculated as a percentage of assets under management by the funds.  Plaintiffs allege that Defendants, thus, had an incentive to increase collective investments in the Proprietary Funds as much as possible (id. ¶ 4).

Second, once the mutual funds were sold, SSB then extracted improper fees from Plaintiff-customers of the Proprietary Funds (id. ¶¶  8, 173-74).  Plaintiffs allege that defendants charged excessive fees in several ways (id. ¶¶ 9, 174).  Defendants failed to inform Plaintiffs of "breakpoints" (i.e., levels of investment at which the fees being charged declines in percentage terms), by dividing investments into multiple purchases to fall just below "breakpoints," and by steering Plaintiffs to purchase less economically advantageous Class "B" shares as opposed to Class "A" shares (id. ¶¶ 9 n.2, 175-80, 183-87).  (Class "A" shares have an up-front fee but lower continuing fees, while Class "B" shares have no up-front fee, but higher continuing payments (id. ¶ 9).)  Defendants also imposed annual payments, called "12b-1 trails," to pay for distribution costs, including payments to broker-dealers that were set at "abnormally high levels" to pay for the unjustified and undisclosed payments to SSB brokers (id. ¶¶ 9, 188-96).  Since these fees were set as a percentage of the total assets of the Proprietary Funds, which were growing, investors' expenses continued to grow, thereby depriving them of economies of scale associated with increased investments (id. ¶¶ 189-90).  Defendants also paid commissions called "soft dollars," which did not benefit Plaintiffs and were excessive (id. ¶¶ 9, 197-200).  Plaintiffs charge that Defendants used soft dollars to pay for improper expenses such as overhead costs (id. ¶ 198); and that SSB did not allow customers to rollover funds transferred from other mutual

funds into Proprietary Funds, forcing Plaintiffs to incur unnecessary, customary fees for first liquidating and then purchasing shares (id. ¶¶ 181-82).

Third, the fraudulent scheme involved SSB's use of Proprietary Funds to support its investment banking clients (id. ¶¶ 10, 201-11).  According to Plaintiffs, SSB and other Defendants caused the Funds to purchase shares in under-performing and non-performing companies to the detriment of Plaintiffs and the benefit of SSB (id.).

None of the materials SSB provided to clients – including prospectuses, Statements of Additional Information ("SAIs"), and semi-annual and annual reports for the Proprietary Funds – disclosed these practices (id. ¶¶ 11, 212–69).

The Complaint alleges that Plaintiffs suffered three types of damages.  First, Defendants improperly steered Plaintiffs into poorly-performing Funds such that Plaintiffs received lower returns for their investments (id. ¶ 271).  Second, Plaintiffs paid excessive fees in connection with their purchases and ownership of shares in the Proprietary Funds (id. ¶ 272). Third, Plaintiffs purchased fund assets in poorly-performing companies because of their status as SSB investment banking clients thereby experiencing lower returns due to these improper investments (id. ¶ 273).

**C.       The Claims in the Complaint and the Asserted Grounds for Dismissal**

The Complaint asserts thirteen claims.  For ease of understanding, the Court summarizes Plaintiffs' claims and the grounds Defendants assert for dismissing the claims in the following chart.

| Claim | On Behalf of | Against | For Violations of | Defendants' Arguments for Dismissal |
|---|---|---|---|---|
| First | Purchasers Subclass | – Registrants<br>– Director Defendants<br>– SSB | § 11 of SA | • failure to allege material misstatements / omissions<br>• failure to plead fraud with requisite particularity<br>• failure to allege scienter with requisite particularity<br>• Complaint establishes that there is no loss causation<br>• Plaintiffs not entitled to damages |
| Second | Purchasers Subclass | – Proprietary Funds | § 12(a)(2) of SA | • failure to allege material misstatements / omissions<br>• failure to plead fraud with requisite particularity<br>• failure to allege scienter with requisite particularity<br>• Complaint establishes that there is no loss causation<br>• Plaintiffs not entitled to damages or rescission |
| Third | Purchasers Subclass | – SSB | § 12(a)(2) of SA | • failure to allege material misstatements / omissions<br>• failure to plead fraud with requisite particularity<br>• failure to allege scienter with requisite particularity<br>• Complaint establishes that there is no loss causation<br>• Plaintiffs not entitled to damages or rescission |
| Fourth | Purchasers Subclass | – Citigroup<br>– CGMHI<br>– Investment Adviser Defendants<br>– Director Defendants | § 15 of SA<br>– control person liability | • failure to state primary violation under §§ 11, 12 of SA<br>• as to Citigroup and CGMHI, complaint fails to allege control person relationship between them and alleged primary violator<br>• as to outside Director Defendants, Complaint's allegations insufficient to establish control |
| Fifth | Purchasers Subclass | – SSB<br>– Proprietary Funds | § 10(b) of SEA<br>Rule 10b-5(b)<br>Rule 10b-10 | • no private right of action under Rule 10b-10<br>• failure to allege any material misstatement or omissions<br>• failure to plead fraud with requisite particularity<br>• failure to plead scienter with requisite particularity<br>• failure to plead reliance – cannot invoke fraud on the market doctrine<br>• failure to plead loss causation |
| Sixth | Purchasers Subclass | – Registrants | § 10(b) of SEA<br>Rule 10b-5(b) | • failure to allege any material misstatement or omissions<br>• failure to plead fraud with requisite particularity<br>• failure to plead scienter with requisite particularity<br>• failure to plead reliance – cannot invoke fraud on the market doctrine<br>• failure to plead loss causation |
| Seventh | Purchasers Subclass | All Defendants | § 10(b) of SEA<br>Rule 10b-5(a), (c) | • failure to allege any material misstatement or omissions<br>• failure to plead fraud with requisite particularity<br>• failure to plead scienter with requisite particularity<br>• failure to plead reliance – cannot invoke fraud on the market doctrine<br>• failure to plead loss causation |
| Eighth | Purchasers Subclass | – Citigroup<br>– CHMHI<br>– Investment Adviser Defendants<br>– Director Defendants | § 20(a) of SEA<br>– control person liability | • failure to state primary violation under §10(b) of SEA<br>• as to Citigroup and CGMHI, complaint fails to allege control person relationship between them and alleged primary violator<br>• as to outside Director Defendants, Complaint's allegations insufficient to establish control |

| Claim | On Behalf of | Against | For Violations of | Defendants' Arguments for Dismissal |
|---|---|---|---|---|
| Ninth | Holders Subclass | – Investment Adviser Defendants | § 34(b) of ICA | • no private right of action<br>• failure to bring claims derivatively |
| Tenth | Holders Subclass | – Investment Adviser Defendants | § 36(b) of ICA | • no private right of action<br>• failure to bring claims derivatively |
| Eleventh | Holders Subclass | – Citigroup<br>– CHMHI<br>– Director Defendants | § 48(a) of ICA – control person liability | • no private right of action – decide this<br>• failure to state primary violation under §§36(b), 34(b) of ICA<br>• failure to bring claims derivatively<br>• as to Citigroup and CGMHI, complaint fails to allege control person relationship between them and alleged primary violator<br>• as to outside Director Defendants, Complaint's allegations insufficient to establish control; Directors can't be liable for compensation they did not receive |
| Twelfth | Holders Subclass | – Investment Adviser Defendants | State law – breach of fiduciary duty | • Preempted by SLUSA<br>• failure to bring claims derivatively |
| Thirteenth | Holders Subclass | – Director Defendants | State law – breach of fiduciary duty | • Preempted by SLUSA<br>• failure to bring claims derivatively |

## III.     DISCUSSION

### A.     The Federal Securities Claims

#### 1.     The Securities Act

Counts One, Two, Three, and Four of the Complaint allege violations of §§ 11, 12(a)(2), and 15 of the 1933 Act. 15 U.S.C. §§ 77k, 77*l*(a)(2), 77*o*. "The primary innovation of the 1933 Act was the creation of federal duties – for the most part, registration and disclosure obligations – in connection with public offerings." Gustafson v. Alloyd Co., Inc., 513 U.S. 561,

571 (1995) (citations omitted); see also Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195 (1976)

(same).  The Supreme Court has described § 11 claims under the SA[5] as follows:

> Section 11 of the 1933 Act allows purchasers of a registered
> security to sue certain enumerated parties in a registered offering
> when false or misleading information is included in a registration
> statement.  The section was designed to assure compliance with the
> disclosure provisions of the Act by imposing a stringent standard
> of liability on the parties who play a direct role in a registered
> offering.  If a plaintiff purchased a security issued pursuant to a
> registration statement, he need only show a material misstatement
> or omission to establish his prima facie case.  Liability against the
> issuer of a security is virtually absolute, even for innocent
> misstatements.

Herman & Maclean v. Huddleston, 459 U.S. 375, 381 (1983).  "To allege a claim under Section

11 of the Securities Act, a plaintiff need show that a registration statement:  (1) 'contained an

untrue statement of material fact'; (2) 'omitted to state a material fact required to be stated

therein'; or (3) omitted to state a material fact 'necessary to make the statement therein not

misleading.'"  In re Morgan Stanley, No. 03 Civ. 8208, 2006 U.S. Dist. LEXIS 20758, at *25

(S.D.N.Y. Apr. 14, 2006) (citing 15 U.S.C. § 77k).  "The test for whether a statement is

materially misleading under . . . Section 11 is 'whether the defendants' representations, taken

together and in context, would have misled a reasonable investor.'" Rombach v. Change, 355

F.3d 164, 172 n. 7 (2d Cir. 2004) (citation omitted).

---

[5] Section 11 of the 1933 Act, 15 U.S.C. § 77k, imposes liability on a variety of individuals (such as every person who signed the registration statement, officers of the issuer, and underwriters among others) in the following circumstance:

> In case any part of the registration statement, when such part became effective,
> *contained an untrue statement of a material fact or omitted to state a material*
> *fact required to be stated therein or necessary to make the statements therein*
> *not misleading*, any person acquiring such security (unless it is proved that at the
> time of such acquisition he knew of such untruth or omission) may, either at law
> or in equity, in any court of competent jurisdiction, sue [such individuals]. . . .

