UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re SALOMON SMITH BARNEY MUTUAL FUND FEES LITIGATION | No. 04 Civ. 4055 (PAC) **SECOND CONSOLIDATED AMENDED COMPLAINT** JURY TRIAL DEMANDED |

Plaintiffs allege the following upon information and belief, except as to those allegations concerning Plaintiffs which are alleged based upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included: (a) a review and analysis of Defendants' (including mutual funds offered by Defendants) filings with the United States Securities and Exchange Commission (the "SEC") and other regulatory filings; (b) review and analysis of press releases, public statements, advisories, news articles and other publications disseminated by or concerning the Funds or the other defendants; (c) review of documents relating to recent inquiries and regulatory actions against certain mutual funds by the National Association of Securities Dealers (the "NASD") and the SEC; and (d) interviews with former employees of SSB and its affiliates who have knowledge of the conduct complained of herein.

Plaintiffs believe that further substantial evidence exists to support the allegations in this Second Consolidated Amended Complaint that will become available after a reasonable opportunity for discovery. Most of the specific facts supporting the allegations herein are known only to Defendants or are exclusively within their custody or control.

**NATURE OF THE ACTION**

1.      This is a derivative action brought on behalf of the Salomon Smith Barney ("SSB") mutual funds held by Plaintiffs (as defined below) (the "Funds")[1] arising from the payment of excessive compensation and fees to Defendants. Defendants are liable under Section 36(b) of the Investment Company Act of 1940 (the "ICA") because, during the relevant timeframe of May 28, 2003 through March 22, 2004,[2] the advisory and other fees received by Defendants and their affiliates were disproportionate to the value of the services provided and not within the bounds of what would have been negotiated in an arm's-length transaction. Thus, the fees received by the Defendants as described herein were received in violation of the ICA.

2.      During the relevant timeframe, compensation and fees paid to the Investment Adviser and Distributor Defendants (as defined below) rose dramatically even though the services provided by these Defendants remained the same, and no additional benefits were provided to the Funds or their investors in return for the additional fees.

3.      One reason for the dramatic increase in compensation to the Investment Adviser Defendants, Distributor Defendant and their affiliates, was the growth in the size of the Funds resulting from Defendants' use of Fund assets to promote the sale of Fund shares through participation in revenue sharing programs.  Among other things, those programs included: (a) cash payments to brokers in return for the brokers' agreement to promote sales of Fund shares (often called "revenue sharing"); (b) the directing of Fund portfolio brokerage to brokerage firms in return for agreements by the brokers to promote the shares of the Funds; and (c) "Soft Dollar"

---

[1] The Funds held by Plaintiffs are: Salomon Brothers Capital Fund, Smith Barney Large Capitalization Growth Fund, Smith Barney Aggressive Growth Fund, Smith Barney Appreciation Fund, Smith Barney Large Capitalization Value Fund, Smith Barney Mid Cap Core Fund, Smith Barney Technology Fund, Smith Barney Premier Selections Global Growth Fund (a/k/a Smith Barney Global All Cap Growth and Value Fund), and Smith Barney Allocation Series Fund - High Growth Portfolio (a/k/a Smith Barney High Growth Portfolio).

[2] The relevant timeframe is defined by the Court's Order dated July 26, 2006.

commission arrangements with brokers. These payments resulted in the growth of the Funds, which benefited the Investment Adviser and Distributor Defendants because it allowed their advisory and other asset-based fees to increase. The aforesaid Defendants engaged in those programs in an effort to generate increased compensation even though many of those programs were in violation of SEC and National Association of Securities Dealers ("NASD") rules and regulations. They engaged in such activity despite ample evidence that the increase in their compensation was not justified by any increase in the quality or nature of the services which they provided to the Funds or their investors, or by additional benefits to the Funds or their investors.

4.      Although an increase in mutual fund assets can benefit investors through economies of scale that decrease the expenses of operating such funds on a per share basis, Defendants failed to reduce their fees to pass on the economies of scale to the Funds or their investors. Instead, they utilized the economies of scale for their own benefit.

5.      The fee structure imposed by Defendants on the Funds and their investors far exceeded the fees that would be paid as a result of arm's-length bargaining. Fees for essentially the same services that were paid by similar funds not affiliated with Defendants were substantially less.

6.      In addition, Fund assets were used to pay excessive "Rule 12b-1" fees to the Distributor Defendant without any benefit accruing to the Funds or their investors from those payments. Defendants' management fees were also excessive because they used Fund assets to pay their out-of-pocket expenses even though they were already being compensated on a basis that reimbursed them for such expenses. For example, they caused the Funds to make "Soft Dollar" commission payments to brokers, through which brokers were paid commissions at a rate that exceeded the normal rate for effectuating portfolio transactions, in return for services

- 3 -

that would normally be provided by the adviser and for which the adviser was already being paid. Soft Dollar commissions were utilized by Defendants to shift significant expenses from the Investment Adviser Defendants to the Funds and their investors without any corresponding offset in the level of the management fee.

7.     Furthermore, the Directors of the Funds failed to satisfy their duty to independently and conscientiously evaluate the Funds' 12b-1 and advisory fee arrangements, a factor which strongly supports a finding of fee excessiveness. The Directors failed to perform their duties as the "watchdogs" of the Funds because they failed to obtain enough information to adequately evaluate the Funds' distribution fees as required by Rule 12b-1, or approved those fees in the face of information showing that the distribution program was failing to benefit the Funds. As a result, they were unable to evaluate whether Defendants' use of Fund assets for revenue sharing agreements was in the Funds' and their investors' best interest and whether the fees being charged were excessive. Moreover, the increase in the Funds' net assets, accompanied by an increase in the expense ratios and Defendants' failure to sufficiently reduce their fees, were red flags which the Directors disregarded, as was the fact that other comparable funds were paying substantially lower fees for similar services. As a result, the Directors did not perform their duties as "watchdogs" of the Funds because they failed to ensure that any economies of scale that were being realized from the increase in Fund assets were passed to the Funds and their investors, and that the fees paid by the Funds to Defendants were not excessive. The Directors' failure to satisfy their duties resulted in excessive fees being charged to the Funds that were disproportionate to the services rendered and were not the product of arm's-length bargaining.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b) and 28 U.S.C. §§ 1331, 1337 and 1367(a).

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in substantial part in this District. Defendants Citigroup Asset Management, SSB, Salomon Brothers Asset Management Inc., and Smith Barney Fund Management LLC are and were at all relevant times headquartered in this District in New York City.

10.     In connection with the acts and omissions alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including without limitation, the mails, interstate telephone communications and the facilities of the national securities markets and exchanges.

## PLAINTIFFS

11.     Plaintiff LuAnn Beyer ("Beyer") held during the relevant period and continues to hold shares of Salomon Brothers Capital Fund, Class C.

12.     Plaintiff Chanda Maxwell ("C. Maxwell") held during the relevant period and continues to hold shares of the Smith Barney Aggressive Growth Fund, Class B, Smith Barney Appreciation Fund, Class B, Smith Barney Large Capitalization Growth Fund, Class B, Smith Barney Large Cap Value Fund, Class B, and Smith Barney Mid Cap Core Fund, Class B.

13.     Plaintiff Ryan Maxwell ("R. Maxwell") held during the relevant period and continues to hold shares of the Smith Barney Aggressive Growth Fund, Class B, Smith Barney Appreciation Fund, Class B, and Smith Barney Large Capitalization Growth Fund, Classes A and B.

14.     Plaintiff Tony C. Evans ("Evans") held during the relevant period and continues to hold shares of the Smith Barney Technology Fund, Class A, and the Smith Barney Premier Selections Global Growth Fund, Class A.

15.     Plaintiff Michelle Gomez ("Gomez") held during the relevant period and continues to hold shares of Smith Barney Allocation Series Fund - High Growth Portfolio, Class A and Smith Barney Aggressive Growth Fund, Class A.

16.     Plaintiffs Beyer, C. Maxwell, R. Maxwell, Evans and Gomez are collectively referred to herein as "Plaintiffs."

## DEFENDANTS

### The Investment Adviser Defendants

17.     Defendant Citigroup Asset Management ("CAM") is a group of investment adviser affiliates of Citigroup, Inc. ("Citigroup"). The investment services of CAM are provided by Salomon Brothers Asset Management, Inc., Smith Barney Asset Management, Citibank Global Asset Management (a unit of Citibank, N.A. and Citibank International PLC), Citigroup Asset Management Limited and affiliated advisory entities. CAM is incorporated in Delaware and located at 399 Park Avenue, 7th Floor, New York, New York 10043.

18.     Defendant SSB, n/k/a Citigroup Global Markets, Inc., and d/b/a Smith Barney Asset Management, is registered as an investment adviser under the Investment Advisers Act and managed and advised the Funds. SSB, together with defendants Smith Barney Fund Management and Salomon Brothers Asset Management, as defined herein, had responsibility for overseeing the day-to-day management of the Funds. SSB is located at 399 Park Avenue, New York, New York 10022. SSB is also a registered broker-dealer and employs a nationwide network of brokers and financial advisors that sold the Funds to Plaintiffs. The main office of SSB's broker-dealer operations is 388 Greenwich Street, New York, New York 10013.

19.     Defendant Salomon Brothers Asset Management, Inc. ("Salomon Brothers Asset Management") is registered as an investment adviser under the Investment Advisers Act and managed and advised the Funds.    Salomon Brothers Asset Management, together with defendants SSB and Smith Barney Fund Management, as defined herein, had responsibility for overseeing the day-to-day management of the Funds.  Salomon Brothers Asset Management is located at 399 Park Avenue, New York, New York 10022.