15 U.S.C. § 77k.

Section 12(a)(2) of the 1933 Act provides that any person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact . . . shall be liable . . . to the person purchasing such security from him." 15 U.S.C. 77*l*(a).  Section 15 of the 1933 Act imposes control person liability.[6]  Typically, "[n]either Section 11 nor Section 12(a)(2) requires that [P]laintiffs allege the scienter or reliance elements of a fraud cause of action." Rombach v. Change, 355 F.3d at 169 n. 4 (citation omitted). The Second Circuit, however, has held that "the heightened pleading standard of Rule 9(b) applies to [§] 11 and [§] 12(a)(2) claims insofar as the claims are premised on allegations of fraud." Id. at 171.

### 2.    Securities and Exchange Act of 1934

Counts Five, Six, Seven, and Eight assert claims under the 1934 Exchange Act and, more specifically, under § 10(b), 15 U.S.C. § 78j(b) and Rules 10b-5(a) and (c) and 10b-10. 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c), 240.10-10.  "In order to state a claim for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 promulgated by the SEC thereunder . . ., a plaintiff must establish that 'the defendant, [1] in connection with the purchase or sale of securities, [2] made a materially false statement or omitted a material fact, [3] with scienter, and [4] that the plaintiff's reliance on the defendant's action [5] caused injury to the plaintiff."

---

[6] Section 77*o* of the 1933 Act provides as follows:
> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the fact by reason of which the liability of the controlled person is alleged to exist.

Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir. 2003) (citations omitted).  To state a claim for

relief under Rule 10b-5, a plaintiff must allege that:

> in connection with the purchase or sale of securities, the defendant,
> acting with scienter, made a false material representation or
> omitted to disclose material information and that plaintiff's
> reliance on defendant's action caused [plaintiff] injury.

Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 534 (2d Cir. 1999) (citation omitted).

Defendants move to dismiss the 1933 Act and 1934 Act securities claims on

various grounds, including: (i) failure to allege material misstatements or omissions; (ii) failure

to plead fraud with the requisite particularity; (iii) failure to plead scienter with the requisite

particularity; (iv) failure to plead reliance; and (v) failure to establish loss causation.  The Court

finds that Plaintiffs fail to satisfy a fundamental element common to all the federal securities

claims asserted – loss causation – and, accordingly, all of Plaintiffs' securities claims must be

dismissed.  The Court does not consider any of Defendants' other grounds for dismissal.

### 3.    Loss Causation

The Supreme Court has stated that "[a] private plaintiff who claims securities

fraud must prove that the defendant's fraud caused an economic loss." Dura Pharms., Inc. v.

Broudo, 544 U.S. 336, 338 (2005).  Loss causation is an element in Plaintiffs' Section 10(b)

claim under the Exchange Act. Id. at 1631.  Moreover, in 1995, Congress added an express loss

causation provision to § 12 of the 1933 Act through the adoption of the Private Securities

Reform Act of 1995.[7]  The absence of loss causation is also an affirmative defense to a § 11

---

[7] As to loss causation, Section 12(b) of the 1933 Act provides:
   In an action described in subsection (a)(2) of this section, if the person who
   offered and sold such security proves that any portion or all of the amount
   recoverable under subsection (a)(2) of this section represents other than the

claim under the 1933 Act.  Goldkrantz v. Griffin, No. 97 Civ. 9075, 1999 U.S. Dist. LEXIS 4445,

at *16 (S.D.N.Y. Apr. 5, 1999); see also Bastian v. Petren Resources Corp., 892 F.2d 680, 685

(7th Cir. 1990) (same).  In addition, "in order to establish a prima facie case under Rule 10b-5, a

plaintiff must show . . . loss causation." Grace v. Rosenstock, 228 F.3d 40, 46 (2d Cir. 2000)

(internal quotation marks and citations omitted).

       "Loss causation" is defined as "a causal connection between the material

misrepresentation and the loss." Dura, 544 U.S. at 342.  In the Second Circuit, "[i]t is long settled

that a securities-fraud plaintiff must prove both transaction and loss causation." Lentell v. Merrill

Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) (citations and internal quotation marks

omitted).  These terms mean as follows:

> Transaction causation is akin to reliance, and
> requires only an allegation that 'but for the claimed
> misrepresentation or omissions, the plaintiff would
> not have entered into the detrimental securities
> transaction' . . . .
> Loss causation is the causal link between the alleged
> misconduct and the economic harm ultimately
> suffered by the plaintiff.

Id. at 172 (citations and internal quotation marks omitted); see also Suez Equity Investors, L.P. v.

Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001) ("It is settled that causation under

federal securities laws is two-pronged:  a plaintiff must allege both transaction causation, i.e.,

that but for the fraudulent statement or omission, the plaintiff would not have entered into the

---

      depreciation in value of the subject security resulting from such part of the
      prospectus or oral communication with respect to which the liability of that
      person is asserted, not being true or omitting to state a material fact required to
      be stated therein or necessary to make the statement not misleading, then such
      portion or amount, as the case may be, shall not be recoverable.

15 U.S.C. § 77l(b).

Case 1:04-cv-04055-PAC   Document 60   Filed 07/26/06   Page 13 of 48

transaction; and loss causation, <u>i.e.</u>, that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." (citation omitted)).

    Plaintiffs, in their Complaint, allege that they suffered three different types of damages (Compl. ¶ 270).  First, Plaintiffs claim that Defendants "improperly directed [them] into mutual funds . . . that provided Plaintiffs with lower returns then they would have received had the SSB Financial Consultants directed them toward funds that were in their best interests;" that "Plaintiffs would not have purchased the inferior . . . Funds had they known of the illegal and improper practices the Defendants used to direct Plaintiffs into [these] Funds;" and that "[b]y investing in [the] Funds, Plaintiffs received a return on their investment that was substantially less than the return on investment that they would have received had they investment the same dollars in a comparable fund" (<u>id.</u> ¶ 271).

    With regard to Plaintiffs' assertion that they would not have purchased the Fund shares had they known of the complained-of practices, this assertion makes out transaction causation – not loss causation. <u>Arduini/Messina P'ship v. National Med. Fin. Servs. Corp.</u>, 74 F. Supp. 2d 352, (S.D.N.Y. 1999) (averring that, but for defendants' material omissions, plaintiffs would not have invested in the securities is sufficient to plead only transaction causation or reliance).  With regard to Plaintiffs' claims that they forewent better investment opportunities by virtue of Defendants' actions, as Judge Owen of this District recently ruled in a decision addressing virtually identical claims, the Supreme Court has held that "a shareholder cannot recover for 'damages' based on hypothetical investments he did not make." <u>In re Morgan</u>

13

Stanley, 2006 U.S. Dist. LEXIS 20758, at *39 (citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975)).[8]

Plaintiffs further allege that they were damaged by being "forced to pay excessive and improper commissions in connection with their purchases and ownership of shares in the . . . Funds" through the complained-of practices (Compl. ¶ 272) and that "Plaintiffs were damaged because the . . . Funds purchased fund assets in contravention of the investment guidelines disclosed in the fund Prospectuses and other Fund documents" (Compl. ¶ 273).

None of these statements succeed in satisfying the fundamental pleading requirement of federal securities claim:  "To plead loss causation, the complaints must allege facts that support an inference that [Defendants'] misstatements and omissions concealed the circumstances that bear upon *the loss suffered* such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." Lentell v. Merrill Lynch & Co., 396 F.3d at 175.  The "loss suffered" of course refers to diminution of value of the mutual fund share and, here, Plaintiffs make no such allegations and, indeed, they cannot.  First, disgorgement of the claimed excessive fees falls entirely outside of the federal securities scheme as Plaintiffs have not linked these fees in any way to a diminished value of the mutual fund shares.  Second, where Defendants at all times disclosed the total fees in the Fund Prospectuses, allocation of fees would not affect mutual fund share value.

The case of Castillo v. Dean Witter Discover & Co. is instructive. No. 97 Civ. 1272, 1998 U.S. Dist. 9489, at **13-21 (S.D.N.Y. June 25, 1998).  There, elderly and

---

[8] In Blue Chip Stamps, the Supreme Court held that potential purchasers of sales who allege that they decided not to purchase because of a misrepresentation or omission are not entitled to sue under the federal securities laws. 421 U.S. at 373-49.

14

inexperienced investors in an investment company complained of being steered into risky mutual

funds owned by the company that carried higher fees without adequate disclosures. Id. at **7-8.

The court noted as follows:

> The complaint appears to complain that the sales commissions
> awarded to . . . brokers (account executives) were too large and that
> those commissions came out of the assets of each . . . mutual fund,
> thereby causing the plaintiff a loss.  However, the total fees,
> commissions and charges deducted from the assets were disclosed
> in the prospectuses.  Plaintiffs complain that they were not
> informed of the precise allocation of fees between the defendants
> and their brokers (account executives), but the allocation of fees
> would not affect the damages for the losses claimed by plaintiffs.
> It is the total fees charged that would affect the asset value of a
> mutual fund and the decision to invest.  The prospectuses disclosed
> these amounts.
> Furthermore, . . . the decline in the net asset value of each fund is
> related to the success of the investment strategies of that fund . . .
> and bears no relationship to the compensation arrangements of the
> brokers (account executives) of the other . . . practices [by
> defendants] of which plaintiffs complain the brokers failed to
> advise the plaintiff class.  Indeed, the complaint contains no
> allegation that any causal relationship exists between the
> compensation of the brokers . . . and the performance of any fund.

Id. at **15-16 (citations omitted).[9]

Likewise here, Defendants disclosed the total fees charged in the Prospectuses.

Moreover, Plaintiffs' allegations that Defendants' omissions caused them to make investment

choices they now regret in allegedly poorer quality, high-expense funds and that they would not

have entered into these transactions had they known the information withheld by Defendants

---

[9] Judge Owen in In re Morgan Stanley also agreed with the Castillo reasoning stating that:
Unlike an ordinary share of stock traded on the open market, the value of a
mutual fund share is calculated according to a statutory formula.  Share price is a
function of "Net Asset Value", the pro-rata share of assets under management,
minus liabilities such as fees.  Plaintiffs explain no mechanisms by which a
mutual fund share's price could differ from its objective "value."
2006 U.S. Dist. LEXIS 20758, at **35-36.

constitutes transaction causation.  "While [allegations of transaction causation] may explain why plaintiff purchased the [defendant's] stock, it does not explain why it lost money on the purchase, the very question that the loss causation allegation must answer."  <u>Emergent Capital Inv. Mgmt. v. Stonepath Group</u>, 343 F.3d 189, 198 (2d Cir. 2003).  Here, Plaintiffs have not only not alleged *why* they lost money on their purchase of the mutual fund stock, they have not alleged even that they in fact lost money on their purchase of the mutual fund stock (<u>i.e.,</u> that the mutual fund share price dropped and that it dropped for the precise reason complained of).