20.     Defendant Smith Barney Fund Management LLC ("Smith Barney Fund Management") is registered as an investment adviser under the Investment Advisers Act and managed and advised the Funds.  Smith Barney Fund Management, together with defendants SSB and Salomon Brothers Asset Management, had responsibility for overseeing the day-to-day management of the Funds.  Smith Barney Fund Management is located at 399 Park Avenue, 4th Floor, New York, New York 10022.

21.     Defendants CAM, SSB, Salomon Brothers Asset Management and Smith Barney Fund Management are collectively referred to herein as the "Investment Adviser Defendants."

**The Distributor Defendant**

22.     As part of its marketing function, SSB also administered the Funds' distribution plans and served as a vehicle for financing the Funds sales campaigns.  SSB, when acting in its capacity as a distributor of the Funds, shall be referred to herein as the "Fund Distributor," or the "Distributor."

23.     Collectively, all defendants named above are referred to herein as "Defendants."

**The Funds**

24.     The Funds owned by the Plaintiffs are open-ended management companies comprised of the capital invested by mutual fund shareholders, each having a board of Directors or Trustees charged with representing the interests of the shareholders of that fund.

## SUBSTANTIVE ALLEGATIONS

## DEFENDANTS BREACHED THEIR DUTIES BY CHARGING EXCESSIVE FEES NOT REASONABLY RELATED TO THE SERVICES PROVIDED

25.    Under the ICA the fee charged to mutual fund investors should be the equivalent of fees that would have resulted from arm's-length bargaining.  Mutual fund directors are required to negotiate the fees charged to the fund on behalf of the investors (who, individually, are unable to negotiate such fees), and on behalf of the fund, which is otherwise under the control of the fund's adviser or distributor.  At the same time, investment advisers and their affiliates have a fiduciary duty with respect to the fees that are charged to the funds and their investors, in that the fees must be reasonably related to the services provided.

**The Fees At Issue**

26.    Investment Advisory Fees:    Investment advisory fees are calculated as a percentage of assets under management.  Investment advisory fees are paid to investment advisers for managing the underlying portfolio, *i.e.*, for choosing the securities in which a mutual fund should invest and the operations required to support the management of the portfolio.  As the fund assets increase, the dollar amount of such fees parallels this growth.

27.    Rule 12b-1 Fees: SEC Rule 12b-1 permits a fund to pay "12b-1" distribution fees out of fund assets only if the fund has adopted a 12b-1 plan authorizing their payment, and only if the Directors properly find that there is a reasonable likelihood that the plan will benefit the fund and its shareholders.  Legitimate uses of 12b-1 distribution fees include payments for the cost of marketing and selling fund shares (such as compensation for brokers and others who sell fund shares, and payments for advertising, the printing and mailing of prospectuses and sales literature).  Like the investment advisory fees, the 12b-1 fees are calculated as a percentage of assets under management and the dollar amount of such fees increases with the size of the fund.

- 8 -

28.    <u>Transfer Agency Fees</u>:  Transfer agency fees are paid to either an affiliated or independent third party to handle sales and redemptions of fund shares, to maintain shareholder records, to compute the net asset value (the "NAV") of the fund daily, and to pay out dividends and capital gains.  Like the investment advisory fees and 12b-1 fees, the transfer agency fees are calculated as a percentage of assets under management and the dollar amount of such fees increases with the size of the fund.  These fees can constitute "fall-out" benefits to the Investment Adviser as a result of its relationship with the Funds, and must be considered in evaluating whether the fees paid were excessive.

29.    <u>Administrative Fees</u>:  Administrative fees are generally paid by funds to cover the cost of responding to investor inquiries, providing investors with information about their investments, and other services required to enable the functioning of the fund.  Unlike 12b-1 distribution fees, a fund may pay administrative fees without adopting a 12b-1 plan. Accordingly, such fees are often not visible to investors and are highly susceptible to excessiveness by Investment Advisers.  Like the investment advisory fees and the 12b-1 fees, the administrative fees are calculated as a percentage of assets under management and the dollar amount of such fees increases with the size of the fund.

30.    These fees are the principal components of a fund expense ratio, which is the ratio of total expenses to net assets.  The expense ratio determines the fund's efficiency and cost effectiveness, and consequently a lower number is desirable because it reflects higher total returns.[3]  The expense ratio of a fund is considered in the industry to be a key indicator of a fund's performance.

---

[3] These fees are often measured in basis points.  A basis point ("bp") is one-hundredth of a percentage point (0.01%).  For example, 10 bps of $1 billion equals $1 million.

**Factors That Show The Fees Charged To The Funds By The Defendants**
**Were Not Reasonably Related To The Services Provided To The Funds**

31.     The mutual fund industry recognizes that certain factors indicate that fees are

excessive.  In particular, the following factors, *inter alia*, illustrate whether a fee is excessive to

the funds and their investors:

- the quality of services provided to the fund and its investors;

- the nature of services being paid for by the fund and its investors;

- whether economies of scale were passed to the fund and its investors or kept by
  the investment adviser;

- whether the investment advisory fees are reduced to reflect the "fall-out benefits"
  the adviser receives, which are those benefits other than the advisory fees that
  flow to the adviser and its affiliates as a result of the adviser's relationship with
  the fund;

- what other fund families or funds within the same fund family charge for similar
  mutual funds; and

- whether the trustees exercised a sufficient level of care and conscientiousness in
  approving the investment advisory and distribution agreements and the fees
  contained therein.

32.     However, an analysis of the Funds shows that the Defendants charged excessive

fees to benefit themselves.

**The Defendants' Profits Were Increasing During the Relevant Period**

33.     The mutual fund industry is an enormously profitable industry, as it is for the

Defendants.  In this regard, a Forbes article, published on September 15, 2003, stated as follows:

"The average net profit at publicly held mutual fund firms was 18.8% last year, blowing away

the 14.9% margin for the financial industry overall.  This increase in revenue was due to an

increase in sales."  At a roundtable on investment company regulation by the Securities and

Exchange Commission Historical Society, industry insiders made the following comments about

the mutual fund industry's profits:

> MR. GOLDBERG: Well, a cynic might say that this is such an enormously
> profitable industry, you don't have to steal.

MS. MCGRATH: Well, that's true. So much for 36(b).

The Roundtable on Investment Company Regulation, Securities and Exchange Commission Historical Society, Dec. 4, 2002 at 33.

34.    Similarly, the Investment Adviser Defendants profited tremendously during the relevant period from the significant inflow of assets under management. As the SEC noted, in regards to fees charged to the Funds to pay one of Defendants' affiliates, "This is a case about an investment adviser placing its interest in making a profit ahead of the mutual funds it serves." *In the Matter of Smith Barney Fund Management LLC and Citigroup Global Markets Inc.,* IA Release No. 2390, May 31, 2005. According to Citigroup's 2004 Annual Report, its asset management department reported net income of $238 million in 2004. *See* Citigroup 2004 Annual Report at 19.

35.    According to the 2004 annual report, one of the highlights of the asset management department that resulted in high profits was "increasing penetration of non-Citigroup distribution channels, increasing assets under management in retail and variable annuity/sub advisory third party channels by 29 percent." Defendants were able to obtain such high profits as a result of the excessive fees they charged the Funds.

**Economies Of Scale Were Not Passed On To The Funds**

36.    In theory, as a particular fund's total assets grow, the expenses borne by that fund would be spread out and shared amongst fund investors, so that each investor's *pro rata* share of the fund's expenses is correspondingly diminished. When these savings are not passed on to the funds, excessive fees are, as was the case here, retained by the Investment Advisers.

37.    The legislative history of Section 36(b) recognizes that an investment adviser's failure to pass on economies of scale to the fund is the principal cause of excessive fees:

•

> It is noted . . . that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry. In some instances these economies of scale have not been shared with investors. Recently there has been a desirable tendency of the part of some fund managers to reduce their effective charges as the fund grows in size. Accordingly, the best industry practice will provide a guide.

S. Rep. No. 91-184, at 5-6 (1969), *reprinted in* 1970 U.S. Code Cong. & Ad. News, at 4901-02.

38.     To illustrate, on a per share basis, it does not cost more to manage additional assets in a growing fund because economies of scale occur on both the fund complex and portfolio level for various costs incurred. As noted by the SEC in the *Report of the SEC on the Public Policy Implications of Investment Company Growth,* H.R. Rep. No.89-2337(1966):

> The economies of size, in large measure, reflect the fact that the management of both large and small security portfolios requires much the same general economic and market forecasting, analyses of various industry groups and evaluations of particular securities, since even a relatively small fund may be large enough to attain adequate diversification of investment risk. Indeed, in recent years there has been a tendency among many larger funds to decrease rather than increase the number of common stock holdings in their portfolios despite substantial growth through sales of fund shares.

39.     Significant economies of scale also exist with regard to the service and administration fees charged to investors, which are also part of the expense ratio. The cost of maintaining a shareholder's account is the same for all shareholders, regardless of the size of his or her account. Suppose the annual cost of maintaining an account is $40 and that the mutual fund has 100,000 shareholders. Under this scenario, if the fund has $100,000,000 in assets (an average of $1,000 per account), then the fund's administrative expenses are 4.0% of fund assets. If total assets are $250,000,000 (an average account of $2,500), however, then the administrative expense ratio is 1.6% because the expense ratio falls as fund assets rise. *See* David A. Latzko, *Economies of Scale in Mutual Fund Administration*, Penn. St. Univ., JOURNAL OF FINANCIAL RESEARCH, Sept. 22, 1999.