Because Plaintiffs failed to plead loss causation, the federal securities claims – Counts One, Two, Three, Five, Six, and Seven – must be dismissed.  Since there is no liability in these claims, Counts Four and Eight for control-person liability under § 15 of the 1933 Act and § 20(a) of the Exchange Act must also be dismissed. <u>Rombach v. Chang</u>, 355 F.3d at 177-78 (stating that control-person claims are necessarily predicated on a primary violations of securities law and that, where the court dismisses primary security claims, secondary claims must also be dismissed).

### B.    ICA Claims

Plaintiffs allege violations of the ICA in their Complaint, including § 34(b) (Count Nine), § 36(b) (Count Ten), and § 48(a) (Count Eleven).  Defendants contend that Counts Nine and Eleven should be dismissed because no private right of action exists under those provisions.  Plaintiffs disagree.  Defendants further maintain that Count Ten, which alleges violations of  § 36(b), should be dismissed for failure to state a claim and for failure to bring derivatively.  Plaintiffs counter that their § 36(b) claims have been properly brought as direct claims and have been properly pled.

### 1.     No Private Right of Action for §§ 34(b) and 48(a) Claims

Regulatory investigations into and sustained scrutiny of various practices in the mutual fund industry spawned considerable litigation similar to the case at bar.  The issue of whether a private right of action lies under ICA §§ 34(b)[10] and 48(a),[11] has been litigated time and again.  These courts have consistently held that the Supreme Court's holding in <u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001), dictates the outcome.

In <u>Alexander v. Sandoval</u> the Supreme Court addressed whether a statutory provision provides an implied private cause of action. <u>Id.</u> at 286-76.  The Court emphasized that – in a break with past precedent – "[i]n determining whether statutes create private rights of action, as in interpreting statutes generally, legal context matters only to the extent it clarifies text." <u>Id.</u> at 288.  The Court, thus, rejected the prior, more liberal recognition of implied private rights of action. <u>Id.</u> at 287 (describing the evolution of case law).  Under the present, controlling

---

[10] Section 34(b) of the ICA concerns untrue statements and omissions and states as follows:
    It shall be unlawful for any person to make any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this title or the keeping of which is required pursuant to section 31(a) [15 U.S.C. § 80a-30(a)]. It shall be unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading. For the purposes of this subsection, any part of any such document which is signed or certified by an accountant or auditor in his capacity as such shall be deemed to be made, filed, transmitted, or kept by such accountant or auditor, as well as by the person filing, transmitting, or keeping the complete document.
15 U.S.C. § 80a-33(b).

[11] Section 48(a) of the Act states as follows:
    It shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this title or any rule, regulation, or order thereunder.
15 U.S.C. § 80a-47(a).

framework, determination of whether a provision provides a private cause of action requires consideration of the following factors:  whether the provision contains "'rights-creating' language," id. at 288 (citation omitted); whether the provision focuses on those regulated or those protected, id. at 289; and, whether other sections of the provisions expressly provide for enforcement. Id. at 290.

        The Second Circuit had occasion to apply the Sandoval analysis in the context of the ICA in Olmsted v. Pruco Life Insurance Company of New Jersey. 283 F.3d 429 (2d Cir. 2002).  In Olmsted, plaintiffs were holders of variable annuity contracts who alleged violations of §§ 26(f) and 27(l) under ICA on the ground of excessive fees, charges, and expenses. Id. at 430-31.  The Second Circuit looked to the text of the provisions and then considered the other Sandoval factors.  The court noted that no provision of the Act provided expressly for a private right of action for violations of either sections 26(f) or 27(l) and that these provisions did not contain "rights-creating" language. Id. at 432.  The court further observed that the sections focused on the regulated parties and not on the parties intended to be protected by the provisions. Id. at 433.  Second, the court noted that another provision of the Act, § 42, provides for enforcement of all ICA provisions (including the provisions at issue) by the SEC. Id.  The court held that "the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." Id. (citing Sandoval, 532 U.S. at 290).  The court concluded that the ICA's text "creates a strong presumption that Congress did not intend to create private rights of action for violations of §§ 26(f) and 27(l)." Id.

        Since Sandoval and Olmsted, every court in this District that has considered whether §§ 34(b) and 48(a) provide a private right of action has concluded that they do not. See,

e.g. In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig., 04 Civ. 3759, 2006 U.S. Dist. LEXIS

38978, at *18 (S.D.N.Y. June 12, 2006) (no private right of action under §§ 34(b), 36(a), and

48(a)); In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig., 03 Civ. 8208, 2006 U.S.

Dist. LEXIS 20758, at *44 (S.D.N.Y. Apr. 18, 2006) (same as to §§ 34(b) and 48(a)); In re

Evergreen Mut. Funds Fee Litig., 423 F. Supp. 2d 249, 257 (S.D.N.Y. 2006) (same as to §§ 34(b)

and 36(a)); In re Goldman Sachs Mut. Funds Fee Litig., 04 Civ. 2567, 2006 U.S. Dist. LEXIS

1542, at *5 (S.D.N.Y. Jan. 13, 2005) (same);  In re Eaton Vance Mut. Funds Fee Litig., 380 F.

Supp. 2d 222, 231 (S.D.N.Y. 2005) (same as to §§ 34(b), 36(a), and 48(a)); In re Davis Selected

Mut. Funds Litig., 04 Civ. 4186, 2005 WL 2509732, at *2 (S.D.N.Y. Oct. 11, 2005) (same); In re

Merrill Lynch & Co., Inc. Research Reports Securities Litigation, 272 F. Supp. 2d 243, 255-59

(S.D.N.Y. 2003) (no implied private right of action under § 34(b)); Dorchester Investors v. Peak

Int'l Ltd., et al., 134 F. Supp. 2d 569, 581 (S.D.N.Y. 2001) (same).[12]

---

[12] Courts in other Districts have likewise held that no implied private right of action lies under § 34(b). See, e.g., In re Blackrock Mut. Funds Fee Litig., 04 Civ. 164, 2006 U.S. Dist. LEXIS 13846, at **14-20 (W.D. Penn. Mar. 29, 2006) (no implied private right of action under §§ 34(b), 36(a), and 48(a)); Forsythe v. Sun Life Fin., Inc., 417 F. Supp. 2d 100, 106-08 (D. Mass. 2006) (same); In re Dreyfus Mut. Funds Fee Litig., 428 F. Supp. 2d 342 (W.D. Pa. 2005) (same as to §§ 34(b) and 36(a)); In re Franklin Mut. Funds Excessive Fee Litig., 388 F. Supp. 2d 451, 465 (D. N.J. 2005) (same as to § 34(b)); In re Mut. Funds Inv. Litig., 384 F. Supp. 2d 854, 870 (D. Md. 2005) (same with regard to both §§ 34(b) and 36(a)); Chamberlain v. Aberdeen Asset Mgmt. Ltd., et al., 2005 U.S. Dist. LEXIS 2023, *4, **4-11 (E.D.N.Y. Jan. 21, 2005) (same as to § 36(a)), vacated per stipulation, No. 02 Civ. 5870, 2005 WL 1378757, at *1 (E.D.N.Y. Apr. 12, 2005) (stating that vacatur order did not negate prior decision); In re Van Wagoner Funds, Inc. Sec. Litig., 382 F. Supp. 2d 1173, 1189 (N.D. Cal. 2004) (same as to § 34(b)); White, et al. v. Heartland High-Yield Mun. Bond Fund, et al., 237 F. Supp. 2d 982, 986-88 (E.D. Wis. 2002) (same as to §§ 22 and 34(b)).

No circuit court of appeals has yet addressed whether § 34(b) provides an implied right of action.  In re Franklin Mut. Funds Excessive Fee Litig., 288 F. Supp. 2d at 465; see also In re Goldman Sachs Mut. Funds Fee Litig., 2006 U.S. Dist. LEXIS 1542, at *17 (stating that the Second Circuit has not yet decided whether there are private rights of action under §§ 34(b) and 36(a) of the ICA).  Likewise, no circuit court of appeals has yet addressed whether § 48(a) provides an implied right of action.

This Court, as Judge Cederbaum did in <u>In re Davis Selected Mutual Funds</u> <u>Litigation</u>, 2005 WL 2509732, at *2, adopts Judge Koeltl's thorough analysis regarding the application of <u>Sandoval</u> and <u>Olmsted</u> to the issue at bar, <u>see</u> <u>In re Eaton Vance Mut. Funds Fee</u> <u>Litig.</u>, 380 F. Supp. 2d at 230-33, and likewise holds that no private cause of action lies under §§ 34(a) and 48(a).  Plaintiffs' arguments to the contrary are based on cases that primarily predate <u>Olmsted</u> (<u>see</u> Pls.' Mem. Opp'n Mot. Dismiss 34-36, 38); they are rejected.

Accordingly, Counts Nine and Eleven of Plaintiffs' Complaint are dismissed with prejudice.[13]

### 2.    The § 36(b) Claim

Defendants move to dismiss Count Ten, which alleges violations of § 36(b) of the ICA on two grounds:  for failure to bring the claim derivatively and for failure to state a claim for relief.  The Holder Subclass brings this claim against Investment Adviser Defendants.  Section 36(b) provides that investment advisers and persons affiliated with the investment advisers have a fiduciary duty with respect to the receipt of compensation for services and of payments of a material nature made by a registered investment company or shareholder investors. 15 U.S.C. § 80a-35(b).[14]   The Complaint alleges violations of § 36(b) based on:  improper Rule 12b-1

---

[13] Because the Court dismisses Counts Nine and Eleven of the Complaint on the ground that these provisions do not create a private right of action, the Court does not reach Defendants' other basis for dismissal (<u>i.e.</u>, that these claims should have been brought derivatively and not directly).