- 12 -

40.     The mutual fund industry is a business in which economies of scale are present and are statistically significant. *See* Jim Saxton, Chairman, Joint Economic Committee, United States Congress, *The Mutual Fund Industry: An Overview* (citing William Baumol, *The Economics of Mutual Fund Markets: Competition Versus Regulation,* 186, 190, Boston: Kluwer Academic (1990)). As explained by Lori Walsh, a financial economist for the SEC, "If the asset growth is successful, this should translate into a lower expense ratio and higher expected net returns, all other things equal." Lori Walsh, *The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns*, available at http://www.sec.gov/rules/proposed/s70904/lwalsh042604.pdf.[4] To this end, the growth of assets under management by the Investment Adviser Defendants has generated substantial economies of scale to the great benefit of the Investment Adviser and Distributor Defendant, which have not been passed on to the Funds and their investors through lower expense ratios.

41.     The failure of the Investment Adviser Defendants to pass along the savings created from the growth of the Funds is evidenced in each of the Fund's annual and semi-annual reports, which provided data regarding the total net assets of the fund and the ratio of expenses to net assets of the fund. Despite the increase in assets across the Funds, the economies of scale created did not result in a corresponding decrease in the expense ratios of the funds.

42.     For example, according to the 2003 Annual Report for the Smith Barney Aggressive Growth Fund, filed on October 31, 2003, the fund's total assets were $6.6 billion and the expense ratio for Class A shares was 1.22%. However, between 2002 and 2004 the Smith Barney Aggressive Growth Fund's assets increased from $4.7 billion to $7.8 billion, an increase

---

[4] Fixed costs of mutual funds also included accounting, registration, and directors' fees, which are spread over the asset base and therefore decrease per shareholder as assets increase. Additionally, asset growth results in lower flow volatility, which decreases liquidity costs for the funds.

of 66%. Over this same period the fund's expense ratio for Class A shares decreased by only 1.7%, from 1.21% in 2002 to 1.19% in 2004.[5] Other Funds demonstrated similar properties.

43.     Between 2000 and 2004, the Smith Barney Mid Cap Core Fund's assets increased from $1.172 billion[6] to $1.232 billion, an increase of over 5%. Over this same period the fund's expense ratio for Class A shares increased from 1.15% in 2000 to 1.16% in 2004.[7]

44.     Between 2002 and 2003, the Smith Barney Large Cap Value Fund's assets increased from $730 million to $751 million, an increase of almost 3%. Over this same period the fund's expense ratio for Class A shares remained unchanged at 0.94%.[8]

45.     Between 2002 and 2003, the Smith Barney Technology Fund's assets increased from $69.2 million to $100.2 million, an increase of over 44%. Over this same period the fund's expense ratio for Class A shares remained unchanged at 1.5%.[9]

46.     Between 2001 and 2004, the Smith Barney Appreciation Fund's assets increased from $4.948 billion[10] to $5.908 billion, an increase of over 19%. Over this same period the fund's expense ratio for Class A shares increased by 1.09%, from 0.92% in 2001 to 0.93% in 2004.[11]

---

[5] Smith Barney Aggressive Growth Fund, Annual Report for the Fiscal Year Ending Aug. 31, 2003 (Form N-CSR) (Sept. 15, 2003).

[6] Smith Barney Mid Cap Core Fund, Annual Report for the Fiscal Year Ending Nov. 30, 2002 (Form N-30D) (Nov. 30, 2002).

[7] Smith Barney Mid Cap Core Fund, Annual Report for the Fiscal Year Ending Nov. 30, 2004 (Form N-CSR) (Nov. 30, 2004).

[8] Smith Barney Large Cap Value Fund, Annual Report for the Fiscal Year Ending Dec. 31, 2004 (Form N-CSR) (Dec. 31, 2004).

[9] Smith Barney Technology Fund, Annual Report for the Fiscal Year Ending Oct. 31, 2003 (Form N-CSR) (Nov. 16, 2004).

[10] Smith Barney Appreciation Fund, Annual Report for the Fiscal Year Ending Dec. 31, 2001 (Form N-30D) (Dec. 31, 2001).

[11] Smith Barney Appreciation Fund, Annual Report for the Fiscal Year Ending Dec. 31, 2004 (Form N-CSR) (Dec. 31, 2004).

47.    Between 2000 and 2004, the Smith Barney Large Cap Growth Fund's assets increased from $3.805 billion[12] to $4.831 billion, an increase of over 26%. Over this same period the fund's expense ratio for Class A shares increased by 2.68%, from 1.12% in 2000 to 1.15% in 2004.[13]

48.    Between 2001 and 2003, the Salomon Brothers Capital Fund's assets increased from $1.298 billion to $1.588 billion, an increase of over 22%. Over this same period the fund's expense ratio for Class A shares increased by 0.93%, from 1.07% in 2001 to 1.08% in 2003.[14]

49.    Between 2003 and 2006, the Smith Barney Allocation Series Fund - High Growth Portfolio's assets increased from $496 million[15] to $702 million, an increase of over 41%. Over this same period the fund's expense ratio for Class A shares remained *unchanged* at 0.80%.[16]

50.    When looking at the total amount of fees charged in dollars, it becomes clear that the amount charged was significant, as is illustrated in the chart below:

**Dollar Expenses - Estimates Using Expense Ratios and 12B-1 Fees (2003)**

| Name of Fund | Expenses ($ millions) | 12B-1 Fees ($ millions) |
|---|---|---|
| Salomon Brothers Capital Fund | $24.0845 | $10.0845 |
| Smith Barney Aggressive Growth Fund | $121.3645 | $45.2888 |
| Smith Barney Appreciation Fund | $65.0449 | $24.0613 |
| Smith Barney Large Cap Growth Fund | $68.5349 | $24.9533 |
| Smith Barney Large Cap Value Fund | $8.2896 | $2.5485 |
| Smith Barney Mid Cap Core Fund | $20.0776 | $9.0528 |

---

[12] Smith Barney Large Capitalization Growth Fund, Annual Report for the Fiscal Year Ending Nov. 30, 2001 (Form N-30D) (Nov. 30, 2001).

[13] Smith Barney Large Capitalization Growth Fund, Annual Report for the Fiscal Year Ending Nov. 30, 2004 (Form N-CSR) (Nov. 30, 2004).

[14] Salomon Brothers Capital Fund, Annual Report for the Fiscal Year Ending Dec. 31, 2003 (Form N-CSR) (Dec. 31, 2003).

[15] Smith Barney Allocation Series Fund-High Growth Portfolio, Annual Report for the Fiscal Year Ending Jan 31, 2005 (Form N-CSR) (Jan. 31, 2005).

[16] Smith Barney Allocation Series Fund-High Growth Portfolio, Annual Report for the Fiscal Year Ending Jan 31, 2006 (Form N-CSR) (Jan. 31, 2006).

| | | |
|---|---|---|
| Smith Barney Technology Fund | $2.1635 | $0.8488 |
| Smith Barney Allocation Series High Growth | $7.5688 | $3.9848 |
| Smith Barney Premier Selections Global Growth | $1.7199 | $0.7138 |
| **Total Estimated Dollar Expenses** | $318.85 | $121.54 |

Notes: Estimates of dollar expenses are calculated using the end of year 2003 expense and
12b-1 ratios multiplied by the total net assets in each of the fund classes as of December 2003.

51.     It becomes even more clear that the fees charged to the Funds and their investors were excessive when looking at how much more Plaintiffs paid than was paid by investors in funds of comparable size. As evidenced above, the growth of the Funds has not benefited the Funds in the form of lower fees. This is illustrated by the fact that the Funds' expense ratios are significantly higher than those of large-size benchmark funds, further demonstrating that economies of scale were not being passed to the Funds or their investors by the Defendants. The chart below shows that the Investment Adviser and Distributor Defendants charged fees to the Funds and their investors that were higher than comparable funds, which due to their size have similar costs and experience similar economies of scale:[17]

---

[17] University of Chicago's Center for Research in Securities Prices ("CRSP") Benchmark in this chart is the value weighted (weights obtained using the monthly asset valuation for each fund) average of all funds in the same size quartile that had the same CRSP Strategic Objective Designation. CRSP assigns each fund one of 187 Strategic Insight Fund Objective Codes based on its investment strategy. The results in this chart are for the A, B and C Classes of each Fund only, and are presented in terms of difference, defined as follows: Funds Expense Ratio Levels Minus Benchmark Expense Ratio Levels. Thus, a positive value denotes Fund expense ratios that are higher than industry benchmark averages. For example, the Smith Barney Aggressive Growth Fund exceeds the CRSP Benchmark by 36 basis points.

**Comparison of 2003 Fees on SSB Funds to CRSP**
**Valued-Weighted Benchmark of Same Sized Funds (All Share Classes)**

| Fund Name | Strategic Objective | Amount By Which Fund Expenses Exceed Benchmark[18] |
|---|---|---|
| Salomon Brothers Capital Fund | Growth | 15 |
| Smith Barney Aggressive Growth Fund | Aggressive Growth | 36 |
| Smith Barney Appreciation Fund | Growth | 20 |
| Smith Barney Large Cap Growth and Value | Growth | 28 |
| Smith Barney Large Cap Value Fund | Growth & Income | 9 |
| Smith Barney Mid Cap Core Fund | Growth Midcap | 37 |
| Smith Barney Technology Fund | Technology | 2 |
| Smith Barney Premier Selections Global Growth | Equity Growth Global | 34 |

52.     Additionally, neither research costs nor performance justify the Defendants failure to reduce the Funds' expense ratios. Correlation between the Funds' performance indicates that the Defendants kept their research costs down by sharing the same research across the Funds; therefore, investors who purchased different SSB mutual funds received relatively little diversity through these investments.