[14] Section 36(b) of the Act states, in part, as follows:
    An action may be brought under this subsection by the Commission, or *by a security holder of such registered investment company on behalf of such company,* against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

marketing fees, undisclosed soft dollar payments, and excessive commissions (Compl. ¶ 289). The Complaint charges that these violations resulted in injuries to the Proprietary Funds and the Class of "millions of dollars in damages" (id. ¶ 391). The Court addresses each ground for dismissal in turn.

### a.  Failure to Bring Claim Derivatively

Defendants move to dismiss Claim Ten for failure to have brought the § 36(b) claim derivatively.[15]  Defendants argue that shareholders may not sue individually to recover damages for injuries to the individual Proprietary Funds (i.e., the corporations) and that all of the injuries alleged by Plaintiffs are indirect and thus require derivative action.  Plaintiffs rely on two Supreme Court decisions, Kamen v. Kemper Financial Services, Inc., 500 U.S. 90 (1991), and Daily Income Fund, Inc. v. Fox, 464 U.S. 523 (1984), to argue that § 36(b) claims must be brought directly.  Plaintiffs point to various prospectuses and SAIs that indicate, under the Funds' fee structures, the fees investors will pay (Pls.' Mem. Opp'n Mot. Dismiss 44).  Plaintiffs also argue that the rates paid by the various classes of fund shares differ and that individual stockholders falling within the various classes of fund shares are thus "directly, rather than indirectly, impacted by such payments" (id. at 45).  Finally, Plaintiffs further maintain that if the claims are maintained derivatively, recovery will go to the Funds creating a windfall for current shareholders but depriving former investors of any recovery at all (id. at 46).

---

15 U.S.C. 80a-35(b) (emphasis added).

[15] Defendants also moved to dismiss Claims Nine (i.e., based on § 34(b) of the ICA), Eleven (i.e., based on § 48(a) of the ICA), Twelve (i.e., based on state common law breach of fiduciary duty), Thirteen (same) for failure to bring such claims derivatively.  The Court does not address this basis for dismissal since it dismisses these claims on other grounds (i.e., Claims Nine and Eleven are dismissed on the ground that these provisions do not create an implied private right of action and Claims Twelve and Thirteen are dismissed on the ground of SLUSA preemption).

In <u>Kemper</u> and <u>Daily Income Fund</u>, the Supreme the Court addressed the application of Rule 23.1[16] to ICA claims and determined whether plaintiffs had to first make a demand upon the board of directors prior to bringing an action under the Act.

### i.  **Daily Income Fund, Inc. v. Fox**

The question before the Supreme Court in <u>Daily Income Fund, Inc. v. Fox</u> was "whether Rule 23.1 of the [Federal Rules of Civil Procedure] requires that an investment company security holder first make a demand upon the company's board of directors before bringing an action under § 36(b) of the [ICA] to recover allegedly excessive fees paid by the company to its investment adviser." 464 U.S. at 524.  In that case, the plaintiff alleged excessive fees on the ground that, although investment decisions remained routine and substantially unchanged, the Fund fees had remained constant (at a rate of one-half of one percent) notwithstanding a growth in net assets from $75 million to $775 million. <u>Id.</u> at 525.  In this instance, the complaint sought damages in favor of the Fund. <u>Id.</u>

---

[16] Rule 23.1 of the Federal Rules of Civil Procedure provides as follows:

In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. *The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.* The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs.

(emphasis added).

22

The Court noted that "[a]lthough any action in which a shareholder asserts the rights of a corporation could be characterized as 'derivative,' Rule 23.1 applies . . . only to a 'derivative action brought by one or more shareholders or members to enforce a right of a corporation [when] the corporation [has] failed to enforce a right which may properly be asserted by it'." Id. at 527-28 (citing Fed. R. Civ. P. 23.1) (emphases omitted); see also id. at 528 ("In sum, the term 'derivative action,' which defines the scope of Rule 23.1, has long been understood to apply only to those actions in which the right claimed by the shareholder is one the corporation could itself have enforced in court.").  The Court's analysis focused on the interface of § 36(b) in the context of Rule 23.1 and, more specifically, on the demand requirements of that Rule.  To reach this issue, the Court considered whether a § 36(b) claim could be judicially enforced by the investment company (i.e., the corporation for purposes of Rule 23.1), id. at 534, and concluded that Congress did not intend to create an implied right of action in favor of the investment company under § 36(b). Id. at 539.[17]

The Court examined the text of § 36(b) generally as well as its legislative history and considered whether a plaintiff could sue in their individual capacity.  The decision emphasized what the text of the statute makes clear:  that shareholders have express standing to bring claims for violations of § 36(b). Id. at 534-35.  The Court noted that:

> By its terms, . . . the unusual cause of action created by § 36(b) differs significantly from those traditionally asserted in shareholder derivative suits.  Instead of establishing a corporate action from which a shareholder's right to sue derivatively may be inferred,

---

[17] Notably, in determining whether an investment company had an implied right of action under § 36(b), the Court undertook an analysis under the pre-Sandoval formulation. 464 U.S. at 535-39.

§ 36(b) expressly provides only that the new corporate right it
creates may be enforced by the [SEC] and security holders of the
company.

Id. at 535.

The Court went on to discuss in what capacity plaintiffs could bring

§ 36(b) claims and explained as follows:

Petitioners argue, that, because § 36(b) provides for an action "by a
security holder of such registered investment company *on behalf of
such company*" (emphasis added), such an action is necessarily
derivative.  In this regard, petitioners rely on this Court's statement
in Burks v. Lasker that a "derivative suit is brought by shareholders
to enforce a claim *on behalf of* the corporation" (emphasis added).
The fact that derivative suits are brought on behalf of a corporation
does not mean, however, that all suits brought on behalf of a
corporation are derivative.  The "on behalf" language in § 36(b)
indicates only that the right asserted by the shareholder suing under
the statute is a "right of the corporation" – a proposition confirmed
by other aspects of the action:  The fiduciary duty imposed on
advisers by § 36(b) is owed to the company itself as well as its
shareholders and any recovery obtained in a § 36(b) action will go
to the company rather than the plaintiff. [Citing S. Rep. No. 91-
184, p. 6 (1970).]  In this respect, a § 36(b) action is undeniably
"derivative" in a broad sense of that word.  As we noted, however,
Rule 23.1 applies by its terms only to "a derivative action brought
by one or more shareholders . . . to enforce a right of a corporation
[when] the corporation [has] *failed to enforce a right which may
properly be asserted by it"* (emphasis added). The legislative
history of § 36(b) makes clear that Congress intended the perhaps
unique "right of a corporation" established by § 36(b) to be
asserted by the company's security holders and not by the company
itself.

Id. at 535, n.11 (citations omitted unless otherwise indicated); see also id. at 541 ("Section

36(b)'s express provisions for actions by security holders ensures that, even if the company's

directors cannot bring an action in the fund's name, the company's rights under the statute can be

fully vindicated by the plaintiffs authorized to act on its behalf.").  Thus, the Court indicated that

24

the shareholder could bring the § 36(b) claim directly. Id. at 535, n.11.  Most importantly, the

Court stated that all the recovery should go to the Fund rather than to plaintiffs. Id.  The end

result of Fox appears to be that, under § 36(b), a claimant brings a "direct" suit in name only and

a "derivative" one with respect to the recovery of any damages.

### ii.   Kamen v. Kemper Financial Services, Inc.

In Kamen v. Kemper Financial Services, Inc., 500 U.S. 90 (1991), the Court

considered whether it "should fashion a federal common law rule obliging the representative

shareholder in a derivative action founded on the [ICA] to make a demand on the board of

directors even when such a demand would be excused as futile under state law." Id. at 92.  The

plaintiff in this case brought the action under § 20(a) of the Act, which prohibits materially

misleading proxy statements.  Unlike Fox, the Court expressly distinguished between the issue of

whether a party has standing to bring an action under § 20(a) versus the capacity in which such a

party must bring the action. Id. at 97 n.4.  The Court, however, declined to reach this issue. Id.[18]

The Court spoke to the manner in which a § 36(b) claim can be brought and stated

that a plaintiff could bring the claim without making a pre-complaint demand.  The Court

explained as follows:

---

[18] The Court specifically stated as follows:
> We have never addressed the question whether § 20(a) creates a shareholder
> cause of action, either direct or derivative.  The SEC, as *amicus curiae*, urges us
> to hold that a shareholder may bring suit under § 20(a) but only on his own
> behalf.  The parties did not litigate this question in the Court of Appeals, and
> because that court disposed of petitioner's claim on different grounds, it declined
> to address whether § 20(a) creates a derivative action.  The petition for certiorari
> likewise did not raise this issue in the questions presented.  Because the question
> whether § 20(a) supports a derivative action is not jurisdictional . . ., we leave
> this question for another day.

500 U.S. at 97 n.4.

> [Respondent] . . . ignores the role that the ICA clearly envisions for
> shareholders in protecting investment companies from conflicts of
> interest.  As we have pointed out, § 36(b) of the ICA expressly
> provides that an individual shareholder may bring an action on
> behalf of the investment company for breach of the investment
> adviser's fiduciary duty.  Congress added § 36(b) to the ICA in
> 1970 because it concluded that the shareholders should not have to
> "rely solely on the fund's directors to assure reasonable adviser
> fees, notwithstanding the increased disinterestedness of the board."
> Daily Income Fund, Inc. v. Fox, 464 U.S. at 50.  This legislative
> background informed our conclusion in Fox that a shareholder
> action "on behalf of" the company under § 36(b) is direct rather
> than derivative and can therefore be maintained without *any*
> precomplaint demand on the directors.

Id. at 108.