53.     The chart in Exhibit A, attached hereto, illustrates the highly correlated performance of the Funds.

54.     By looking at the expense ratio data of the Funds, from Fund to Fund and from year to year, the Defendants' scheme to extract excessive fees is exposed. The distribution of a fund's shares and the increase in overall assets of a fund were supposed to be good for investors. However, the systematic overcharging of fees and expenses by the Defendants eliminated any benefits of distribution for investors. In this case, the distribution plan and other undisclosed incentives existed only to enrich the Defendants.

---

[18] Differences expressed in terms of basis points.

**The Fees Charged To The Funds And Their Investors Were**
**Excessive Relative To Similar Funds Offered In The Industry**

55.     When examining the expense ratios of other fund families that provide the same types of funds as SSB, it is apparent that the Investment Adviser Defendants charged higher fees than other investment advisers who manage similar types of portfolios with similar investment objectives.  As the exhibit below illustrates, there was a pattern of overcharging in the Funds' expense ratios.  The expense ratios for the selected Fund share classes exceeded industry benchmarks by as much as 96 bps, which is statistically significant.

56.     The graph below illustrates that the Funds' expense ratios were far beyond the expense ratios of similar funds in the industry.  When comparing SSB Funds to funds with similar strategic objectives and the same value weighted average (weights obtained using the monthly asset valuation for each fund), there is evidence of consistently excessive expense ratios:[19]

**Comparison of SSB Funds Fees to the CRSP Benchmark**
**Benchmark is the Value-Weighted Average of All Funds Existing During 2003**
**With the Same CRSP Strategic Objective as the SSB Funds (All Share Classes)**

| Fund Name | Strategic Objective | Amount By Which Fund Expenses Exceed Benchmark[20] |
|---|---|---|
| Salomon Brothers Capital Fund | Growth | 21 |
| Smith Barney Aggressive Growth Fund | Aggressive Growth | 29 |
| Smith Barney Appreciation Fund | Growth | 17 |
| Smith Barney Large Cap Growth and Value | Growth | 63 |
| Smith Barney Large Cap Value Fund | Growth & Income | 51 |
| Smith Barney Mid Cap Core Fund | Growth Midcap | 50 |
| Smith Barney Technology Fund | Technology | 41 |

[19] The CRSP Benchmark in these charts is the value weighted average of all funds in the same size quartile that had the same CRSP Strategic Objective Designation.  The results in this chart are for the A, B and C Classes of each Fund only, and are presented in terms of the difference between the SSB Funds Expense Ratio Levels Minus the Benchmark Expense Ratio Levels.  Thus, a positive value denotes Funds' expense ratios that are higher than industry benchmark averages.

[20] Differences expressed in terms of basis points.

| | | |
|---|---|---|
| Smith Barney Allocation Series High Growth | Aggressive Growth | 20 |
| Smith Barney Premier Selections Global Growth | Equity Growth Global | 96 |

57.     Analysts have also come to similar conclusions about other SSB funds. For example, Morningstar analysts have illustrated how the fees for Salomon Brothers High-Yield Bond A Fund are excessive compared to similar funds, noting:

> The 1.25% levy on its A shares is higher than that of the typical front-load member of its category. Moreover, the fund's assets ballooned in 2003, and expenses have only dropped by a few basis points. Salomon Brothers should be realizing economies of scale and should pass on the cost savings to shareholders.

Paul Herbert, Morningstar's Take: This globetrotting fund has merit, but high costs prevent a resounding recommendation, June 16, 2004, http://quicktake.moringstar.com (password required). Up to present, analysts continue to make the same observations: "The fund also should be cheaper, in our view." Paul Herbert, Morningstar's Take: Things have settled down here, but we aren't giving Salomon Brothers High-Yield Bond a ringing endorsement, July 14, 2006, http://quicktake.moringstar.com (password required).

**The Nature and Quality of Services Do Not Justify The Excessive Fees**

58.     The nature and quality of advisory services provided to the Funds do not justify the excessive expense ratios carried by the Funds. Defendants cannot justify their high fees by arguing that their managers and analysts are of superior quality and provide superior performance. The performance of these Funds was not up to par with other similar funds in the industry, and thus could not justify the higher fees. The Funds underperformed their benchmarks during the relevant time period from 2003 to 2004. The Funds underperformed no-load and load funds with the same strategic objective as the Funds. For example, the Funds underperformed no-load benchmark funds by an average of (3.51%). Moreover, when comparing the Funds to a

benchmark including both load and no-load funds, the average performance of the Funds was

dramatically inferior, averaging (12.39%).

**Comparison of Cumulative Excess Returns on Smith Barney and Salomon Brothers (SSB) Funds Relative to Benchmarks Over the Class Period, All Class Shares (May 2003 Through March 2004)**

| Fund Name | Net Expenses & Loads (no-load benchmark) | Net Expenses & Loads (load benchmark) |
|---|---|---|
| Salomon Brothers Capital Fund | 13.14 | 4.84 |
| Smith Barney Aggressive Growth Fund | -3.53 | -12.83 |
| Smith Barney Allocation Series High Growth | 3.48 | -5.82 |
| Smith Barney Appreciation Fund | -10.30 | -18.59 |
| Smith Barney Large Cap Growth and Value | -2.03 | -10.32 |
| Smith Barney Large Cap Value Fund | -1.81 | -11.44 |
| Smith Barney Mid Cap Core Fund | -18.44 | -31.94 |
| Smith Barney Premier Selections Global Growth | -4.86 | -13.84 |
| Smith Barney Technology Fund | -7.28 | -11.65 |
| **Arithmetic Average** | -3.5151 | -12.3986 |

59.     This chart demonstrates that when the Funds' performance is analyzed net of

expenses and sales loads they are inferior to what investors would have received had they

invested in comparable benchmark funds. Since the quality of the services for which Defendants

received their fees failed to result in superior Fund performance, the fees were disproportionate

to the services rendered and were therefore excessive.

60.     In fact, in the issue dated January 30, 2006, Forbes published an article titled "The

Empire Builder," which stated that over the past five years Legg Mason's (which recently

acquired SSB's Funds) 11 equity funds averaged a return of 8.9% per year versus SSB funds

which returned on average 0.6% over that same period.

## THE FEES CHARGED WERE NOT REASONABLY RELATED TO SERVICES PROVIDED TO THE SSB FUNDS AND THEIR INVESTORS

### The Investment Adviser Defendants Placed The Expense Of Revenue Sharing Payments On The Funds And Their Investors

61.     The Investment Adviser and Distributor Defendant also charged excessive fees by charging the Funds and their investors for such Defendants' out-of-pocket revenue sharing expenses.  Revenue sharing arrangements are very appealing to investment advisers because they can increase sales from three to ten fold.  *See* Smita Madhur, Revenue Sharing Boosts Mutual Fund Sales Tenfold, Financial-Planning.com, Jan. 24, 2005, http://www.financial-planning.com/pubs/fpi/20050124101.html.

62.     At the same time, revenue sharing arrangements are very expensive for investors because their high costs translate into higher and excessive fees levied upon shareholders.

63.     These payments increased the fees levied on the Funds and their investors because the Investment Adviser Defendants, in determining the amount they would charge for their advisory fees, accounted for the costs of the revenue sharing agreements for which they paid broker-dealers and others, in order to ensure the recovery of their full profit after the revenue sharing payments were made.

64.     A recent report on revenue sharing by Cerulli Associates notes that advisory fees are the most significant source of revenue sharing.  *See* Cerulli Associates, Mutual Fund Revenue Sharing: Current Practices and Projected Implications (2005).  The advisory fee can be inflated in order to finance the adviser's revenue sharing obligations and, as shown herein, the Investment Adviser Defendants did just this with respect to the SSB Funds.

65.     However, investment advisory fees are meant to cover management of the invested funds.  This includes management and administrative activities related to managing the

fund's portfolios.  Report of the SEC on the Public Policy Implications of Investment Company Growth, H.R. Rep. No. 89-2337 (1966).

66.    The investment advisory fees used for revenue sharing do not fit either of these categories.  Revenue sharing expenses are not supposed to be borne by funds and their investors as they are not management or traditional advisory expenses.  Furthermore, the revenue sharing payments may benefit the Investment Adviser Defendants, but do not benefit the Funds or their investors.

67.    The SEC has expressed concern over these practices, stating that, "[r]evenue sharing arrangements not only pose potential conflicts of interest, but also may have the indirect effect of reducing investors' returns by increasing the distribution-related costs incurred by funds.  Even though revenue sharing is paid to broker-dealers directly by fund investment advisers, rather than out of fund assets, it is possible that some advisers may seek to increase the advisory fees that they charge the fund to finance those distribution activities . . . Moreover, revenue sharing arrangements may prevent some advisers from reducing their current advisory fees." *Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities, and Other Confirmation Requirement Amendments, and Amendments to the Registration Form for Mutual Funds*, 69 Fed. Reg. 6438, 6441 n.21 (Feb. 10, 2004) (to be codified at 17 C.R.F. pts. 239, 240 and 274).