While a § 36(b) claim does not require a Rule 23.1 demand and has been

construed as a direct cause of action, nevertheless, many courts have required the claim to be

expressly pled as a derivative claim. In re Blackrock Mut. Funds Fee Litig., 04 Civ. 164, 2006

U.S. Dist. LEXIS 13846, at *33 (W.D. Pa. Mar. 29, 2006) (collecting cases).  For example, the

Second Circuit in Olmsted characterized an action under § 36(b) as a "private right of *derivative*

action." 283 F.3d at 433 (emphasis added).  Few court decisions have considered or analyzed

whether a § 36(b) must be pled derivatively or directly in light of its "unique," Fox, 464 U.S. at

353 n.11, and hybrid nature.  Those courts that have considered and analyzed the issue, however,

have concluded that § 36(b) claims must be pled derivatively.  See, e.g., Blackrock Mut. Funds

Fee Litig., 2006 U.S. Dist. LEXIS 13846, at **30-31 ("Section 36(b) clearly provides for a

private right to bring a derivative action, not a private right to bring a direct action, and thus

plaintiffs' 36(b) claim is improperly pled as a direct claim of a security holder."); see also In re

Franklin Mut. Funds Excessive Fee Litig., 04 Civ. 982, 2005 U.S. Dist. LEXIS 20106, at *43 (D.

N.J. Sept. 9, 2005) ("Although shareholders do have a right to sue under § 36(b), and funds do not, that does not constrain or shed light on the nature of the claims that a shareholder may bring under § 36(b)[;] [a]s stated in Fox, a § 36(b) action is undeniably derivative.")

Accordingly, Defendants' motion to dismiss Claim Ten for violations of § 36(b) for failure to bring such a claim derivatively is granted, but with leave to replead as a derivative claim.

### b.  Failure to State a Claim

Defendants move to dismiss the § 36(b) claim on the additional ground that the claim fail to state a cause of action.  Section 36(b) provides, in relevant part, that:

> the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b).  As noted previously, the Holder Subclass asserts the § 36(b) claim against the Investment Adviser Defendants (Compl. ¶¶ 386-92).[19]

### i.  Applicable Pleading Standards

Section 36(b) claims must comply with numerous statutory requirements, discussed below.  Section 36(b)(3) limits liability in several ways.  First, the Act provides that

---

[19]   The Complaint identifies four investment advisors defendants. The first, Citigroup Asset Management ("CAM"), is group of investment affiliates of Citigroup, which has services provided by Salomon Brothers Asset Management Inc., Smith Barney Asset Management, Citibank Global Asset Management, and Citigroup Asset Management Limited (Compl. ¶ 43).  CAM, Plaintiffs claim, is a Delaware corporation (id.), but which Defendants maintain is not an entity that can be sued.  The second, Salomon Smith Barney, Inc. ("SSB"), is a registered investment adviser under the Investment Advisers Act and a registered broker-dealer employing a nationwide network of brokers and financial advisors who sold the Proprietary Funds to Plaintiffs (id. ¶ 44).  SSB managed the Funds' distribution plans (id.).  The third, Salomon Brothers Asset Management, is a registered investment adviser under the Investment Advisers Act and managed and advised the Proprietary Funds (id. ¶ 45).  The fourth, Smith Barney Fund Management LLC, is a registered investment adviser and managed and advised the Funds (id. ¶ 46).

"[n]o award of damages shall be recoverable for any period prior to one year before the action

was instituted." 15 U.S.C. § 80a-35(b)(3).  Thus, recovery in this case would be limited to

damages incurred from May 28, 2003 (one year prior to the filing of the Complaint) to March 22,

2004 (the end date of the proposed Class Period) and not during the Class Period alleged in the

Complaint (Compl. at 1 (defining Class Period from March 22, 1999 to March 22, 2004)).  See In

re Alliancebernstein Mut. Fund Excessive Fee Litig., 04 Civ. 4885, 2006 U.S. Dist. LEXIS 939,

at **5-8 (S.D.N.Y. Jan. 11, 2006) (stating that plaintiffs have to plead facts showing § 36(b)

violations during the statutory one-year period).

Second, § 36(b) provides that "[n]o such action shall be brought or maintained

against any person other than the recipient of such compensation or payments, and no damages or

other relief shall be granted against any person other than the recipient of such compensation or

payments." 15 U.S.C. § 80a-35(b)(3).  Thus, to survive a motion to dismiss, the § 36(b) claim

must plead facts that proper defendants (i.e., either an investment adviser or an affiliated person

to the investment adviser as statutorily defined, see 15 U.S.C. § 80a-2(a)(3)[20]) received

compensation, which violates the ICA.  Third, § 36(b) limits the award of damages "to the actual

---

[20] The ICA defines "affiliated person" as follows:
"Affiliated person" of another person means (A) any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting securities of such other person; (B) any person 5 per centum or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such other person; (C) any person directly or indirectly controlling, controlled by, or under common control with, such other person; (D) any officer, director, partner, copartner, or employee of such other person; (E) if such other person is an investment company, any investment adviser thereof or any member of an advisory board thereof; and (F) if such other person is an unincorporated investment company not having a board of directors, the depositor thereof.

damages resulting from the breach of fiduciary duty" and states that it "shall in no event exceed the amount of compensation or payments." Id.

In addition to the statutory requirements outlined above, the Second Circuit in Gartenberg v. Merrill Lynch Asset Management, 694 F.2d 923 (2d Cir. 1982), cert. denied, 461 U.S. 906 (1983), has identified factors, which district courts must consider when evaluating § 36(b) claims. Gartenberg involved an appeal following a non-jury trial, id. at 925, in which the court stated that § 36(b) liability required "the adviser-manager [to] charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." Id. at 928 (citations omitted). The court noted that § 36(b) protects investors against "the potentially incestuous relationships between . . . advisers and their funds." In determining "whether a fee is so excessive as to constitute a 'breach of fiduciary duty,'" id. at 929-30, the trial court considers: (i) the nature and quality of the services provided by the advisers to the shareholders; (ii) the profitability of the mutual fund to the adviser-manager; (iii) "fall-out" benefits; (iv) the economies of scale achieved by the mutual fund and whether such savings are passed on to the shareholders; (v) comparative fee structures with other similar funds; and (vi) the independence and conscientiousness of the mutual fund's outside directors. In re Eaton Vance, 380 F. Supp. 2d 222, 237 (S.D.N.Y. 2005) (citing Gartenberg, 964 F.2d at 929-30).

Following Gartenberg, the Second Circuit has not elaborated on what facts plaintiffs must plead in order for a § 36(b) claim to survive a motion to dismiss. See, e.g., Levy v. Alliance Capital Mgmt. L.P., 189 F.2d 461, 461 (2d Cir. 1999) (affirming without published decision); Levy v. Alliance Capital Mgmt. L.P., No. 98-9528, 1999 U.S. App. LEXIS 20213, at

**4-5 (2d Cir. Aug. 20, 1999) (unpublished decision) (affirming dismissal of § 36(b) claim for failure to consider each fee separately and reiterating Gartenberg test without expounding on pleading requirement); Meyer v. Oppenheimer Mgmt. Corp., 895 F.2d 861, 866 (2d Cir. 1990) (same). Other Circuits have emphasized that it is insufficient to plead that the fees are excessive and that the complaint must also plead facts showing that the fees are disproportionate to the services rendered. See, e.g., Migdal v. Row Price-Fleming Int'l Inc., 248 F.3d 321, 327 (4th Cir. 2001) (affirming dismissal of a § 36(b) claim in part for failure to allege "something about the particular services offered by the funds' investment advisors"); Krantz v. Prudential Inv. Fund Mgmt. LLC, 305 F.3d 140, 142 (3d Cir. 2002) (same). While not elaborating on the pleading requirements of a § 36(b) claim, the Second Circuit has nevertheless referenced Gartenberg and made clear that "payments of each type [of alleged § 36(b) violations] must be examined for reasonableness separately, not aggregated and then considered as a whole." Levy, 1999 U.S. App. LEXIS 20213, at **4-5 (citing Meyer, 895 F.2d at 866).

### ii. Application

Claim Ten of the Complaint alleges as follows:

> The Investment Adviser Defendants had a fiduciary duty to the Class with respect to the receipt of compensation for services and of payments of a material nature made by and to the Investment Adviser Defendants.
> The Investment Adviser Defendants violated Section 36(b) by improperly charging investors in the Proprietary Funds purported Rule 12b-1 marketing fees, and by drawing on Proprietary Funds assets to make undisclosed payments of Soft Dollars and excessive commissions, as defined herein, in violation of Rule 12b-1.
> . . . .

> Plaintiff [sic], in this count, seeks to recover the Rule 12b-1
> fees, Soft Dollars, excessive commissions and the management
> fees charged the Proprietary Funds and the Holder Subclass by the
> Investment Adviser Defendants.

(Compl. ¶¶ 388-89, 392.)

**Section 36(b) Requirement that Claim Involve Receipt of Compensation by the Investment Adviser or Any Affiliated Person of Such An Investment Adviser.**  With regard to the Rule 12b-1 trail fees, the Complaint does not clearly allege that the compensation complained of was received by an "investment adviser or any affiliated person of such investment adviser," 15 U.S.C. § 80a-35(b), as required by the ICA.  The Complaint notes that "12b-1 payments are made pursuant to each fund's 12b-1 plan, which sets forth the amount of the annual fee mutual funds pay for distribution costs, including payments to broker-dealers" (Compl. § 173).  Payments to broker-dealers, however, fall outside of § 36(b). See, e.g., Pfeiffer v. Bjurman, Barry & Assocs., 03 Civ. 9741, 2006 U.S. Dist. LEXIS 7862, at **11-12 (S.D.N.Y. Mar. 3, 2006) (finding no § 36(b) liability where mutual fund paid contested fees to broker-dealers).

The Complaint also states that "[t]he 12b-1 fees paid to SSB and its affiliates from the Proprietary Funds collectively during the Class Period totalled approximately $1.49 billion" (Compl. ¶ 232).  Although Plaintiffs allege that SSB is a registered investment adviser, a registered broker-dealer, and also distributor (id. ¶ 444), the Complaint does not specify in what capacity SSB received the Rule 12b-1 trail fees nor for what kinds of services.  Moreover, Plaintiffs allege no facts to give Defendants notice in what capacity a Defendant is identified as an "affiliated person." Pfeiffer v. Integrated Fund Servs., Inc., 371 F. Supp. 2d 502, 509

(S.D.N.Y. 2005) ("To qualify as an 'affiliated person' . . ., a defendant would need to be a shareholder of or otherwise affiliated with [investment adviser] . . .[;] [plaintiff] has alleged no facts, however, that give the [defendants] fair notice that his claim rests on their satisfying the "affiliated person of such investment advisor" prong of § 36(b)." (citation omitted)).  Moreover, where the Complaint refers expressly to recipients of Rule 12b-1 fees, the names of the recipient companies do not match the corporate names of Defendant Investment Advisers. Compare Compl. ¶ 243 (referencing "Salomon Smith Barney" regarding Rule 12b-1 fees) and id. ¶ 246 (referencing "Salomon Smith Barney Financial Consultants (and PFSI Registered Representatives)" regarding same), with id. ¶47 (identifying Defendants "CAM, SSB, Salomon Brothers Asset Management and Smith Barney Fund Management" as the Investment Adviser Defendants).