68.    This type of behavior was already noticed by Morningstar analysts.  One of the reasons that the expense ratios are failing to decrease is explained as follows:

> the company can exhibit some of the worst traits of the big Wall Street brokerage firms. . . .  Smith Barney has also been investigated for some of its brokerage practices relating to the sales of its funds.  Though the brokerage unit is separate from the unit that manages the funds, investors should note the inherent conflict of buying a fund through an advisor who may have incentives to steer them toward proprietary funds.  Such links

make it less likely that the fund group will lower costs or take other shareholder-friendly actions.

*Stewardship Grade: Salomon Investors Value*, www.morningstar.com (password required).

69.     The nature of Defendants' revenue sharing program was such that it strongly incentivized broker-dealers to expand their marketing efforts in order to increase the size of the Funds. As a result of such activities, the aggregate net assets—against which the management fees were charged on a percentage basis—increased, with a consequent increase in the dollar amount of the advisory fees. The Investment Adviser Defendants therefore received "something for nothing" from the Funds and their investors because the fees were not the result of any increase or improvement in the services being provided, and did not reflect any legitimate increase in the cost of the services being provided to the advisers and their affiliates.

70.     In addition, the advisory fee payments made by the Funds and their investors that were utilized for revenue sharing were charged in violation of Rule 12b-1. Advisory fees paid to an investment adviser with the intent of allocating a certain amount towards distribution practices, such as revenue sharing, are regulated under Rule 12b-1 and Section 36(b). As the SEC explained, "Rule 12b-1 could apply . . . in certain cases in which the adviser makes distribution related payments out of its own resources . . . 'if any allowance were made in the investment adviser's fee to provide money to finance distribution.'" Investment Company Institute, 1998 SEC No-Act. LEXIS 976, at *16 (Oct. 30, 1998) (citing Payment of Asset-Based Sales Loads By Registered Open-End Management Investment Companies, Investment Company Act Release No. 16431, 1988 SEC LEXIS 1206 (June 13, 1988)) (emphasis added). Defendants paid for part of these revenue sharing arrangements through advisory fees to circumvent limits placed on such distribution payments by Rule 12b-1.

**Defendants Received Massive 12b-1 Fees But Provided No**
**Benefit To The SSB Funds Or Their Investors In Return**

71.     As discussed above, Rule 12b-1, promulgated by the SEC pursuant to the

Investment Company Act, prohibits mutual funds from directly or indirectly distributing or

marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met.

The Rule 12b-1 conditions are, amongst others, that payments for marketing must be made

pursuant to a written plan "describing all material aspects of the proposed financing of

distribution and that all agreements with any person relating to implementation of the plan are in

writing"; the plan must be approved by a vote of the majority of the board of directors; and the

board of directors must review, at least quarterly, "a written report of the amounts so expended

and the purposes for which such expenditures were made." 17 C.F.R. § 270.12b-1. Additionally,

the directors "have a duty to request and evaluate, and any person who is a party to any

agreement with such company relating to such plan shall have a duty to furnish, such information

as may reasonably be necessary to an informed determination of whether such plan should be

implemented or continued." 17 C.F.R. § 270.12b-1(d). The directors may continue the plan

"only if the directors who vote to approve such implementation or continuation conclude, in the

exercise of reasonable business judgment and in light of their fiduciary duties under state law

and sections 36(a) and (b) (15 U.S.C. 80a-35(a) and (b)) of the Act that there is a reasonable

likelihood that the plan will benefit the company and its shareholders." 17 C.F.R. § 270.12b-1(e).

As noted above, Rule 12b-1 fees are assessed as a percentage of assets under management and,

accordingly, grow proportionately with the size of the Funds.

72.     The Distributor Defendant, as an affiliate of the Investment Adviser Defendants,

was similarly obligated by fiduciary duty to the Funds and their investors with respect to the fees

it received. The Distributor Defendant was the recipient of 12b-1 fees, but took no measures to

assure that the fees were reasonably related to the services provided to the Funds or their investors.

73.    Additionally, the 12b-1 fees charged to the SSB Funds and their investors were higher than those charged by comparable funds. As illustrated below, Defendants charged 12b-1 fees that were significantly higher than comparable funds:[21]

### Comparison of the 2003 12b-1 fees for the SSB Funds to the Value Weighted CRSP Benchmark of All Funds

| Fund Name | Strategic Objective | Amount By Which 12b-1 Expenses Exceed Benchmark[22] |
|---|---|---|
| Salomon Brothers Capital Fund | Growth | 24 |
| Smith Barney Aggressive Growth Fund | Aggressive Growth | 26 |
| Smith Barney Appreciation Fund | Growth | 24 |
| Smith Barney Large Cap Growth and Value | Growth | 54 |
| Smith Barney Large Cap Value Fund | Growth & Income | 31 |
| Smith Barney Mid Cap Core Fund | Growth Midcap | 37 |
| Smith Barney Technology Fund | Technology | 48 |
| Smith Barney Allocation Series High Growth | Aggressive Growth | 56 |
| Smith Barney Premier Selections Global Growth | Equity Growth Global | -14 |

74.    The reason for the higher commissions was so that the Distributor Defendant could satisfy revenue sharing arrangements and pay brokers more than other mutual fund companies did. For example, actual sales commissions paid to brokers that sold Class B shares would typically be 4.5%, compared to 4% for a similar class in a non-proprietary fund. Additionally, actual sales commissions paid to brokers for selling a Fund's Class C shares would typically be 2-3%, compared to 1% on other similar non-proprietary funds. Finally, actual sales

---

[21] The CRSP Benchmark in this chart is the value weighted average of all funds that had the same CRSP Strategic Objective Designation. The results in this chart are for the A, B and C Classes of each Fund only, and are presented in terms of difference, defined as follows: 12b-1 fees charged to SSB Funds Minus Benchmark 12b-1 fees. Thus, a positive value denotes SSB Funds 12b-1 fees that are higher than industry benchmark averages.

[22] Differences expressed in terms of basis points.

commissions paid to brokers for selling a Fund's L shares would typically be 2% compared to 1% on non-proprietary funds. Investors were unaware and brokers were careful not to disclose that this additional undisclosed sum – beyond the standard up-front commission – was being paid to brokers as an incentive to sell the particular Fund.

## THE INVESTMENT ADVISER DEFENDANTS FAILED TO REDUCE THEIR FEES TO RELECT OTHER BENEFITS THEY RECEIVED FROM THE FUNDS

### The Investment Adviser and Distributor Defendant Failed to Reduce Their Fees to Reflect The Benefits They Recovered From Directing Brokerage to Cover Their Out-of-Pocket Expenses

75.    Directed brokerage is a practice which directly harms investors, especially where, as here, the fund is alleged to be "paying up," or trading securities at commission rates higher than the fund would otherwise pay if it were not indirectly paying for distribution through directing brokerage. Directed brokerage gives the investment adviser a strong incentive to use brokerage commissions to increase the size of its funds (thereby increasing management/advisory fees) and to avoid paying brokers out of its own assets.

76.    By shifting their expenses to the Funds and their investors, the Investment Adviser and Distributor Defendants were able to increase their own revenues at the expense of investors. These Defendants should have reduced their advisory and 12b-1 fees to reflect the benefits they received from the use of brokerage commissions to satisfy revenue sharing arrangements. However, Defendants' failure to reduce their fees to reflect their use of fund assets resulted in their receipt of excessive advisory and 12b-1 fees.

77.    In addition to corroding the broker-investor relationship, Defendants' use of directed brokerage commissions decreased the transparency of the Funds' and investors' costs. Monies spent through directed brokerage do not show up as expenses, but are merely reflected as a decrease in investors' returns. The opaqueness of this form of payment also allowed the

Investment Adviser and Distributor Defendant to circumvent the limits placed by the NASD on 12b-1 fees.

78.     By paying the excessive commissions and directing brokerage business, the Investment Adviser and Distributor Defendant violated Section 12 of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 plan.

79.     The excessive commissions and directed brokerage practices caused Fund investors to pay for services that did not benefit the Funds or their investors.  In fact, the Investment Adviser Defendants and their affiliates profited from the improper use of Fund and investor assets because it resulted in an increase in the size of the Funds and, thus, the size of their asset-based fees.  This increase in fees bore no reasonable relation to the services rendered.

80.     The cost of revenue sharing and directed brokerage arrangements should have been borne by the Investment Adviser Defendants and their affiliates as an out-of-pocket expense instead of coming out of Fund and investor assets.

**Through Their "Soft Dollar" Program, The Investment Adviser
Defendants Shifted Overhead Costs To SSB Funds And Their
Investors Without Providing Any Offset In Their Advisory Fees**

81.     The Investment Adviser Defendants received significant benefits by using "Soft Dollars," as defined below, to shift research costs onto investors through inflated broker commissions, while failing to reduce their advisory fees to reflect this benefit.

82.     Investment advisers routinely pay broker commissions on the purchase and sale of fund securities, and such commissions may, under certain circumstances, properly be used to purchase certain other services from brokers as well.  Specifically, the Section 28(e) "safe harbor" provision of the Securities Exchange Act carves out an exception to the rule that requires investment management companies to obtain the best possible execution price for their trades. Section 28(e) provides that fund managers shall not be deemed to have breached their fiduciary

duties "solely by reason of [their] having caused the account to pay a ... broker ... in excess of the amount of commission another . . . broker . . . would have charged for effecting that transaction, if such person determined in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided." 15 U.S.C. § 78bb(e)(1). In other words, funds are allowed to include in "commissions" payment for not only purchase and sales execution, but also for specified services, which the SEC has defined to include any service that "provides lawful and appropriate assistance to [the] money manager in performance of his investment decision-making responsibilities." *Id.*, Interpretative Notes and Decisions 7 (citation omitted). The commission amounts charged by brokerages to investment advisers in excess of the purchase and sales charges are known within the industry as "Soft Dollars."