The claims regarding soft dollar payments and excessive commissions suffer from similar problems.  Like the Rule 12b-1 trail fee claims, Plaintiffs fail to plead that Investment Adviser Defendants or affiliated persons to those Investment Adviser Defendants received the soft dollar payments and excessive compensation.  Instead, the Complaint alleges that "the Investment Adviser Defendants improperly directed brokerage commissions to SSB's affiliated brokers and other broker-dealers to satisfy secret *quid-pro-quo* agreements to pay excessive commissions and directed brokerage business to brokers and broker-dealers that steered their client into pre-determined Proprietary Funds" (Compl. ¶ 253). See also id. ¶ 254 (quoting prospectus SAI stating that the fund manager compensated broker-dealers); id. ¶ 256 (stating that "the Investment Adviser Defendants authorized the payment of excessive commissions from the Proprietary Funds' assets to broker dealers").  Section 36(b) liability is expressly limited to

32

receipt of compensation by investment advisers or affiliated persons of such investment advisers. Because the Complaint does not allege receipt of soft dollar payments or excessive compensation by the investment advisers but rather alleges receipt of such fees by brokers and broker-dealers and because the Complaint does not allege facts showing statutory "affiliated person" status by such brokers and broker-dealers to the investment advisers, the § 36(b) claim must be dismissed. See In re Evergreen Mut. Funds Fee Litig., No. 04 Civ. 4453, 2006 WL 753000, at *7 (S.D.N.Y. Mar. 24, 2006) (dismissing § 36(b) claims, in part, for failure to allege that defendant investment adviser and trustee/officer were recipients of the fees); Eaton Vance Mut. Funds Fee Litig., 380 F. Supp. 2d at 238 (dismissing § 36(b) claim against defendants who were not the alleged recipients of the disputed payments).

        **Second Circuit "Disproportionality" Requirement.**  These deficiencies aside, whether the Complaint makes out a § 36(b) claim in light of Second Circuit precedent and the Gartenberg factors is a closer question.  The degree of specificity required to plead a § 36(b) is an unresolved question with most courts dismissing claims for failure to allege sufficient facts regarding the disproportionality of fees to the services rendered and a few allowing such claims to survive based on mostly general allegations.[21] Compare In re Eaton Vance Mut. Funds Fee Litig., 403 F. Supp. 2d 310, 315 (S.D.N.Y. 2005) (dismissing claim because "allegation[s] of improper use of fees that [did] not benefit the plaintiffs" do not fall under § 36(b) and because complaint did not contain any "allegation that the fees charged were so disproportionately large that they bore no relationship to the services rendered"); Yampolsky v. Morgan Stanley Inv.

---

[21]  The Second Circuit Court of Appeals is likely to address this issue in the appeal of In re Eaton Vance Mutual Funds Fee Litigation, which is currently scheduled to be fully briefed and argued in September, 2006.

Advisers, Inc., 2004 U.S. Dist. LEXIS 8573, at **5-7 (S.D.N.Y. May 12, 2004) (allegations of

fund under-performance and deficient performance by the trustees insufficient to survive a

motion to dismiss despite effort to track Gartenberg factors; complaint failed to show why fees

were "disproportionately large" and failed to make factual allegations as to any actual fee

negotiations or management and distribution services rendered by the defendants), with Wicks v.

Putnam Inv. Mgmt., LLC, 2005 WL 705360, *1, *4 (D. Mass. Mar. 28, 2005) (finding that

complaint satisfied Fed. R. Civ. P. 8(a)(2) requirement of "a short and plain statement of the

claim showing that the pleader is entitled to relief" simply by alleging that the advisory fees, Rule

12b-1 distribution fees, and soft dollar payments violate § 36(b)); Pfeiffer v. Bjurman, Barry &

Assocs., 2004 WL 1903075, at *4 (S.D.N.Y. Aug. 26, 2004) ("The plaintiff has met its burden of

alleging that [the investment adviser] violated its fiduciary duty under Section 36(b) by receiving

excessive promotion, distribution and servicing fees . . . [and by] assert[ing] in essence that [the

investment advisor's] increased Rule 12b-1 fees were not 'reasonably related' to the services it

performed for the Fund[;] [i]t is unnecessary for the plaintiff to set forth evidentiary details to

support this allegation, or to support those elements of the Gartenberg test that may apply to

promotion, distribution, and service fees.").

       The Supreme Court has made clear that "Rule 8(a)'s simplified pleading standard

applies to all civil actions, with limited exceptions," and that all that is required is that the

complaint "give[] [Defendants] fair notice of the basis for [Plaintiffs'] claims." Swierkiewicz v.

Sorema N. A., 534 U.S. 506, 512, 514 (2002).  Although "ordinary pleading rules are not meant

to impose a great burden upon a plaintiff," Dura Pharms., Inc. v. Broudo, 544 U.S. at 347 (citing

Swierkiewicz, 534 U.S. at 513-15), nevertheless Plaintiffs must allege facts  – that if proven true

– would state a claim.  Although § 36(b) does not particularize or detail criteria for determining when a breach of fiduciary duty occurs in connection with compensation received by investment advisors or their affiliates, this Circuit has well-established precedent that claimants must show that the contested "fee . . . is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." Gartenberg, 694 F.2d at 928.  Such a showing has been interpreted to require plaintiffs to plead facts regarding the services rendered in relation to the fees charged. See, e.g., In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig., 2006 U.S. Dist. LEXIS 38978, at **18-21 (dismissing § 36(b) claim for failure to plead facts showing fee disproportionality or meeting the Gartenberg factors; conclusory allegations that fees inflated and excessive insufficient); In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig., 2006 U.S. Dist. LEXIS 20758, at *49 (same); In re Oppenheimer Funds Fees Litig., 426 F. Supp. 2d at 158 (dismissing § 36(b) claim for failure to make specific factual allegations as to why contested payments render advisory fees, as an economic matter, disproportionate to the services rendered).  Plaintiffs have failed to do so here. Moreover, the great weight of authority in this District has found that the fees' disproportionality to services must be shown with regard to the *total* amount of fees charged (i.e., that the fees charged must be so outsized that they constitute a breach of the investment adviser's fiduciary duty):[22]  Thus, almost all Courts in this District have followed Judge Koeltl's decision in Eaton

---

[22]  In this District and elsewhere, the great majority of district courts that have considered § 36(b) claims in the spate of mutual fund fee litigation cases has dismissed such claims. See, e.g., In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig., 04 Civ. 3759, 2006 U.S. Dist. LEXIS 38978, at **18-21 (S.D.N.Y. June 12, 2006) (dismissing § 36(b) claims); In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig., 03 Civ. 8208, 2006 U.S. Dist. LEXIS 20758, at *49 (S.D.N.Y. Apr. 18, 2006) (same); In re Oppenheimer Funds Fees Litig., 426 F. Supp. 2d at 159 (same, upon reconsideration); In re Evergreen Mut. Funds Fee Litig., 423 F. Supp. 2d at 259 (same); In re Goldman Sachs Mut. Funds Fee Litig., 2006 SL 126772, at *38 (same); In re AllianceBernstein Funds Mut. Fee Litig., 2006 U.S. Dist. LEXIS 939, at **3-11 (same, upon reconsideration); In re Davis Selected Mut. Funds Litig., 2005 U.S. Dist.

Vance and held that improper usage of fees charged (to support what this Court deems potentially questionable practices) falls outside of § 36(b) so long as the total amount charged in and of itself is not outsized. In re Eaton Vance Mut. Funds Fee Litig., 408 F. Supp. 2d at 315; see also In re Evergreen Mut. Funds Fee Litig., 423 F. Supp. 2d at 259 (following Eaton Vance and holding that improper fees do not assert a § 36(b) claim for excessive investment advisory fees); In re Goldman Sacks Mut. Funds Fee Litig., 2006 U.S. Dist. LEXIS 1542, at *37 (same); In re Davis Selected Mut. Funds Litig., 2005 WL 2509732, at **9-10 (same).

Notably, the Complaint describes the Rule 12b-1 trail fees as "excessive" because, although total net assets grew during the relevant time period, the Proprietary Funds did not reduce Plaintiffs' *pro rata* share of expenses and thus failed to pass on to investors the benefits of economies of scale (Compl. ¶¶ 188-96).  The Complaint, however, does not expressly plead that the failure to pass on the benefits of economies of scale constituted a § 36(b) violation. Id. ¶¶ 188-96, 386-92; see also In re Eaton Vance Mut. Funds Fee Litig., 403 F. Supp. 2d 310, 315 (S.D.N.Y. 2005) (on reconsideration, affirming decision to dismiss § 36(b) claim and noting that "nowhere in the [complaint] do the plaintiffs ever allege that the failure to pass on benefits from economies of scale was a violation of § 36(b)").

Notwithstanding the alleged fees and whether they constitute breaches of fiduciary duties, under clear Second Circuit precedent, the Court must dismiss the § 36(b) claim for failure

---

LEXIS 23203, at **9-10 (same); In re Eaton Vance Mut. Funds Fee Litig., 403 F. Supp. 2d 310, 315 (S.D.N.Y. 2005) (same); but see In re Dreyfus Mut. Funds Fee Litig., No. 04-0128, 2005 U.S. Dist. LEXIS 29152, at *28 (W.D. Pa. Sept 30, 2005) (recognizing that "it [was] a close case," but nevertheless sustaining the § 36(b) claim); Pfeiffer v. Bjurman, Barry & Assocs., 2004 U.S. Dist. LEXIS 16924, at *18 (denying motion to dismiss § 36(b) claims).

to state a claim.  However, Defendants are granted leave to replead to meet the pleading standards set forth above.