83.     The Investment Adviser Defendants paid excessive commissions to broker-dealers, which, insofar as they were transferred under the guise of Soft Dollars, were a sham and unjustifiable in light of the Investment Adviser Defendants' in-house research apparatus, for which the Funds and their investors were already paying through the advisory fee. Instead, the purpose of these payments was to induce the brokers to steer their clients to the SSB Funds. These incentives caused brokers to steer clients to the Funds regardless of the Funds' investment quality relative to other investment alternatives.    By paying the excessive brokerage commissions, Defendants also violated Section 12(b) of the Investment Company Act because such payments were not made pursuant to valid Rule 12b-1 plans.

84.     The Directors did not have adequate information to measure the value to the Funds and their investors of the Soft Dollars generated. However, the amount paid by the Funds and their investors for excessive commissions was significant and the advisory fee was not

reduced to reflect the benefits received by the Investment Adviser Defendants, who utilized Fund

assets in the form of Soft Dollars to pay for research that was already being paid for through the

advisory fee. Accordingly, the fees paid by the Funds and their investors through so-called "Soft

Dollar" payments were excessive and bore no reasonable relationship to the services provided.

Such fees resulted in the promotion by brokers of the SSB Funds, thereby increasing the size of

the Funds and Defendants' asset-based fees with no corresponding increase in services provided

to the Funds or their investors.

**Defendants Failed To Reduce Their Fees To Recognize The**
**Benefits Affiliates Received From Transfer Agency Fees**

85.    The Investment Adviser Defendants' affiliates, such as the transfer agent, also

charged excessive fees to the Funds. As affiliates of the Investment Adviser Defendants, they

also had a fiduciary duty with respect to the fees charged to the Funds. The Defendants served

as investment adviser to the Funds and in this capacity recommended that the Funds contract

with the affiliate of SSB to perform limited transfer agent services while sub-contracting with the

Funds' existing transfer agent. The existing transfer agent would perform almost all the same

services it had previously performed, but at a steep discount, permitting SSB's affiliate to keep

the discount and thus gain a high profit while performing only limited work. These transactions

were made in self-interest in order to permit SSB and its affiliates to profit at the expense of the

Funds and their shareholders. The SEC agreed, stating:

> According to the Commission's Order, the investment adviser in this case
> placed its interest in making a profit ahead of the interests of the mutual
> funds it had a duty to serve. Investment advisers have a fiduciary duty to act
> in the best interests of the mutual funds they advise and the funds'
> shareholders. In this case, the adviser recommended that the mutual funds
> contract with an affiliate of the adviser to serve as transfer agent without
> fully disclosing to the mutual funds' boards that most of the actual work
> was to be done under a subcontract arrangement that respondents had
> negotiated with the mutual funds' existing third party transfer agent at
> steeply discounted rates. Rather than passing the substantial fee discount on

> to the mutual funds, the respondents, through the affiliated transfer agent,
> took most of the benefit of the discount for themselves, reaping nearly $100
> million in profit at the funds' expense over a five year period.

http://www.sec.gov/news/press/2005-80.htm.

86.     Therefore, Defendants' fees were also excessive because they failed to reduce

theirs and their affiliates' fees to reflect the discounts they received and the enormous the profits

they made.

**The Directors' Failure To Act Independently And Conscientiously Resulted
In Defendants Charging Excessive Fees To The Funds And Their Investors**

87.     Mutual funds are typically created and managed by investment advisers for a

profit.  Investment advisers usually supervise a mutual funds' daily operations, and often select

affiliated persons to serve on the Board of Directors.  As former SEC Commissioner Manuel

Cohen remarked when referring to testimony by investment advisers:

> They also made the point that the investment adviser creates the fund, and
> operates it in effect as a business.  Many of them stated that "It is our fund, we run
> it, we manage it, we control it," and I don't think there is anything wrong with
> them saying it.  They were just admitting what is a fact of life.  The investment
> adviser does control the fund.

Statement of Manuel Cohen, Commissioner, SEC,  Investment Company Act Amendments of

1976: Hearings on H.R. 9510, H.R. 9511 Before the Subcomm. on Commerce and Fin. of the

Comm. on Interstate and Foreign Commerce (1967) (emphasis added).

88.     As a result of the investment adviser's control of the fund, the relationship

between investment advisers and mutual funds contains many potential conflicts of interest.  This

conflict arises because part of the fees the investment advisers charge, which reduce investors'

returns, represents revenue and a source of profit to the investment adviser.  *See*  GAO Report,

Mutual Fund Fees: Additional Disclosure Could Encourage Price Competition ("GAO Report"),

at 14, 82, available at http://www.gao.gov/new.items/gg00126.pdf.

89.     The ICA was enacted in response to concerns that mutual fund shareholders were not being adequately protected as a result of these conflicts of interest. As a result, the Directors were made responsible for overseeing the investment advisers' activities. GAO Report at 14. More specifically, the ICA requires the presence of independent directors on the Board of Directors to review and approve the fees the Funds and their investors are charged. *See* 15 U.S.C. § 80a-10(a). The Board of Directors is responsible for approving the investment advisory agreements, 12b-1 plans, and fees paid to Defendants. In reviewing and approving the foregoing, the Directors are required to act in the best interest of the investors.

90.     Acting in the investors' best interests requires the Directors to exercise due care in approving the fees charged to those funds that the Directors have the responsibility to oversee. This is why the expertise of the independent Directors, whether they are fully informed about all facts bearing on the adviser's fee, and the extent of care and conscientiousness with which they perform their duties are among the most important factors to be examined in evaluating whether the compensation fund advisers and distributors receive is reasonable under §36(b) of the ICA. *See Gartenberg v. Merrill Lynch Asset Mgmt, Inc.*, 694 F.2d 923, 930 (2d Cir. 1982).

91.     One of the ways to evaluate whether the Directors fulfilled their duties with adequate care and conscientiousness is to determine whether they acted independently in approving the Funds' fee arrangements or whether the Directors' actions were controlled by the Funds' investment advisers. In determining whether or not a Director is considered an "interested person," the ICA states that "a natural person shall be presumed not to be a controlled person." 15 U.S.C. § 80a-2(a)(9). The term "interested person" is defined to include "any affiliated person" of an investment company, investment adviser, or principal underwriter. *Id.* at § 80a-2(a)(19)(A)(i), (B)(i). "Affiliated person" is further defined as "any person directly or

indirectly controlling, controlled by, or under common control with, such other person." *Id.* at § 80a-2(a)(3)(C) (emphasis added). Finally, the ICA defines "control" as "the power to exercise a controlling influence over the management or policies of a company." *Id.* at § 80a-2(a)(9) (emphasis added).

92.    The presumption that a Director is not a "controlled person" under the ICA may be rebutted by "evidence." 15 U.S.C. § 80a-2(a)(9). Such evidence may include allegations that non-employee directors followed a course of action suggested by the investment adviser which prejudiced the funds' shareholders. If the Directors rubber stamp suggestions of the investment advisers, they cannot fulfill their statutory duties to act as "watchdogs" for the Funds.

93.    The Directors who served on the Board of Directors of the Funds during the relevant time period include:

94.    R. Jay Gerken ("Gerken") – Gerken was a Director or Trustee charged with overseeing 227 or more of SSB's funds including, the Salomon Brothers Capital Fund, Smith Barney Aggressive Growth Fund, Smith Barney Appreciation Fund, Smith Barney Large Cap Value Fund, Smith Barney Mid Cap Core Fund, Smith Barney Premier Selections Global Growth Fund, and Smith Barney Allocation Series Fund - High Growth Portfolio. Gerken also served as Managing Director of SSB, President and Chief Executive Officer ("CEO") of certain mutual funds associated with Citigroup, Inc. and Chairman, President and CEO of Smith Barney Fund Management, Travelers Investment Adviser, Inc. and Citifund Management, Inc.;

95.    Carol L. Colman ("Colman") - Colman was a Director or Trustee charged with overseeing thirty-five or more of SSB's funds including, the Salomon Brothers Capital Fund;

96.    Daniel P. Cronin ("Cronin") - Cronin was a Director or Trustee charged with overseeing seven or more of SSB's funds including, the Salomon Brothers Capital Fund;

97.     Leslie H. Gelb ("Gelb") - Gelb was a Director or Trustee charged with overseeing thirty-two or more of SSB's funds including, the Salomon Brothers Capital Fund;

98.     William R. Hutchinson ("Hutchinson") - Hutchinson was a Director or Trustee charged with overseeing forty-two or more of SSB's funds including, the Salomon Brothers Capital Fund;

99.     Jeswald W. Salacuse ("Salacuse") – Salacuse was a Director or Trustee charged with overseeing thirty-two or more of SSB's funds including, the Salomon Brothers Capital Fund;

100.    Andrew L. Breech ("Breech") – Breech was a Director or Trustee charged with overseeing four or more of SSB's funds including, the Salomon Brothers Capital Fund;

101.    William R. Dill ("Dill") – Dill was a Director or Trustee charged with overseeing four or more of SSB's funds including, the Salomon Brothers Capital Fund;