### 3.    The § 48(a) Claim

Previously, the Court held that § 48(a) of the ICA contains no implied private right of action and, accordingly, dismissed that claim (i.e., Count Eleven of the Plaintiffs' Complaint).  Plaintiffs' § 48(a) claim is also dismissed on the ground that no underlying ICA violation exists as the Court has also dismissed Plaintiffs' § 34(a) and § 36(b) claims.

### C.    SLUSA Preemption

Defendants move to dismiss Plaintiffs' state common law breach of fiduciary claims (i.e., Counts Twelve and Thirteen of the Complaint) against the Investment Adviser Defendants and the Director Defendants on the ground of SLUSA preemption.  Defendants contend, among other arguments, that Plaintiffs attempt to evade SLUSA by defining a subclass of "holders" (as opposed to purchasers or sellers), but that SLUSA ultimately preempts their state law breach of fiduciary claims.  This is so, Defendants maintain, because the scheme complained of necessarily implicates the purchase of securities and the state common law claims are inextricably related to the purchase of fund shares.  Plaintiffs argue that the state law claims against the Investment Adviser Defendants are not based on misrepresentations and omissions but on improper annual Rule 12b-1 fees, improper payments of soft dollars, and unauthorized use of "directed brokerage" in exchange for shelf space.  These grounds, the Plaintiffs maintain, are based solely on the status of the subclass as holders of fund shares; moreover, the state law breach of fiduciary claims against the Director Defendants are based on their failure to prevent the improper fees charges and payments made by the Investment Adviser Defendants.  Plaintiffs

request that, if the Court should find that the state law claims are preempted, Plaintiffs be permitted to re-plead.

      After this motion was fully briefed, the United States Supreme Court decided <u>Merrill Lynch v. Dabit</u>, __ U.S. __, 126 S. Ct. 1503 (2006), which compels dismissal of these claims.  SLUSA preempts certain "covered class actions" based upon state or local statutory or common law in any state or federal court by any private party alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1)(A).  In <u>Dabit</u>, the Supreme Court held that the SLUSA's operative language must be read broadly to sweep in not only purchasers and sellers of securities but also holders of securities where "the fraud alleged 'coincide[s]' with a securities transaction – whether by the plaintiff or by someone else." 126 S. Ct. at 1513.

      Plaintiffs' Complaint expressly defines two subclasses, one of purchasers and one of holders.[23]  The holder subclass asserts the state common law breach of fiduciary duty claims, which Defendants move to dismiss. (Compl. ¶¶ 399-408.)  Plaintiffs' attempts to distinguish between misrepresentations and omissions connected with the purchase of securities with purportedly improper annual Rule 12b-1 fees, improper payments of soft dollars, and unauthorized use of "directed brokerage" in exchange for shelf space are unavailing.  <u>Dabit</u>'s

---

[23] Plaintiffs' Complaint defines the subclasses as follows:

> The Class is divided into two subclasses–the Purchasers Subclass and the Holders Subclass.  The Purchasers Subclass includes all persons or entities that purchased one or more shares or other ownership units of the Proprietary Funds at any time during the Class Period [*i.e.*, between March 22, 1999 and March 22, 2004] (the "Purchasers Subclass").  The Holders Subclass includes all persons or entities that held one or more shares or other ownership units of the Proprietary Funds at any time during the Class Period (the "Holder Subclass").

(Compl. ¶ 305.)

very broad interpretation of SLUSA includes such claims within its "pre-emptive sweep." 126 S. Ct. at 1514.  These alleged practices  necessarily "coincide" with the securities transactions complained of – i.e., the alleged improper steering of Plaintiffs to particular funds and other allegations.

Accordingly, Counts Twelve and Thirteen of the Complaint are dismissed with prejudice.[24]

## D.    Standing Issue

Plaintiffs represent holders of shares in twenty of SSB's eighty-eight mutual funds.  Defendant maintains that Plaintiffs have no standing with regard to the sixty-eight Proprietary Funds that they have not purchased.  As to these sixty-eight funds, the Plaintiffs cannot "allege a personal injury fairly traceable to the defendants' allegedly unlawful conduct." Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 85 (2d Cir. 2006) (citation and internal quotation marks omitted).

### 1. Traditional Standing Analysis

Defendants rely on Supreme Court precedent holding that "Article III standing is a threshold issue in every case that must be decided first." (Defs.' Mem. at 1 (citing Warth v. Seldin, 422 U.S. 490, 498 (1975); City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983); Simon v. East Ky. Welfare Rights Org., 425 U.S. 26, 37 (1976); O'Shea v. Littleton, 414 U.S. 488, 494 (1974)).)

---

[24] In light of the Supreme Court precedent that disposes of Counts Eleven and Twelve the Court does not reach the additional ground on which Defendants sought dismissal (i.e., that these claims should have been brought derivatively as opposed to directly).

Under established standing jurisprudence involving typical class actions, courts undertake a two-step analysis.  First, the court determines whether the representative plaintiff has standing vis-a-vis the defendant:  *i.e.,* can the plaintiff demonstrate injury by that defendant so as to have a sufficiently direct and substantial interest.  If so, then the court determines whether the moving party can satisfy the class certification requirements under Rule 23. See, e.g., 7AA Charles Alan Wright et al., Federal Practice and Procedure § 1785.1, at 388-89 (3d ed. 2005).

> Under this traditional rubric:
>
> Care must be taken, when dealing with apparently standing-related concepts in a class action context, to analyze individual standing requirements separately and apart from Rule 23 class prerequisites. Though the concepts appear related, in that they both seek to measure whether the proper party is before the court to tender the issues for litigation, they are in fact independent criteria.  They spring from different sources and serve different functions.  Often satisfaction of one set of criteria can exist without the other.

1 Conte & Newberg, Newberg on Class Actions § 2:9, at 109.

## 2.  The Supreme Court Standing Decisions

Recent cases from the Supreme Court suggest that the traditional framework of addressing Article III standing prior to class action considerations may not always be applicable. Anchem Products, Inc. v. Windsor, 521 U.S. 591 (1997), involved a class certification of a global settlement against asbestos products manufacturers.  The Supreme Court stated:

> We agree that "[t]he class certification issues are dispositive;" because their resolution here is logically antecedent to the existence of any Article III issues, it is appropriate to reach them first.  Cf. Arizonans for Official English v. Arizona, 520 U.S. 43, 66-67 (1997) (declining to resolve definitely question whether petitioners had standing because mootness issue was dispositive in the case.)  We therefore follow the path taken by the Court of Appeals, mindful that Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling

Act, which instructs that rules of procedure "shall not abridge,
enlarge or modify any substantive right." 28 U.S.C. § 2072(b).).

Id. at 613.

In Steel Company v. Citizens for a Better Environment, 523 U.S. 83 (1998), the

Court considered whether courts should first address statutory jurisdiction or Article III standing.

In Steel, the question was whether the Emergency Planning and Community Right-to-Know Act

of 1986, 42 U.S.C. § 110000 et seq., authorized suits for purely past violations.  The Supreme

Court emphasized "the rule that Article III jurisdiction is always an antecedent question." 523

U.S. at 101; see also id. ("The requirement that jurisdiction be established as a threshold matter

'spring[s] from the nature and limits of the judicial power of the Unites States' and is 'inflexible

and without exception.'" (citation omitted)).

Ortiz v. Fibreboard Corporation, 527 U.S. 815 (1999), also involved a global

settlement against a manufacturer of asbestos-containing products.  The Supreme Court

characterized the case as follows:  "This case turns on the conditions for certifying a mandatory

settlement class on a limited fund theory under Federal Rule of Civil Procedure 23(b)(1)(B)." Id.

at 821.  The Court then noted that prior to reaching this issue, it would address defendants'

assertion that the class claims were nonjusticiable under Article III. Id. at 830-31.  The Court

stated that:

> Ordinarily . . . this or any other Article III court must be sure of its
> own jurisdiction before getting to the merits [citing Steel].  But the
> class certification issues are, as they were in Amchem, "logically
> antecedent" to Article III concerns and themselves pertain to
> statutory standing, which may properly be treated before Article III
> standing.  Thus, the issue about Rule 23 certification should be
> treated first, mindful that [the Rule's] requirements must be
> interpreted in keeping with Article III constraints. . . ." [citing
> Amchem].

Id. at 831.

41

Amchem and Ortiz are cases where the class certification issues are "dispositive" because "their resolution . . . is logically antecedent to the existence of any Article III issues." Amchem, 521 U.S. at 613. They appear to be sui generis, involving global mass tort settlements in distinct and unique procedural postures. In re AllianceBernstein Mut. Fund Excessive Fee Litig., No. 04 civ. 4885, 2005 WL 2677753, at *9 (S.D.N.Y. Oct. 19, 2005) ("The [Supreme] Court has stressed that [the Ortiz] exception should only be applied when a court is confronted with an extremely complex case defying customary judicial administration.").

Other courts have had to decide whether the Article III analysis should be performed first or whether the Amchem and Ortiz class action determination approach ought to proceed first. The better reasoned decisions favor the traditional test, so that Article III standing is determined first, before proceeding to the issue of determining the class. "Based on th[e] guidance [provided in Ortiz], it would be inappropriate for the court to proceed directly to a class certification inquiry before resolving the issue of justiciability." Id. at *9; see also In re Eaton Vance Corp. Sec. Litig., 220 F.R.D. 162,169 (D. Mass. 2004) ("[T]he Supreme Court's aversion to creating broad exceptions to the requirements of jurisdiction, the unique factual and procedural history of Amchem and Ortiz, . . . the practical realities of this case, and the important principles underlying Article III convince this Court that the Ortiz exception should be narrowly interpreted and its applicability does not extend to the current case.").[25]

---

[25] Judge Kram noted in In re AllianceBernstein Mutual Fund Excessive Fee Litigation that:
As a straightforward securities case, many of the concerns triggering the exception mentioned by the Supreme Court in Ortiz are noticeably absent here. In fact, in the arena of securities litigation, standing requirements have been considered particularly important "in order to curb the risks of vexatious litigation and abuse of discovery." In re Bank of Boston Corp. Sec. Litig., 762 F. Supp. 1525, 1531 (D. Mass. 1991). Moreover, because Plaintiffs clearly have standing to sue on behalf of the . . . Funds in which they own shares, addressing class certification would not be outcome determinative. See Pederson v.