102.    Clifford M. Kirtland, Jr. ("Kirtland") – Kirtland was a Director or Trustee charged with overseeing four or more of SSB's funds including, the Salomon Brothers Capital Fund;

103.    Louis P. Mattis ("Mattis") – Mattis was a Director or Trustee charged with overseeing three or more of SSB's funds including, the Salomon Brothers Capital Fund;

104.    Thomas F. Schlafly ("Schlafly") – Schlafly was a Director or Trustee charged with overseeing three or more of SSB's funds including, the Salomon Brothers Capital Fund;

105.    Lee Abraham ("Abraham") – Abraham was a Director or Trustee charged with overseeing twenty-eight or more of SSB's funds including, the Smith Barney Large Cap Value Fund;

106.    Allan J. Bloostein ("Bloostein") – Bloostein was a Director or Trustee charged with overseeing thirty-five or more of SSB's funds including, the Smith Barney Large Cap Value Fund;

107.    Jane F. Dasher ("Dasher")  - Dasher was a Director or Trustee charged with overseeing twenty-eight or more of SSB's funds including, the Smith Barney Large Cap Value Fund;

108.    Paul Hardin ("Hardin") – Hardin was a Director or Trustee charged with overseeing thirty-five or more of SSB's funds including, the Smith Barney Large Cap Value Fund;

109.    Roderick Rasmussen ("Rasmussen") – Rasmussen was a Director or Trustee charged with overseeing twenty-eight or more of SSB's funds including, the Smith Barney Large Cap Value Fund;

110.    John P. Toolan ("Toolan") – Toolan was a Director or Trustee charged with overseeing twenty-eight or more of SSB's funds including, the Smith Barney Large Cap Value Fund;

111.    Donald R. Foley ("Foley") – Foley was a Director or Trustee charged with overseeing twenty-eight or more of SSB's funds including, the Smith Barney Large Cap Value Fund;

112.    Richard E. Hanson, Jr. ("Hanson") – Hanson was a Director or Trustee charged with overseeing twenty-eight or more of SSB's funds including, the Smith Barney Large Cap Value Fund;

113.    Paul Ades ("Ades") – Ades was a Director or Trustee charged with overseeing fifteen or more of SSB's funds including the Smith Barney Aggressive Growth Fund;

- 34 -

114.    Herbert Barg ("Barg") – Brag was a Director or Trustee charged with overseeing forty-two or more of SSB's funds including, the Smith Barney Large Cap Growth Fund, Smith Barney Mid Cap Core Fund, and Smith Barney Technology Fund;

115.    Dwight B. Crane ("Crane") – Crane was a Director or Trustee charged with overseeing forty-nine or more of SSB's funds including, the Smith Barney Aggressive Growth Fund, Smith Barney Appreciation Fund, Smith Barney Mid Cap Core Fund, Smith Barney Premier Selections Global Growth Fund, Smith Barney Technology Fund, and Smith Barney Allocation Series Fund - High Growth Portfolio;

116.    Frank G. Hubbard ("Hubbard") – Hubbard was a Director or Trustee charged with overseeing fifteen or more or more of SSB's funds including, the Smith Barney Aggressive Growth Fund, and the Smith Barney Premier Selections Global Growth Fund;

117.    Jerome H. Miller – Jerome Miller was a Director or Trustee charged with overseeing fifteen or more of SSB's funds including, the Smith Barney Aggressive Growth Fund;

118.    Ken Miller - Ken Miller was a Director or Trustee charged with overseeing fifteen or more of SSB's funds including, the Smith Barney Aggressive Growth Fund, and the Smith Barney Premier Selections Global Growth Fund;

119.    Burt N. Dorsett ("Dorsett") – Dorsett was a Director or Trustee charged with overseeing twenty-seven or more of SSB's funds including, the Smith Barney Large Cap Growth Fund, Smith Barney Appreciation Fund, Smith Barney Mid Cap Core Fund, and Smith Barney Technology Fund;

120.    Elliot S. Jaffe ("Jaffe") – Jaffe was a Director or Trustee charged with overseeing twenty-seven or more of SSB's funds including, the Smith Barney Large Cap Growth Fund,

Smith Barney Appreciation Fund, Smith Barney Mid Cap Core Fund, and Smith Barney Technology Fund;

121.   Stephen E. Kaufman ("Kaufman") – Kaufman was a Director or Trustee charged with overseeing fifty-six or more of SSB's funds including, the Smith Barney Large Cap Growth Fund, Smith Barney Appreciation Fund, Smith Barney Mid Cap Core Fund, Smith Barney Allocation Series Fund - High Growth Portfolio, and Smith Barney Technology Fund;

122.   Joseph J. McCann ("McCann") – McCann was a Director or Trustee charged with overseeing twenty-seven or more of SSB's funds including, the Smith Barney Large Cap Growth Fund, Smith Barney Appreciation Fund, Smith Barney Mid Cap Core Fund, and Smith Barney Technology Fund;

123.   Cornelius C. Rose, Jr. ("Rose") – Rose was a Director or Trustee charged with overseeing twenty-seven or more of SSB's funds including, the Smith Barney Appreciation Fund, Smith Barney Mid Cap Core Fund, Smith Barney Technology Fund, and the Smith Barney Large Cap Growth and Value Fund;

124.   H. John Ellis ("Ellis") – Ellis was a Director or Trustee charged with overseeing thirty-four or more of SSB's funds including, the Smith Barney Allocation Series Fund - High Growth Portfolio;

125.   Armon R. Kamesar ("Kamesar") – Kamesar was a Director or Trustee charged with overseeing thirty-four or more of SSB's funds including, the Smith Barney Allocation Series Fund - High Growth Portfolio; and

126.   John J. Murphy ("Murphy") – Murphy was a Director or Trustee charged with overseeing thirty-four or more of SSB's funds including, the Smith Barney Allocation Series Fund - High Growth Portfolio.

127.    These purportedly "non-interested" Directors routinely followed the Investment Adviser Defendants' suggested courses of action by rubber stamping fees and arrangements which prejudiced the Funds' investors.[23]  As a result, even if the Directors were considered "independent," they failed to fulfill their duties with the care and conscientiousness necessary to ensure that the fees paid to Defendants from Fund and investor assets were reasonable and not excessive.  Specifically, the Directors failed to genuinely consider and recognize that the Funds should be considered individually for purposes of evaluating their fees instead of as part of a fund family unit; that no economies of scale were passed to the Funds or their investors as the Funds grew; that the fees were significantly more expensive than comparable funds; and that the advisory fees should be reduced to reflect the "fall-out" benefits received by Defendants.

128.    Moreover, the Directors knew that the cost of the aforementioned revenue sharing and directed brokerage payments should have been borne by Defendants as their own out-of-pocket expenses, yet the Directors did nothing to prevent the siphoning of these payments from Fund and investor assets or to appropriately reduce the advisory fee.

129.    Moreover, the Directors failed to recognize that directed brokerage had been used to pay for distribution of the Fund shares, and that since brokerage commissions are Fund assets, they should have been reflected in a 12b-1 plan.  This failure to act prejudiced the Funds and their investors and resulted in the Funds and their investors paying excessive distribution fees.

130.    Another of these instances was the Directors' lack of action with respect to the fee levels and structures in place for the Funds.  Again, by failing to act to reduce the Funds' fees, the Directors neglected to represent the Funds and their investors with the degree of care and conscientiousness required of them.  *See supra* ¶¶87-92.  The SEC has made clear that it is the

---

[23] Gerken is reported to be an interested director.

duty of the Directors to carefully scrutinize the advisory and other fees to ensure that the economies of scale are being passed to investors as fund assets grow so that the increases in advisory and other fees are not a windfall to the investment advisers and their affiliates:

> If the fund or fund family is experiencing economies of scale, fund directors have an obligation to ensure that fund shareholders share in the benefits of the reduced costs by, for example, requiring that the adviser's fees be lowered, breakpoints be included in the adviser's fees, or that the adviser provide additional services under the advisory contract. If the fund or fund family is not experiencing economies of scale, then the directors may seek to determine from the adviser how the adviser might operate more efficiently in order to produce economies of scale as fund assets grow.

SEC, Division of Investment Management: Report on Mutual Fund Fees and Expenses available at: http://www.sec.gov/news/studies/feestudy.htm.

131.    In addition, in order for the Directors to fulfill their responsibilities regarding the charging of Rule 12b-1 fees, the Directors must understand the Funds' distribution system as a whole so that the 12b-1 fees can be placed in the appropriate context. To do this, the Directors must understand what the primary distribution channels are, what the Funds and the advisers are paying to use these channels, whether the distribution efforts are succeeding, and whether there are resulting economies of scale which benefit the investors. The Directors failed to obtain this necessary information, and their failure to do so prejudiced the Funds and their investors.

132.    While Fund assets were used to encourage the growth of the Fund, the Funds received no benefits in return. The Directors continually allowed Fund assets to be used for only the benefit of the Investment Adviser Defendants and their affiliates.    As purportedly "independent" Directors, they had a duty to question the Investment Adviser Defendants' and their affiliates' practices, and to ensure that any economies of scale that were being realized from the increase in the Funds' assets were being passed on to the Funds. The Directors ultimately failed to exercise the requisite care and conscientiousness in performing their statutory duties by

- 38 -

approving a course of action suggested by the Investment Adviser Defendants that was of no benefit to the Funds or their investors. The Directors' approval of such actions, which prejudiced the Funds and their investors, further demonstrates that they were controlled by the Investment Adviser Defendants.