Consequently, the Court holds that the Article III standing determination should precede that of class certification.  With regard to the sixty-eight funds of which Plaintiffs own no shares, Plaintiffs do not have standing to assert any claims because Plaintiffs cannot satisfy the standing requirements. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); see also In re Columbia Entities Litig., No. 04-11704, 2005 U.S. Dist. LEXIS 33439 (D. Mass. Nov. 30, 2005) (no standing unless plaintiff owns shares in a particular fund); In re AllianceBernstein Mut. Fund Excessive Fee Litig., 2005 WL 2677753, at *9 (same); In re Eaton Vance Corp. Sec. Litig., 220 F.R.D. at 169 (same); Nenni et al. v. Dean Witter Reynolds et al., 1999 U.S. Dist. LEXIS 23351, at *6 (D. Mass. Sept. 29, 1999) (same); but see In re Franklin Mut. Funds Excessive Fee Litig., 2005 U.S. Dist. LEXIS 20106, **22-23 (D. N.J. Sept. 9, 2005) (class action permissible against defendant funds in which no plaintiff owed shares); In re Dreyfus Aggressive Growth Mut. Fund Litig., No. 98 Civ. 4318, 2000 WL 1357509, at **3-5 (S.D.N.Y. Sept. 20, 2000) (same).[26]

---

Louisiana State Univ., 213 F.3d 858, 866 n.5 (5th Cir. 2000); Clark v. McDonald's Corp., 213 F.R.D. 198, 204 (D. N.J. 2003).
2005 WL 2677753, at *9.  The conclusions reached in In re AllianceBernstein are equally applicable to the case at bar.

[26] The Court rejects Plaintiffs' argument that the "juridical link doctrine" provides a basis for permitting the action to proceed against Defendants connected to Funds in which no Plaintiff owns shares (Pls.' Mem. Opp'n Mot. Dismiss 49-50).  A "juridical link" has been defined as "some [independent] legal relationship which relates all defendants in a way such that single resolution of the dispute is preferred to a multiplicity of similar actions." Luyando v. Bowen, 124 F.R.D. 52, 58 (S.D.N.Y. 1989) (Wood, J.) (citation omitted), rev'd sub nom. on other grounds, Luyando v. Grinker, 8 F.3d 948 (2d Cir. 1993).  The Court also notes that application of the juridical link exception in the commercial context is disfavored:

[Application of the doctrine is inappropriate,] however, in the absence of a conspiracy, joint tort, or collective wrong.  For instance, a widespread legal violation in an industry may have affected many persons, and a plaintiff may have suffered a direct injury from a wrongdoer with whom the plaintiff had direct dealings.  Assuming that there are others similarly situated who also dealt with this same defendant, the plaintiff would have standing to represent a class of such a group of injured persons.  Suppose further, however, that the violation charged is common to many others who had dealings with other defendants in the same industry who had had no contact with the plaintiff.  In the absence of an

Accordingly, the Court dismisses from the action those Defendant Proprietary Funds, as well as the Defendants (personal and corporate) whose only connection is to Funds in which the Plaintiffs own no shares.  This dismissal is without prejudice to Plaintiffs' right to add defendants should they be able to identify individuals who own shares in the SSB's other sixty-eight mutual funds.

### E.      Staying the Claims Related to Class B Shares

Plaintiffs assert that "Defendants also improperly directed Plaintiffs to purchase Class 'B' shares in Proprietary Funds, when, given the size of the investment, purchase of Class 'A' shares would have been far more economically advantageous." (Compl. ¶ 9.)  While Class A shares generally have an up-front fee, they have lower continuing fees, whereas Class B shares have no up-front fee but higher continuing payments based upon the amount invested. (Id. ¶ 9 n.2.)  Plaintiffs also allege that Defendants failed to disclose "breakpoints," or the levels of investment at which the percentage charged is reduced by breaking up large orders into smaller investments in multiple funds. (Id. ¶¶ 175-78.)  Plaintiffs rely on these allegations as grounds for asserting claims under the federal securities laws and the ICA.[27]

---

alleged conspiracy, may the plaintiff represent a class of all persons similarly situated who suffered injury from any member of the industry, by virtue of the commonality of the liability issues involved, without more?  At least one circuit court has said that the answer is no.  The plaintiff, having dealings with specific defendants, has suffered alleged injury only at their hands.  Such a plaintiff has suffered no direct injury with respect to any defendant with whom he or she has had no dealings.

1 Conte & Newberg, Newberg on Class Actions § 2:8, at 107 (citing La Mar v. H & B Novelty & Loan Co., 489 F.2d 461 (9th Cir. 1973)).

[27] In particular, the Complaint relies on the allegation of Plaintiffs' improper steerage to Class B shares by Defendants to support claimed violations of the following provisions:  § 11 of the SA (id. ¶ 314(l)), § 12(A)(2) of the SA (id. ¶¶ 324(l), 331(l)), § 15 of the SA (id. ¶ 335), § 10(b) of the SEA and Rules 10b-5(b) and 10b-10 (id. ¶¶ 344(l), 354(l)), § 20(a) of the SEA (id. ¶ 378), and § 34(b) (id. ¶ 381(l)) of the ICA.

Defendants request a stay of this portion of the lawsuit because of a previously-filed action entitled <u>Fitzgerald v. Citigroup, Inc.</u>, No. 03 Civ. 4305 (S.D.N.Y. 2003), pending before Judge Batts in this District.  Defendants maintain that the <u>Fitzgerald</u> litigation asserts claims that are "substantially identical" to the claims asserted here and point out, as well, that the lead plaintiff in <u>Fitzgerald</u> is also a plaintiff in the case at bar (Defs.' Mem. Supp. Mot. Dismiss 13).  Plaintiffs oppose this request.

The "first-to-file" rule dictates that the Court grant Defendants' motion.[28]  The Second Circuit discussed this rule in <u>Adam v. Jacobs</u>, 950 F.2d 89 (2d Cir. 1991), and stated as follows:

> "'Where there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience . . . or . . . special circumstances . . . giving priority to the second.'" <u>First City Nat'l Bank and Trust Co. v. Simmons</u>, 878 F.2d 76, 79 (2d Cir. 1989) (citations omitted).  Deference to the first filing "embodies considerations of judicial administration and conservation of resources." <u>Id.</u> at 80 (citations omitted).  The decision whether or not to stay or dismiss a proceeding rests within a district judge's discretion. <u>See</u> <u>Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co</u>, 342 U.S. 180, 188-84 (1952).

<u>Id.</u> at 92.  The court emphasized the overriding policy considerations of conserving judicial resources and ensuring that the parties' controversy be resolved in a single determination. <u>Id.</u>  To

---

[28] The problem of parallel federal lawsuits typically involves the commencement of an action by a plaintiff in one district and the commencement of a second action by the defendant in the first action in another district. Whether to stay one of these actions frequently implicates Federal Rule of Civil Procedure 13(a), which governs compulsory counterclaims. <u>See</u>, <u>e.g.</u>, <u>Adam v. Jacobs</u>, 950 F.2d 89, 93 (2d Cir. 1991) (discussing compulsory counterclaims and stays); <u>J. Lyons & Co. Ltd. v. Republic of Tea</u>, 892 F. Supp. 486, 488 (S.D.N.Y. 1995) (analyzing stay considerations in light of three actions filed in the Southern District and three actions filed in other federal districts involving trademark infringement and related claims).  The issue before this Court is somewhat unusual as it involves two actions filed in the same district against several common defendants by at least one common plaintiff where the main claim in the first action is also asserted in the second action.

that end, these policies "are furthered by the second court's exercising judicial self-restraint."

Id.[29]

In the present circumstances, there is no good reason for the Court to proceed. With regard to judicial economy, the parties in the Fitzgerald case have fully briefed motion to dismiss and judicial resources have already been expended in litigating that action before Judge Batts.  Moreover, neither the balance of convenience nor special circumstances warrant not staying the common claims in this second-filed suit.

Defendants' motion to stay the claims related to the Class B Shares is granted.

**CONCLUSION**

The Court grants the Defendants' motion as follows:

•   Counts One, Two, Three, Four, Five, Six, Seven, Eight, Nine, Eleven, Twelve, and Thirteen are dismissed with prejudice;

•   Count Ten is dismissed without prejudice to its renewal on a proper pleading;

•   Claims against Defendants who are Funds or related to Funds for which Plaintiffs own no shares are dismissed, without prejudice with leave to replead should there be additional individuals who join in the litigation and own shares in one or more of the sixty-eight mutual funds as to which Plaintiffs have not purchased; and,

---

[29] The Second Circuit elaborated that a district judge contending with a second-filed action should stay that action even though, under "the normal chronology," the court of first impression enjoins the second court. Adam v. Jacobs, 950 F.2d at 93.  The court stated:

> We can see no reason why the end result should be different when the party seeking to preserve the primacy of the first court moves the second court to stay its hand rather than asking the first court to enjoin prosecution of the second case.  Whatever the procedure, the first suit should have priority, "absent the showing of balance of convenience in favor of the second action."

Id. at 93-94.

•      Claims related to the Class B shares (i.e., alleged steering of purchasers to Class B as

opposed to Class A shares and failure to disclose breakpoints) is stayed in light of

Fitzgerald v. Citigroup, Inc., No. 03 Civ. 4305 (S.D.N.Y. 2003).

Dated:  New York, New York
         July 26, 2006


                                    SO ORDERED


                                    _____
                                    PAUL A. CROTTY
                                    United States District Judge

47

- Claims related to the Class B shares (i.e., alleged steering of purchasers to Class B as opposed to Class A shares and failure to disclose breakpoints) is stayed in light of Fitzgerald v. Citigroup, Inc., No. 03 Civ. 4305 (S.D.N.Y. 2003).

Dated: New York, New York
  July 26, 2006

SO ORDERED

PAUL A. CROTTY
United States District Judge

47