133. The SEC has set forth several additional factors relevant to a determination of whether the presumption that the Directors are not "controlled" persons under the ICA may be rebutted. These factors include: (1) Director affiliations with the controlling party; (2) selection or nomination of the Director by the controlling party; (3) the Directors' independent knowledge of corporate affairs; and (4) the amount of time spent by directors at meetings. *See* First Australia Fund, Inc. SEC No-Action Letter, 1987 WL 108483 (S.E.C.), at *7 (Oct. 8, 1987). These factors also rebut the Directors' presumption of "independence."

**Independent Knowledge of Corporate Affairs**

134. The mutual fund industry and its distribution and fee structures are not simple to understand. For this reason, it is critical that the Directors responsible for overseeing the fee agreements of a fund have experience in the mutual fund arena. Yet many of the Fund Directors lacked the experience necessary to fulfill their duties as "watchdogs" of the Funds, and this lack of experience prejudiced the Funds and their investors. This lack of knowledge strongly supports a finding of excessive fees.

135. These Directors' backgrounds illustrate that some of them lacked the financial experience necessary to understand the different mutual fund fee structures and adequately represent shareholders.

**Amount of Time Spent by Directors at Meetings**

136. The purportedly "independent" Directors' receive handsome compensation for what amounts to, at best, part-time work. Moreover, for many of them, given the huge number

- 39 -

of Portfolios they oversee and their concurrent high level positions with other companies, it is

unlikely that the Directors could devote the amount of time required to prepare properly for the

Board Meetings and analyze the fees for all of those Portfolios. As such, they relied on the

Investment Adviser Defendants to set the fees and essentially rubber-stamped them.

137.   Moreover, in addition to these factors, the Directors were biased and not

disinterested and failed to conduct arm's-length bargaining with Defendants on behalf of the

Funds and their investors because, *inter alia*, they acquiesced in revenue sharing agreements

with broker-dealers and, failed to obtain the information necessary to evaluate the existence of

and pass on the Funds' economies of scale, which prejudiced the Funds and their investors.

138.   As explained by Paul Roye, Director, Division of Investment Management of the

U.S. Securities & Exchange Commission:

> Independence in my view is how you analyze and approach the issues
> before you. Is your central consideration what's in the shareholder's best
> interest? If so, you are functioning independently. While you need not be
> antagonistic toward management of the fund, you need to recognize that
> management's interests aren't always aligned with the shareholders of the
> fund and sometimes constructive skepticism is called for. The regulatory
> framework and the nature of the mutual fund business, creates a healthy
> tension between a fund's management and the independent directors.
> Sometimes it is necessary to probe and challenge to identify potential areas
> of concern before they become significant problems.

Speech by SEC Staff: What Does It Take To Be an Effective Independent Director of a Mutual

Fund? (Apr. 14, 2000), available at http://www.sec.gov/news/speech/spch364.htm (emphasis

added).   As indicated, if the Directors were in fact acting independently, they would have

performed at least a minimal amount of constructive skepticism, or probed into the issues that are

alleged herein. "[D]espite th[e] congressionally mandated 'watchdog' role, trustees have

acquiesced too readily to the demands of fund management companies, failing to ... [*inter alia*]

question excessive fees. . . ."   Julie Hembrock Daum and Richard Lannamann, Rising

- 40 -

Expectations: Mutual fund directors called to create a culture of independence, June 2004, available at http://www.spencerstuart.com/research/boards/679/.

139.    Regardless of whether the Directors were "controlled" by the Investment Adviser Defendants, by failing to obtain the information necessary to inform themselves about the reasonableness of the fees charged to the Funds and by approving fee arrangements that prejudiced the Funds and their investors, the Directors failed to effectively represent the Funds and their investors through arm's-length bargaining.

### FIRST CLAIM FOR RELIEF

#### (against the Investment Adviser Defendants pursuant to Section 36(b) of the Investment Company Act)

140.    Plaintiffs repeat and reallege each and every allegation contained above and otherwise incorporate the allegations contained above.

141.    This Claim is brought against the Investment Adviser Defendants for breach of their fiduciary duties as defined by Section 36(b) of the Investment Company Act.

142.    The Investment Adviser Defendants had a fiduciary duty to the Funds with respect to the receipt of compensation for services and of payments of a material nature made by and to the Investment Adviser Defendants.

143.    As set forth herein, the Investment Adviser Defendants violated Section 36(b) by charging the Funds investment advisory fees that were disproportionate to the services rendered and which would not have been negotiated in an arm's-length transaction.

144.    The conduct alleged herein had the purpose and effect of significantly increasing the size of the Funds. Because the Investment Advisers Defendants' advisory fees were calculated as a percentage of the assets under management, the conduct alleged herein resulted in a significant increase in the investment advisory fees paid to the Investment Adviser Defendants.

- 41 -

The Funds received no benefit from these payments or the increase in Fund size, because Defendants failed to pass on to the Funds the benefits of any economies of scale generated by the increase in Fund size.

145.   By reason of the conduct described above, the Investment Adviser Defendants violated Section 36(b) of the Investment Company Act.

146.   As a direct, proximate and foreseeable result of the Investment Adviser Defendants' breach of their fiduciary duty in their role as investment advisers to the Funds, the Funds have incurred millions of dollars in damages.

### SECOND CLAIM FOR RELIEF

#### (against the Distributor Defendant pursuant to Section 36(b) of the Investment Company Act)

147.   Plaintiffs repeat and reallege each and every allegation contained above and otherwise incorporate the allegations contained above.

148.   This Claim is brought against the Distributor Defendant for breach of its fiduciary duties as defined by Section 36(b) of the Investment Company Act.

149.   The Distributor Defendant had a fiduciary duty to the Funds with respect to the receipt of compensation for services and of payments of a material nature made by and to the Distributor Defendant.

150.   As set forth herein, the Distributor Defendant violated Section 36(b) by improperly charging the Funds purported Rule 12b-1 marketing fees that were disproportionate to the services rendered and which would not have been negotiated in an arm's-length transaction.

151.   As set forth herein, the Distributor Defendant received Rule 12b-1 fees to make payments that had the purpose and effect of significantly increasing the size of the Funds. The

Funds received no benefit from these payments or the increase in Fund size, because Defendants failed to pass on to the Funds the benefits of any economies of scale generated by the increase in Fund size.

152.    By reason of the conduct described above, the Distributor Defendant violated Section 36(b) of the Investment Company Act.

153.    As a direct, proximate and foreseeable result of the Distributor Defendant's breach of its fiduciary duty in its role as the Funds' distributor, the Funds have incurred millions of dollars in damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment as follows:

A.    Awarding compensatory damages in favor of Plaintiffs on behalf of the Proprietary Funds against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.    Awarding Plaintiffs rescission of the Funds' contracts with the Investment Adviser Defendants, where appropriate, and recovery of all attendant fees that would otherwise apply and recovery of all fees paid to the Investment Adviser Defendants pursuant to such agreements;

C.    Enjoining Defendants from charging excessive fees, as alleged herein;

D.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.    Granting such other and further relief as the Court may deem just and proper.

- 43 -

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: New York, New York
October 16, 2006

Respectfully submitted,

Jay W. Eisenhofer (JE-5503)
Sidney S. Liebesman (SL-8444)
James J. Sabella (JS-5434)
GRANT & EISENHOFER P.A.
45 Rockefeller Center
New York, New York  10111
Tel:    (646) 722-8500
Fax:    (212) 755-6503

*Lead Counsel for the Class*

MILBERG WEISS BERSHAD &
    SCHULMAN LLP
Jerome M. Congress (JC-2060)
Janine L. Pollack (JP-0178)
One Pennsylvania Plaza
New York, NY  10119-0165
Tel:    (212) 594-5300

# EXHIBIT A

## Correlations Across Selected SSB Equity Funds

| | Salomon Brothers Capital Fund | Smith Barney Aggressive Growth | Smith Barney Allocation Series High Growth | Smith Barney Appreciation | Smith Barney Large Cap Growth | Smith Barney Large Cap Value | Smith Barney Mid Cap Core | Smith Barney Premier Selections Global Growth | Smith Barney Technology |
|---|---|---|---|---|---|---|---|---|---|
| Salomon Brothers Capital Fund | 1 | | | | | | | | |
| Smith Barney Aggressive Growth | 0.89*** | 1 | | | | | | | |
| Smith Barney Allocation Series High Growth | 0.90*** | 0.91*** | 1 | | | | | | |
| Smith Barney Appreciation | 0.83*** | 0.84*** | 0.93*** | 1 | | | | | |
| Smith Barney Large Cap Growth | 0.82*** | 0.84*** | 0.93*** | 0.96*** | 1 | | | | |
| Smith Barney Large Cap Value | 0.90*** | 0.87*** | 0.93*** | 0.95*** | 0.96*** | 1 | | | |
| Smith Barney Mid Cap Core | 0.87*** | 0.81*** | 0.95*** | 0.87*** | 0.84*** | 0.86*** | 1 | | |
| Smith Barney Premier Selections Global Growth | 0.87*** | 0.93*** | 0.95*** | 0.93*** | 0.90*** | 0.93*** | 0.85*** | 1 | |
| Smith Barney Technology | 0.78*** | 0.75*** | 0.89*** | 0.77*** | 0.76*** | 0.75*** | 0.90*** | 0.80*** | 1 |

*** denotes statistically significant at 1%.

Entries represent correlation coefficients between monthly returns (net of expenses) over the period January 2003 through December 2004.